**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No.:  _____**

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO
INDEMNITY CO., GEICO GENERAL INSURANCE
COMPANY and GEICO CASUALTY CO.,

      Plaintiffs,                                                               **Jury Trial Demand**

vs.

MARK A. CERECEDA, D.C., CEDA ORTHOPEDICS &
INTERVENTIONAL MEDICINE OF DOWNTOWN/LITTLE
HAVANA, L.L.C. d/b/a 388-CEDA, CEDA ORTHOPEDICS &
INTERVENTIONAL MEDICINE OF F.I.U./KENDALL, L.L.C.
d/b/a 388-CEDA, CEDA ORTHOPEDICS &
INTERVENTIONAL MEDICINE OF HIALEAH, L.L.C. d/b/a
388-CEDA, CEDA ORTHOPEDICS & INTERVENTIONAL
MEDICINE OF SOUTH MIAMI, L.L.C. d/b/a 388-CEDA, CEDA
ORTHOPEDICS & INTERVENTIONAL MEDICINE OF
CUTLER BAY, LLC d/b/a 388-CEDA, SPRINGS CROSSING
IMAGING, L.L.C., ROY CANIZARES, D.C., EDGAR
FACUSEH, D.C., VIRGINIA FATATO D.C., PATRICK LOUIS
FENELUS, D.C., THOMAS HABAN, D.C., KARIM HABAYEB,
D.C., ERIC REESE, D.C., JOHN P. ROSS, D.C., MICHAEL B.
SCHULMAN, D.C., RICHARD M. YOHAM, D.C., ALEX
ALONSO, M.D., MARIA CRISTINA CRESPO-SMITH, M.D.,
NESTOR JOAQUIN JAVECH, M.D., ROBERTO MOYA, M.D.,
HERNAN PABON, M.D., JORGE AGUAYO, BLANCA
BAIRES, OMAIDA CEBALLOS, YESSICA HERNANDEZ,
YUNELKYS HIDALGO, YUNEILIS NUNEZ, ASUNCION
OTERO, NITTE PAREDES, MARIA G PASCUCCI, YELINA M
HUNTER PENA, MARTA AUDREU RODRIGUEZ, MAYELIN
BRITO SANCHEZ, YUSLEIVYS GOMEZ SOTO, and YANET
BARBARA ZAPATA,

      Defendants.

_____/

1

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows:

1. This action seeks to recover more than $20,000,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Ceda Orthopedics & Interventional Medicine of Downtown/Little Havana, L.L.C. d/b/a 388-CEDA ("CEDA Downtown"), Ceda Orthopedics & Interventional Medicine of F.I.U./Kendall, L.L.C. d/b/a 388-CEDA ("CEDA Kendall"), Ceda Orthopedics & Interventional Medicine of Hialeah, L.L.C. d/b/a 388-CEDA ("CEDA Hialeah"), Ceda Orthopedics & Interventional Medicine of South Miami, L.L.C. d/b/a 388-CEDA ("CEDA Miami"), Ceda Orthopedics & Interventional Medicine of Cutler Bay, LLC d/b/a 388-CEDA ("CEDA Cutler Bay"), and Springs Crossing Imaging, L.L.C. ("Springs Crossing"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including initial examinations, follow-up examinations, pain management injections, diagnostic imaging services, physical therapy services and/or chiropractic services (collectively, the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent PIP claims that Defendants have submitted or caused to be submitted through CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing, because:

(i)     at all relevant times, CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay, operated in violation of: (a) the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable; (b) Florida's Patient Self-Referral Act, Fla. Stat. § 456.053 (the "Self-Referral Act"); and (c) Florida law regulating advertising by chiropractors, Fla. Stat. § 460.413, F.A.C. Rule 64B2-15.001 (the "Chiropractor Advertising Laws");

(ii)    at all relevant times, Springs Crossing operated in violation of Florida's Self-Referral Act and the Clinic Act.

(iii)   the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – in pervasive violation of the Self-Referral Act, the Clinic Act, the Chiropractor Advertising Laws, and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(v)     in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by individuals who lacked the requisite licenses necessary to perform the services without supervision;

(vi)    in many cases, the Fraudulent Services never were provided in the first instance; and

(vii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3.      Defendants fall into the following categories:

(i)     Defendants CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay, through which the Fraudulent Services purportedly were performed and were billed to insurance companies, including GEICO, falsely purported to be properly-exempted health care clinics under the Clinic Act, and operated in pervasive violation of Florida's Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws.

(ii)     Defendant Springs Crossing, through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO, operated in pervasive violation of Florida's Self-Referral Act and the Clinic Act.

(iii)    Defendant Mark A. Cereceda, D.C. ("Cereceda") is a chiropractor licensed to practice chiropractic in Florida, who was the owner and managing member of CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing.

(iv)    Defendants Roy Canizares, D.C. ("Canizares"), Edgar Facuseh, D.C. ("Facuseh"), Virginia Fatato, D.C. ("Fatato"), Patrick Louis Fenelus, D.C. ("Fenelus"), Thomas Haban, D.C. ("Haban"), Karim Habayeb, D.C. ("Habayeb"), Eric Reese, D.C. ("Reese"), John P. Ross, D.C. ("Ross"), Michael B. Schulman, D.C. ("Schulman"), and Richard M. Yoham, D.C. ("Yoham") are chiropractors licensed to practice chiropractic in Florida, and purported to perform many of the Fraudulent Services on behalf of CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and/or CEDA Cutler Bay.

(v)    Defendants Alex Alonso, M.D. ("Alonso"), Maria Cristina Crespo-Smith, M.D. ("Crespo-Smith"), Nestor Joaquin Javech, M.D. ("Javech"), Roberto Moya, M.D. ("Moya"), and Hernan Pabon, M.D. ("Pabon") are physicians licensed to practice medicine in Florida, and purported to perform many of the Fraudulent Services on behalf of CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and/or Springs Crossing.

(vi)    Defendant Jorge Aguayo ("Aguayo") was licensed as a registered chiropractic assistant in Florida, and purported to perform many of the Fraudulent Services on behalf of CEDA Kendall.

(vii)    Defendant Blanca Baires ("Baires") is licensed as a registered chiropractic assistant in Florida, and purported to perform many of the Fraudulent Services on behalf of CEDA Kendall.

(viii)    Defendants Omaida Ceballos ("Ceballos"), Nitte Paredes ("Paredes"), and Maria G Pascucci ("Pascucci") are licensed as massage therapists and registered chiropractic assistants in Florida, and purported to perform many of the Fraudulent Services on behalf of CEDA Kendall and/or CEDA Miami.

(ix)    Defendants Yessica Hernandez ("Hernandez"), Yunelkys Hidalgo ("Hidalgo"), Yuneilis Nunez ("Nunez"), Asuncion Otero ("Otero"), Yelina M Hunter Pena ("Pena"), Marta Audreu Rodriguez ("Rodriguez"), and Yusleivys Gomez Soto ("Soto") are licensed as massage therapists in Florida, were previously licensed as registered chiropractic assistants in Florida, and purported to perform many of the Fraudulent Services on behalf of CEDA Downtown, CEDA Kendall, CEDA Hialeah, and/or CEDA Miami.

(x)    Defendants Mayelin Brito Sanchez ("Sanchez") and Yanet Barbara Zapata ("Zapata") are licensed as massage therapists in Florida, and purported to perform many of the Fraudulent Services on behalf of CEDA Downtown, CEDA Kendall, and/or CEDA Miami.

4.    As set forth below, Defendants at all relevant times have known that:

(i)    Defendants CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay operated in pervasive violation of the Clinic Act, the Self-Referral Act, and Chiropractor Advertising Laws, rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)    Defendant Springs Crossing operated in pervasive violation of the Self-Referral Act and the Clinic Act, rendering it ineligible to collect no-fault insurance benefits in the first instance, and rendering its no-fault insurance charges noncompensable and unenforceable;

(iii)    the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – in pervasive violation of the Self-Referral Act, the Clinic Act, and the Chiropractor Advertising Laws, and pursuant to a pre-determined fraudulent protocol designed to solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(v)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by individuals who lacked the requisite licenses necessary to perform the services without supervision;

(vi)    in many cases, the Fraudulent Services never were provided in the first instance; and

(vii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provide in order to fraudulently inflate the charges submitted to GEICO.

5.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing.

6.      The charts annexed hereto as Exhibits "1" – "6" set forth a representative sample of the fraudulent claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO.

7.      Defendants' fraudulent scheme began no later than 2013 and have continued uninterrupted since that time. As a result of Defendants' fraudulent schemes, GEICO has incurred damages of more than $20,000,000.00.

8.      Defendants' fraudulent scheme is the latest in a long line of insurance fraud scams aimed at Florida consumers and insurers. They are part of an insurance fraud epidemic that – in 2014 – 2015 alone – led to almost 1,200 convictions in Florida. See Florida Department of Financial Services, Division of Insurance Fraud Annual Report for Fiscal Year 2014-2015.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.     Defendants

10.     Defendant CEDA Downtown is a Florida limited liability company with its principal place of business in Miami, Florida. At all relevant times, CEDA Downtown falsely purported to be exempt from health care clinic licensure requirements pursuant to Fla. Stat. §

400.9905(4)(g). CEDA Downtown was organized in Florida on or about November 18, 2009, had Cereceda as its managing member and owner, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

11.     Defendant CEDA Kendall is a Florida limited liability company with its principal place of business in Miami, Florida. At all relevant times, CEDA Kendall falsely purported to be exempt from health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g). CEDA Kendall was organized in Florida on or about November 16, 2009, had Cereceda as its managing member and owner, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

12.     Defendant CEDA Hialeah is a Florida limited liability company with its principal place of business in Hialeah, Florida. At all relevant times, CEDA Hialeah falsely purported to be exempt from health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g). CEDA Hialeah was organized in Florida on or about November 17, 2009, had Cereceda as its managing member and owner, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

13.     Defendant CEDA Miami is a Florida limited liability company with its principal place of business in Miami, Florida. At all relevant times, CEDA Miami falsely purported to be exempt from health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g). CEDA Miami was organized in Florida on or about November 20, 2009, had Cereceda as its managing member and owner, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

14.     Defendant CEDA Cutler Bay is a Florida limited liability company with its principal place of business in Cutler Bay, Florida. At all relevant times, CEDA Cutler Bay operated

as an unlicensed health care clinic in Florida. CEDA Cutler Bay was organized in Florida on or about June 11, 2015, had Cereceda as its managing member and owner, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

15.     Defendant Springs Crossing is a Florida limited liability company with its principal place of business in Hialeah, Florida. At all relevant times, Springs Crossing falsely purported to be exempt from health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g). Springs Crossing was organized in Florida on or about January 23, 2014, had Cereceda as its managing member and owner, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

16.     Defendant Cereceda resides in and is a citizen of Florida. Cereceda was licensed to practice chiropractic in Florida on January 6, 1995. Cereceda is not and never has been licensed as a physician. Cereceda was the managing member and owner of CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing, and used CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing as vehicles to submit fraudulent no-fault insurance billing to GEICO and other insurers.

17.     Cereceda has a history of involvement in insurance fraud schemes.

18.     For example, on February 8, 2008, United Automobile Insurance Company ("United Automobile") sued Cereceda, Florida Wellness & Rehabilitation Center, Cereceda & Associates, D.C., P.A., and Mark A. Cereceda, D.C., P.A. in the United States District Court for the Southern District of Florida in an action entitled United Automobile Insurance Company v. Florida Wellness & Rehabilitation Center, et al., Case No. 1:08-cv-20348-JAL (the "United Automobile-Cereceda Action").

19.     In the United Automobile-Cereceda Action, United Automobile alleged – among other things – that the defendants engaged in a pattern of fraudulent upcoding of CPT codes and that the defendants unbundled their charges for physical therapy modalities and then fraudulently charged for unbundled billing codes. Based on these allegations, among others, United Automobile asserted civil RICO and other fraud-based claims against Cereceda and his co-defendants.

20.     Several months after the court denied the defendants' motion to dismiss in the United-Cereceda Action, the case settled on undisclosed terms.

21.     Then, on May 3, 2012, various State Farm insurance companies sued Cereceda, Metro Injury, LLC, and others in the United States District Court for the District of Minnesota, in an action entitled State Farm Mutual Automobile Insurance Company et al. v. Metro Injury, LLC et al., Case No. 0:12-cv-01087-DSD-SER (the "State Farm-Cereceda Action").

22.     Much as in the United-Automobile Cereceda Action, the plaintiff-insurers in the State Farm-Cereceda Action asserted fraud and related claims against Cereceda, Metro Injury, and others based on allegations that – among other things – the defendants fraudulently diagnosed insureds, directed and provided medically unnecessary chiropractic care that was not tailored to or designed to benefit the insureds' unique needs, and that the bills and related documents submitted to the plaintiff-insurers were fraudulent because the services were either not performed or were not medically necessary.

23.     The State Farm-Cereceda Action settled on undisclosed terms during discovery.

24.     Then, on January 4, 2017, State Farm Mutual Automobile Insurance Company sued Cereceda, Performance Orthopaedics & Neurosurgery, LLC d/b/a Calhoun Orthopaedics & Neurosurgery, and others in the United States District Court for the Southern District of Florida, in an action entitled State Farm Mutual Automobile Insurance Company v. Performance

9

Orthopaedics & Neurosurgery, LLC et al., Case No. 1:17-cv-20028-KMM (the "Second State Farm-Cereceda Action").

25.     The plaintiff-insurer in the Second State Farm-Cereceda Action asserted fraud-based claims against Cereceda, Performance Orthopaedics, and others based on allegations that – among other things – the defendants were engaged in an unlawful referral scheme.

26.     Then, in 2018, the Second State Farm-Cereceda Action settled on undisclosed terms.

27.     What is more, upon information and belief based on publicly-available reports, on or about February 22, 2013, Cereceda was arrested for orchestrating illegal campaign contributions to numerous Florida elected officials. The alleged crime involved Cereceda asking over 30 of his employees in six of his chiropractic clinics to contribute to various political campaigns throughout Florida, with the understanding that Cereceda then would reimburse their contributions.

28.     Then, on April 3, 2013, Cereceda pleaded guilty to three counts of misdemeanor illegal campaign contributions, for which he served three days in jail and was required to pay a large fine, among other things.

29.     What is more, in March 2012 the Investigative Panel of the Florida Judicial Qualifications Commission issued a Notice of Formal Charges instituting formal proceedings against a Florida County Judge, Ana M. Pando, to inquire into charges that Judge Pando violated the Code of Judicial Conduct based on allegations that:

(i)     On October 14, 2011, while a sitting County Judge, Judge Pando wrote to the Florida Division of Corporations on judicial letterhead stating that a Florida corporation, Florida Wellness & Rehabilitation Center, Inc., had been inadvertently closed.

(ii)    Judge Pando's letter asserted that the corporation's president, Cereceda, "'was not involved in the decision in any fashion as it was exclusively a clerical error on the part of the accountant.' [Judge Pando] attached an affidavit from an accountant, and

[Judge Pando] stated that [she] saw 'no reason not to reinstate the abovementioned corporation.'"

(iii)  "At the time [Judge Pando] wrote the letter, the corporation had been dissolved for 163 days. There was no case before [Judge Pando] that would have necessitated [Judge Pando] to contact the Division of Corporations as part of [Judge Pando's] judicial duties. [Judge Pando's] actions, on behalf on Mr. Cereceda, constitute the practice of law, which is forbidden by the Code of Judicial Conduct. The use of judicial stationery additionally burdens [Judge Pando's] actions by lending the prestige of judicial office to a private interest."

(iv)  "[Judge Pando] [was] a candidate for re-election for Dade County Judge, Group 10. On November 11, 2011, [Judge Pando] received four (4) $500.00 campaign contributions from corporate entities owned or controlled by Mark Cereceda identified on [Judge Pando's] 'Campaign Treasurer's Report - Itemized Contributions' for the period ending December 31, 2011, as Fla Wellness Little Havana, Fla Wellness FIU, Fla Wellness So Miami, and Fla. Wellness Hialeah."

(v)  "Mr. Cereceda is a friend of [Judge Pando]. He approached [Judge Pando] and asked for a court order to reinstate his corporation. While [Judge Pando] correctly surmised that [Judge Pando] could not issue a court order, [Judge Pando] instead wrote a letter that was treated as an order by the Division of Corporations."

(vi)  "[Judge Pando] had previously instructed Mr. Cereceda not to file cases regarding his various corporate entities that would come before [Judge Pando] because [Judge Pando] felt that [Judge Pando's] social relationship with him was too close. However at the time [Judge Pando] wrote the letter, [Judge Pando] had cases before [Judge Pando] that involved corporate entities owned or controlled by Mr. Cereceda. The Florida Supreme Court previously reprimanded [Judge Pando]. In re Pando, 903 So. 2d 902 (Fla. 2005). In that case, [Judge Pando] stipulated that [Judge Pando] knowingly or recklessly accepted improper campaign contributions. The fact and the timing of the campaign contributions by Mr. Cereceda through his corporate entities, coupled with [Judge Pando's] actions on behalf of Mr. Cereceda, give the appearance of impropriety."

30.  The Notice of Formal Charges further stated that "[t]hese acts, if they occurred as alleged, would impair the confidence of the citizens of this State in the integrity of the judicial system and in [Judge Pando] as a judge; would constitute a violation of the Preamble and Canons of the Code of Judicial Conduct; would constitute conduct unbecoming a member of the judiciary; would demonstrate [Judge Pando's] unfitness to hold the office of judge; and would warrant

discipline, including, but not limited to, [Judge Pando's] removal from office and/or any other appropriate discipline recommended by the Florida Judicial Qualifications Commission."

31.     In April 2012, Judge Pando responded to the allegations of the Investigative Panel of the Florida Judicial Qualifications Commission and admitted, among other things, that Cereceda was a friend of hers and that Cereceda approached Judge Pando and asked for a court order to reinstate his corporation.

32.     Upon information and belief based on publicly-available reports, the probe into Judge Pando's alleged ethics violations eventually was dropped when she lost the re-election and she agreed not to run again.

33.     Upon information and belief, Cereceda's personal and professional history – including his criminal history and record of alleged involvement in no-fault insurance fraud schemes, which can be located via simple internet searches – made it practically impossible for him to obtain legitimate employment as a chiropractor, and contributed to his decision to participate in the fraudulent scheme described herein.

34.     Defendant Canizares resides in and is a citizen of Florida. Canizares was licensed to practice chiropractic in Florida on July 12, 1999. Canizares purported to perform many of the Fraudulent Services on behalf of CEDA Downtown.

35.     Defendant Facuseh resides in and is a citizen of Florida. Facuseh was licensed to practice chiropractic in Florida on December 3, 2008. Facuseh purported to perform many of the Fraudulent Services on behalf of CEDA Downtown.

36.     Defendant Fatato resides in and is a citizen of Florida. Fatato was licensed to practice chiropractic in Florida on April 13, 1987. Fatato purported to perform many of the Fraudulent Services on behalf of CEDA Hialeah.

12

37.     Fatato has a history of criminal and professional misconduct which resulted in discipline from the New Jersey Board of Chiropractic Examiners (the "New Jersey Board of Chiropractic") and the Florida State Board of Chiropractic Medicine (the "Florida Board of Chiropractic").

38.     In January 1998, Fatato pleaded guilty in New Jersey Superior Court to one count of theft by deception in the third degree and one count of falsifying records in the fourth degree. Fatato was sentenced to one day in jail and two years of probation.

39.     Following Fatato's criminal convictions, the Attorney General of New Jersey commenced a disciplinary action against Fatato with the New Jersey Board of Chiropractic. The Attorney General of New Jersey alleged, among other things, that:

(i)     Fatato's convictions of theft by deception in the third degree and falsifying records in the fourth degree constituted convictions for crimes involving "moral turpitude" as well as crimes "relating adversely to activity regulated by the Board" pursuant to N.J.S.A. 45:1-21(f), and that such convictions were grounds for suspension or revocation of a license to practice chiropractic in New Jersey.

(ii)    Fatato had submitted billing records to insurance companies knowing that the patients on whose behalf the bills were submitted had not received the treatment, and Fatato had changed or altered patient records in furtherance of her fraudulent activity.

(iii)   Fatato had engaged in fraud, deception, and misrepresentation in her practice of chiropractic in violation of N.J.S.A. 45:1-21(b); she engaged in professional misconduct, in violation of N.J.S.A. 45:1-21(e); and she had failed to maintain good moral character as required for continued licensure by N.J.S.A. 45:9-41.5.

40.     In 2001, following a hearing, the New Jersey Board of Chiropractic found, among other things, that:

(i)     Fatato had been convicted of crimes involving moral turpitude as well as crimes relating adversely to the practice of chiropractic, which were grounds for the suspension or revocation of her license to practice chiropractic.

(ii)    The factual allegations constituted violations of N.J.S.A. 45:1-21(b) and N.J.S.A. 45:1-21(e); and demonstrated that Fatato failed to maintain the good moral

character required, on an ongoing basis, by <u>N.J.S.A.</u> 45:9-41.5 for her continued licensure.

(iii)     The offenses to which Fatato pleaded guilty "were extremely serious, not only as to the moral turpitude they displayed, but most significantly as to the considerable adverse impact such crimes, when committed by chiropractors, have upon the chiropractic profession as a whole … it is not in the best interest of the profession, or the public, to allow [Fatato's] acts to go without redress by this Board".

41.     Based upon the New Jersey Board of Chiropractic's findings, in May 2001, the New Jersey Board of Chiropractic entered a Final Decision and Order suspending Fatato's license to practice chiropractic for a period of five years, with the first two years to be served as a period of active suspension.

42.     Then, in June 2004, Fatato pleaded guilty in New Jersey Superior Court to one count of falsifying records. Fatato was sentenced to two years of probation.

43.     Then, in July 2005, the Florida State Department of Health filed an Administrative Complaint before the Florida Board of Chiropractic alleging, among other things, that Fatato did not report the following information to the Florida Board of Chiropractic in violation of Fla. Stat. §§§ 460.413(1)(c), 460.413(1)(b), and 456.072(1)(w):

(i)     In 1998, Fatato entered a guilty plea in New Jersey Criminal Indictment No. 13-05-07 to theft by deception and falsification of records related to charges that she submitted false PIP insurance claims and altered patient records.

(ii)    In 2001, the New Jersey Board of Chiropractic entered a Final Order suspending Fatato's license for five years for the acts related to New Jersey Criminal Indictment No. 13-05-07.

(iii)   In 2004, Fatato entered a guilty plea to falsification of records in New Jersey Indictment No. S-190-12-02 related to charges that she made a false statement in a claim for disability benefits.

44.     In November 2005, the Florida Board of Chiropractic entered a Final Order in which the Florida Board of Chiropractic ordered that Fatato's license be suspended until Fatato appeared before the Board with the outcome of the action against her license in New Jersey.

45.     Then, in February 2007, the New Jersey Board of Chiropractic entered a Consent

Order in which it found, among other things, that:

(i)     On January 9, 1998, in New Jersey Superior Court, Fatato entered a guilty plea of one count of theft by deception in the third degree and one count of falsifying records in the fourth degree. Fatato had submitted billing records to insurance companies knowing that the patients on whose behalf the bills were submitted had not received the treatment, that she had knowingly received payment of approximately $17,963.00, and that Fatato had also changed or altered patient records in furtherance of her fraudulent activity.

(ii)    The New Jersey Board of Chiropractic suspended Fatato's license as a result of Fatato's 1998 criminal conviction.

(iii)   On June 28, 2004, in New Jersey Superior Court, Fatato entered a guilty plea to one count of falsifying records in the fourth degree in violation of N.J.S.A. 2C:21-4 and N.J.S.A. 2C:21-6. Fatato admitted that on or about October 15, 2000, she did utter or cause to be uttered a record or writing knowing that it contained false statements or information in order to deceive Massachusetts Mutual Life Insurance Company regarding a claim for her personal disability.

(iv)    Fatato's second conviction provided grounds for suspension or revocation of Fatato's license to practice chiropractic in New Jersey pursuant to N.J.S.A. 45:1-21(f), in that it constituted a separate and distinct criminal conviction for a crime involving "moral turpitude" through the falsification of claims to an insurance company, which also related adversely to the practice of chiropractic.

46.     Based upon the New Jersey Board of Chiropractic's findings, the New Jersey Board

of Chiropractic ordered – and Fatato agreed – that Fatato's license to practice chiropractic would

be suspended for a period of 10 years, with the first six years to be served as a period of active

suspension.

47.     Upon information and belief, Fatato's public history of criminal misconduct and

professional discipline – which can be located by prospective employers through a simple internet

search – has made it virtually impossible for Fatato to obtain legitimate employment as a

chiropractor, and made her amenable to participation in the Defendants' fraudulent scheme.

48.     Defendant Fenelus resides in and is a citizen of Florida. Fenelus was licensed to practice chiropractic in Florida on January 12, 2001. Fenelus purported to perform many of the Fraudulent Services on behalf of CEDA Hialeah.

49.     Fenelus has a history of criminal and professional misconduct which resulted in discipline from the Florida Board of Chiropractic.

50.     In 2011, the Florida State Department of Health filed an Administrative Complaint before the Florida Board of Chiropractic alleging, among other things, the following:

(i)     On or about December 8, 2010, in the Circuit Court for Broward County Florida, Fenelus pled no contest to one count of petit theft in violation of Fla. Stat. § 812.014(2)(e).

(ii)    The information to which Fenelus pled no contest asserted that between October 8, 2007 and November 16, 2007, Fenelus unlawfully and with the intent to defraud, or deceive with the intent to temporarily or permanently deprive Allstate Insurance Company, present or cause to be presented written or oral statements as part of, or in support of, claims for payment or other benefits pursuant to an insurance policy issued by Allstate Insurance Company to [M.C.], the insured, knowing that such statements contained false, incomplete, or misleading information concerning a fact or thing material to such claims.

(iii)   Fenelus failed to report his plea of no contest to the Board of Health in writing within 30 days.

(iv)    Fenelus' plea of no contest related to health care fraud.

(v)     Fenelus violated Fla. Stat. §§ 460.413(1)(ff) and 456.072(1)(c), by being convicted of, or entering a plea of guilty or nolo contendere to, any misdemeanor or felony, regardless of adjudication, in any jurisdiction which relates to health care fraud.

51.     Following a hearing before Florida Board of Chiropractic in August 2012, the Florida Board of Chiropractic ordered, among other things, that:

(i)     A board approved monitor would visit every practice location at which Fenelus worked, randomly select and review 10 patient files to determine whether proper care and treatment was being provided, and determine if Fenelus was maintaining proper patient and billing records.

16

(ii)     If the monitor determined Fenelus was providing proper care and treatment, and maintaining proper patient and billing records, the monitoring would cease. If not, then Fenelus would be placed on probation for two years.

(iii)    Fenelus would pay a fine in the amount of $1,024.19.

52.     Upon information and belief, Fenelus's public history of criminal misconduct and professional discipline – which can be located by prospective employers through a simple internet search – has made it virtually impossible for Fenelus to obtain legitimate employment as a chiropractor, and made him amenable to participation in the Defendants' fraudulent scheme.

53.     Defendant Haban resides in and is a citizen of Florida. Haban was licensed to practice chiropractic in Florida on June 25, 2003. Haban purported to perform many of the Fraudulent Services on behalf of CEDA Cutler Bay.

54.     Defendant Habayeb resides in and is a citizen of Florida. Habayeb was licensed to practice chiropractic in Florida on December 3, 2008. Habayeb purported to perform many of the Fraudulent Services on behalf of CEDA Hialeah and CEDA Miami.

55.     Defendant Reese resides in and is a citizen of Florida. Reese was licensed to practice chiropractic in Florida on January 29, 1998. Reese purported to perform many of the Fraudulent Services on behalf of CEDA Cutler Bay.

56.     Defendant Ross resides in and is a citizen of Florida. Ross was licensed to practice chiropractic in Florida on June 21, 2017. Ross purported to perform many of the Fraudulent Services on behalf of CEDA Hialeah.

57.     Defendant Schulman resides in and is a citizen of Florida. Schulman was licensed to practice chiropractic in Florida on January 21, 1997. Schulman purported to perform many of the Fraudulent Services on behalf of CEDA Miami.

17

58.     Defendant Yoham resides in and is a citizen of Florida. Yoham was licensed to practice chiropractic in Florida on January 26, 2000. Yoham purported to perform many of the Fraudulent Services on behalf of CEDA Kendall.

59.     Defendant Alonso resides in and is a citizen of Florida. Alonso was licensed to practice medicine in Florida on December 27, 2001. Alonso purported to perform many of the Fraudulent Services on behalf of Springs Crossing.

60.     Defendant Crespo-Smith resides in and is a citizen of Florida. Crespo-Smith was licensed to practice medicine in Florida on April 26, 2004. Crespo-Smith purported to perform many of the Fraudulent Services on behalf of CEDA Downtown, CEDA Kendall, CEDA Hialeah, and CEDA Miami.

61.     Defendant Javech resides in and is a citizen of Florida. Javech was licensed to practice medicine in Florida on January 5, 1983. Javech purported to perform many of the Fraudulent Services on behalf of CEDA Miami.

62.     Defendant Moya resides in and is a citizen of Florida. Moya was licensed to practice medicine in Florida on September 5, 1977. Moya purported to perform many of the Fraudulent Services on behalf of CEDA Kendall and CEDA Miami.

63.     Moya has a history of professional misconduct which resulted in discipline from the Florida State Board of Medicine (the "Board of Medicine").

64.     In late 1993, the Florida State Department of Business and Professional Regulation filed an Administrative Complaint against Moya with the Board of Medicine alleging, among other things, the following:

(i)     On or about July 23, 1990, Patient 1 – a 15 year old male – presented to Palm Springs General Hospital Emergency Room with injuries sustained when he jumped into a shallow pool and struck his head, losing consciousness. Emergency room physicians examined Patient 1, and Patient 1 underwent x-rays and a

computerized tomography ("CT") scan of his brain and cervical spine. The emergency room physicians placed Patient 1 in a soft collar and requested a consultation from Moya.

(ii)     Moya was unaware that a CT scan had been ordered, failed to review the cervical CT scan results, and failed to order a CT scan. Moya failed to request a transfer by ambulance for Patient 1 and failed to properly stabilize Patient 1 prior to his transfer to Jackson Memorial Hospital for further treatment.

(iii)    Patient 1 presented to Jackson Memorial Hospital where he was diagnosed with a facture dislocation of the cervical spine and treated with a cervical halo and traction.

(iv)    Moya practiced medicine below the standard of care in that Moya failed to order and review Patient 1's cervical spine CT scan results prior to transferring Patient 1, failed to request a transfer by ambulance, and failed to properly stabilize Patient 1 prior to his transfer.

(v)     Moya was guilty of failing to keep written medical records justifying the course of treatment of the patient in that Moya failed to maintain complete medical records documenting a thorough examination of Patient 1 prior to his transfer.

65.     Following a hearing in early 1994, the Board of Medicine ordered that Moya would, among other things, receive a letter of concern from the Board of Medicine, perform 50 hours of community service, and attend 15 hours of continuing medical education in the area of spinal cord injury.

66.     Then, in mid-1994, the Florida State Department of Business and Professional Regulation filed a second Administrative Complaint against Moya. In late 1994, the Board of Medicine adopted as its findings of fact the following allegations, which were undisputed by Moya, as set forth in the second Administrative Complaint:

(i)     On or about September 16, 1991, Patient IM presented to the Ambulatory Center of Hialeah for an arthroscopy on Patient IM's left knee. Patient IM's right leg was prepared and draped for surgery instead of the left leg. Moya began surgery on the patient's right knee, making three incisions in the knee, before he was alerted to the fact that the consent form was for surgery on the left knee. Patient IM did not authorize Moya to perform surgery on her right knee.

(ii)     It was below the standard of care to operate on a patient's right knee when the only authorization provided was for an operation on the patient's left knee.

(iii)   Moya was guilty of performing professional services which were not duly authorized by the patient or the patient's legal representative, in that Moya operated on a patient's right knee when only authorized to operate on her left knee.

(iv)   Moya was guilty of gross or repeated malpractice or the failure to practice medicine with the level of care, skill, and treatment which would be recognized by a reasonably prudent similar physician as being acceptable under similar conditions and circumstances.

67.   The Board of Medicine determined that Moya's actions constituted violations of Fla. Stat. §§ 458.331(1)(p) and (t).

68.   Following the Board of Medicine's determinations, the Board of Medicine ordered that Moya would, among other things, pay an administrative fine in the amount of $2,000.00, attend 10 hours of continuing medical education in the area of risk management, and have a quality assurance consultation conducted by an independent, certified risk manager.

69.   Upon information and belief, Moya's public history of professional discipline – which can be located by prospective employers through a simple internet search – has made it virtually impossible for Moya to obtain legitimate employment as a physician, and made him amenable to participation in the Defendants' fraudulent scheme.

70.   Defendant Pabon resides in and is a citizen of Florida. Pabon was licensed to practice medicine in Florida on July 26, 2007. Pabon purported to perform many of the Fraudulent Services on behalf of CEDA Downtown and CEDA Hialeah.

71.   Defendant Aguayo resides in and is a citizen of Florida. Aguayo was licensed as a registered chiropractic assistant in Florida between June 24, 2010 and March 31, 2018. Aguayo purported to perform many of the Fraudulent Services on behalf of CEDA Kendall.

72.     Defendant Baires resides in and is a citizen of Florida. Baires was licensed as a registered chiropractic assistant in Florida on November 24, 2015. Baires purported to perform many of the Fraudulent Services on behalf of CEDA Kendall.

73.     Defendant Ceballos resides in and is a citizen of Florida. Ceballos was licensed as a massage therapist in Florida on July 11, 2013, and was licensed as a registered chiropractic assistant in Florida on April 19, 2018. Ceballos purported to perform many of the Fraudulent Services on behalf of CEDA Kendall.

74.     Defendant Hernandez resides in and is a citizen of Florida. Hernandez was licensed as a massage therapist in Florida on May 17, 2012, and was licensed as a registered chiropractic assistant in Florida between June 13, 2014 and March 31, 2016. Hernandez purported to perform many of the Fraudulent Services on behalf of CEDA Kendall.

75.     Defendant Hidalgo resides in and is a citizen of Florida. Hidalgo was licensed as a massage therapist in Florida on August 18, 2011, and was licensed as a registered chiropractic assistant in Florida between April 13, 2016 and March 31, 2018. Hidalgo purported to perform many of the Fraudulent Services on behalf of CEDA Downtown.

76.     Defendant Nunez resides in and is a citizen of Florida. Nunez was licensed as a massage therapist in Florida on January 20, 2012, and was licensed as a registered chiropractic assistant in Florida between July 9, 2010 and March 31, 2016. Nunez purported to perform many of the Fraudulent Services on behalf of CEDA Miami.

77.     Defendant Otero resides in and is a citizen of Florida. Otero was licensed as a massage therapist in Florida on June 29, 2010, and was licensed as a registered chiropractic assistant in Florida between May 18, 2010 and March 31, 2016. Otero purported to perform many of the Fraudulent Services on behalf of CEDA Hialeah and CEDA Miami.

78.     Defendant Paredes resides in and is a citizen of Florida. Paredes was licensed as a massage therapist in Florida on April 1, 2011, was licensed as a registered chiropractic assistant in Florida between April 6, 2012 and March 31, 2018, and then was licensed again as a registered chiropractic assistant in Florida on November 28, 2018. Paredes purported to perform many of the Fraudulent Services on behalf of CEDA Miami.

79.     Defendant Pascucci resides in and is a citizen of Florida. Pascucci was licensed as a massage therapist in Florida on September 15, 2010, and was licensed as a registered chiropractic assistant in Florida on April 6, 2012. Pascucci purported to perform many of the Fraudulent Services on behalf of CEDA Hialeah and CEDA Miami.

80.     Defendant Pena resides in and is a citizen of Florida. Pena was licensed as a massage therapist in Florida on August 9, 2018, and was licensed as a registered chiropractic assistant in Florida between January 26, 2016 and March 31, 2018 . Pena purported to perform many of the Fraudulent Services on behalf of CEDA Downtown.

81.     Defendant Rodriguez resides in and is a citizen of Florida. Rodriguez was licensed as a massage therapist in Florida on September 9, 2016, and was licensed as a registered chiropractic assistant in Florida between March 1, 2017 and March 31, 2018. Rodriguez purported to perform many of the Fraudulent Services on behalf of CEDA Hialeah.

82.     Defendant Sanchez resides in and is a citizen of Florida. Sanchez was licensed as a massage therapist in Florida on December 5, 2011. Sanchez purported to perform many of the Fraudulent Services on behalf of CEDA Kendall and CEDA Miami.

83.     Defendant Soto resides in and is a citizen of Florida. Soto was licensed as a massage therapist in Florida on December 6, 2016, and was licensed as a registered chiropractic assistant

in Florida between March 1, 2017 and March 31, 2018. Soto purported to perform many of the Fraudulent Services on behalf of CEDA Downtown.

84.     Defendant Zapata resides in and is a citizen of Florida. Zapata was licensed as a massage therapist in Florida on March 4, 2016. Zapata purported to perform many of the Fraudulent Services on behalf of CEDA Downtown.

## JURISDICTION AND VENUE

85.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

86.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

87.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

88.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

## I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

## A.     The Florida No-Fault Law

89.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the

Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

90.     Under the No Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.      No-Fault Reimbursement and Compliance with Florida Law Governing Health care Practice**

91.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

92.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

93.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment – including, among other things, the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws. See, e.g., State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc., 145 F. Supp. 3d 1154, 1163 (S.D. Fla. 2015); State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., 103 F. Supp. 3d 1343, 1355 (S.D. Fla.

2015); State Farm Mut. Auto. Ins. Co. v. Physicians Group of Sarasota, L.L.C., 9 F. Supp. 3d 1303, 1306, 1311-1314 (M.D. Fla. 2014).

94.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

**C.     No-Fault Reimbursement and the Clinic Act**

95.     Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a clinic in Florida. See Fla. Stat. § 400.991(1)(a). The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

96.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license … .

Fla. Stat. § 400.9905(4)(g)(emphasis added).

97.     In order to qualify for the "wholly owned" exemption under the Clinic Act, "the licensed health care practitioner has a continuing obligation to supervise the business activities of the clinic and remain legally responsible for the entity's compliance with all federal and state laws." See State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc., 103 F. Supp. 3d 1343,

1350 (S.D. Fla. 2015); <u>State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC</u>, 2018 WL 2186496, at *9 (S.D. Fla. 2018)(finding that "in order to qualify for the 'wholly owned' exemption, a clinic's practitioner owners must supervise the clinic's business activities and remain responsible for its legal compliance").

98.     What is more, "[a] clinic that does not qualify for the wholly owned exemption, and does not otherwise have a license, operates unlawfully under Florida law." <u>See</u> <u>State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC</u>, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018).

99.     Pursuant to the Clinic Act, clinics operating in Florida must – among other things – "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." <u>See</u> Fla. Stat. § 400.9935(1).

100.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." <u>See</u> Fla. Stat. § 400.9935(1).

101.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." <u>See</u> Fla. Stat. § 400.9935(1).

102.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether

26

the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

103.    Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Allstate Ins. Co. v. Vizcay, 826 F.3d 1326, 1330-1331 (11th Cir. 2015); B&A Diagnostic, Inc., supra, 145 F. Supp. 3d at 1164-1165.

104.    By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director or other requirements, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Med. Serv. Ctr. of Fla., supra, 103 F. Supp. 3d at 1355 ("Florida law clearly states that [an insurer] can refuse payment for services unlawfully rendered. Fla. Stat. § 627.736(5)(b)(1)(b). As a result of Defendants' conduct, Plaintiffs paid claims which it was statutorily entitled to deny. Accordingly, it would be inequitable to allow Defendants to retain those benefits, regardless of whether those services were medically necessary."); State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, Inc., 2011 U.S. Dist. LEXIS 145629 at * 16 - * 17 (M.D. Fla. Dec. 19, 2011)(same).

**D.    No-Fault Reimbursement and the Self-Referral Act**

105.    Florida's Patient Self-Referral Act, Fla. Stat. § 456.053, prohibits health care providers from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest.

106.    In this context, licensed chiropractors are defined as "health care providers" under the Self-Referral Act, and "designated health services" include physical therapy and diagnostic imaging services such as those purportedly provided through CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing.

107.    The Self-Referral Act also provides that:

> Any health care provider or other entity that enters into an arrangement or scheme, such as a cross-referral arrangement, which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil penalty of not more than $100,000 for each such circumvention arrangement or scheme to be imposed and collected by the appropriate board.

See Fla. Stat. § 456.053(5)(f).

108.    Pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral. See Fla. Stat. § 456.053(5)(c).

109.    What is more, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount on a timely basis". See Fla. Stat. § 456.053(5)(d).

110.    More generally, clinics and other health care providers that operate in violation of the Self-Referral Act are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., B&A Diagnostic, Inc., supra; Med. Serv. Ctr. of Fla., supra.

111.    Likewise, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Self-Referral Act, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Med. Serv. Ctr. of Fla., supra; Silver Star Health & Rehab, Inc., supra.

**E.       No-Fault Reimbursement and the Chiropractor Advertising Laws**

112.    Florida law regulates advertising by chiropractors, and prohibits chiropractors from – among other things – advertising "under a name other than one's own", engaging in "[f]alse, deceptive, or misleading advertising", and "[s]oliciting patients either personally or through an agent, unless such solicitation falls into a category of solicitations approved by rule of the board [of chiropractic medicine]". See Fla. Stat. § 460.413.

113.    Similarly, the Florida Board of Chiropractic has promulgated various rules regarding chiropractor advertising. Among other things, these rules:

(i)     prohibit chiropractors from disseminating or causing the dissemination of any advertisement or advertising which is in any way fraudulent, false, deceptive or misleading; and

(ii)    require all advertisements generated by or on behalf of a chiropractor to disclose that they are generated by or on behalf of a chiropractor by including a reference to the chiropractor by name and degree.

See F.A.C. Rule 64B2-15.001.

114.    Clinics and other health care providers that operate in violation of the Chiropractor Advertising Laws are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., B&A Diagnostic, Inc., supra; Med. Serv. Ctr. of Fla., supra.

115.    Likewise, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Chiropractor Advertising Laws, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Med. Serv. Ctr. of Fla., supra; Silver Star Health & Rehab, Inc., supra.

**F.       No-Fault Reimbursement and Medical Necessity**

116.    Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. <u>See</u> Fla. Stat. § 627.736. Concomitantly, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. <u>Id</u>.

117.    Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

     (a) In accordance with generally accepted standards of medical practice;

     (b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

     (c) Not primarily for the convenience of the patient, physician, or other health care provider.

<u>See</u> Fla. Stat. § 627.732.

**G.    No-Fault Reimbursement, Massage Therapy, and Massage Therapists**

118.    Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics organized under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. <u>See</u> 2012 Fla. ALS 197.

119.    However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or to massage therapists. <u>See</u> 2012 Fla. ALS 197; <u>see also</u> Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.")

120.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or to massage therapists in response to widespread PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

121.     Pursuant to Fla. Stat. § 486.028, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

**H.      No-Fault Reimbursement and Registered Chiropractic Assistants**

122.     Pursuant to Fla. Stat. § 460.4166(1), a registered chiropractic assistant "means a professional, multiskilled person dedicated to assisting in all aspects of chiropractic medicine practice under the direct supervision and responsibility of a chiropractic physician or certified chiropractic physician's assistant." See Fla. Stat. § 460.4166(1).

123.     Thus, a registered chiropractic assistant may, provided that they are working under the direct supervision and responsibility of a licensed chiropractor or certified chiropractic physician's assistant, assist with patient examinations or treatments other than manipulations or adjustments. See Fla. Stat. § 460.4166(2).

124.     Pursuant to Fla. Stat. § 460.403(7), "'direct supervision' means responsible supervision and control, with the licensed chiropractic physician assuming legal liability for the services rendered by a registered chiropractic assistant … [e]xcept in cases of emergency, direct supervision shall require the physical presence of the licensed chiropractic physician for consultation and direction of the actions of the registered chiropractic assistant". See Fla. Stat. § 460.403(7).

125.    Similarly, the Florida Board of Chiropractic Medicine has promulgated various rules regarding the supervision of registered chiropractic assistants. Among other things, these rules state:

(i)    "'[d]irect supervision' means responsible supervision and requires, except in case of an emergency, the physical presence of the licensed chiropractic physician on the premises for consultation and direction. Registered chiropractic assistants shall only perform clinical procedures under direct supervision."

(ii)    "[t]he direct supervision of a registered chiropractic assistant shall mean that the assistant will be under the direction of a chiropractor or a licensed certified chiropractic physician's assistant who is physically located on the premises at all times while a registered chiropractic assistant is performing assigned duties that involve patient care management or treatment."

See F.A.C. Rule 64B2-18.001(8); F.A.C. Rule 64B2-18.0075.

**I.      No-Fault Billing and No-Fault Reimbursement**

126.    Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)    for any service or treatment that was not lawful at the time rendered;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges;

(iii)    for any treatment or service that is upcoded; or

(iv)    with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

127.    The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

II.     **Defendants' Fraudulent Scheme**

128.     Since at least 2013, and continuing through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they billed GEICO millions of dollars, or caused GEICO to be billed millions of dollars, for medically unnecessary, illusory, and otherwise non-reimbursable services.

A.     **The Violations of the Clinic Act**

129.     Although CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and Springs Crossing purported to be exempt from the Clinic Act's health care clinic licensure requirements, CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and Springs Crossing operated without valid exemptions and, as a result, operated as unlicensed health care clinics in violation of the Clinic Act.

130.     In particular, Cereceda failed to supervise CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and Springs Crossing's business activities or ensure compliance with all applicable federal and state laws as required by the Clinic Act and, as a result, CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and Springs Crossing did not qualify for any exemption from the Clinic Act's health care clinic licensure requirements. See Fla. Stat. § 400.9905(4)(g).

131.     What is more, CEDA Cutler Bay also operated as an unlicensed health care clinic in violation of the Clinic Act.

1.     **The Fraudulent Operation of CEDA Downtown Without Supervision by Cereceda**

132.     Cereceda never legitimately supervised the business activities of CEDA Downtown, inasmuch as Cereceda never conducted reviews of the billing or treatment records

from CEDA Downtown to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through CEDA Downtown.

133.     Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing – there is simply no way that Cereceda could have legitimately supervised the business activities of those clinics to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

134.     Had Cereceda legitimately supervised the business activities of CEDA Downtown, Cereceda would have noted that CEDA Downtown was operating in violation of the Self-Referral Act.

135.     Had Cereceda legitimately supervised the business activities of CEDA Downtown, Cereceda would have ensured that CEDA Downtown's employees possessed the appropriate licenses to perform their jobs without supervision, or were appropriately supervised.

136.     In fact, Cereceda could not legitimately have supervised CEDA Downtown's business activities, because CEDA Downtown provided health care services that were beyond the scope of Cereceda's chiropractic license.

137.     As set forth above, Cereceda is a chiropractor. Cereceda is not, and has never been, licensed as a medical doctor.

138.     Florida law defines the scope of chiropractic medicine – in pertinent – part as follows:

> Chiropractic physicians may adjust, manipulate, or treat the human body by manual, mechanical, electrical, or natural methods; by the use of physical means or physiotherapy, including light, heat, water, or exercise; by the use of acupuncture; or by the administration of foods, food concentrates, food extracts, and items for which a prescription is not required

and may apply first aid and hygiene, but <u>chiropractic physicians are expressly prohibited from prescribing or administering to any person any legend drug except as authorized under subparagraph 2.</u>, from performing any surgery except as stated herein, or from practicing obstetrics.

<u>See</u> Fla. Stat. § 460.403(9)(c)(1)(emphasis added).

139.    The terms "legend drug" or "prescription drug" mean drugs which are required by federal or state law to be dispensed only on a prescription. <u>See</u> Fla. Stat. § 465.003(8).

140.    As a chiropractor, rather than a medical doctor, Cereceda was not qualified by training, education, or licensure, to supervise the prescription of medication to Insureds.

141.    Even so, and in keeping with the fact that Cereceda could not legitimately have supervised the business activities of CEDA Downtown, CEDA Downtown purported to provide services – such as the prescription of medications – that were beyond the scope of Cereceda's chiropractic license.

142.    For example:

(i)     On or about May 27, 2014, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named LM, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Mobic 15 mg and Flexeril 5 mg to be taken as directed."

(ii)    On or about June 10, 2014, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named VC, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Mobic 15 mg to be taken as directed."

(iii)   On or about September 16, 2014, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named SC, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Mobic 15 mg to be taken as directed."

(iv)    On or about December 16, 2014, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named JD, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Flexeril 5 mg and Motrin 800 mg to be taken as directed."

(v)     On or about December 6, 2016, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named LM, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Mobic 15 mg and Flexeril 5 mg to be taken as directed."

143.    These are only representative examples. In the claims identified in Exhibit "1", Crespo-Smith routinely prescribed medication to Insureds at CEDA Downtown, which was a service that was beyond the scope of Cereceda's chiropractic license, thereby making it impossible for Cereceda to legitimately supervise CEDA Downtown's business activities.

144.    What is more, and as set forth below, CEDA Downtown, Cereceda, and Pabon subjected many Insureds to pain management injections, including, but not limited to, arthrocentesis injections, epidural injections, and facet injections, despite the fact that the administration of pain management injections was beyond the scope of Cereceda's license and constituted business activities that Cereceda could not supervise.

145.    Accordingly, CEDA Downtown never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did CEDA Downtown have a medical director as required for a health care clinic without an exemption. As a result, CEDA Downtown operated – at all relevant times – in violation of the Clinic Act.

**2.     The Fraudulent Operation of CEDA Kendall Without Supervision by Cereceda**

146.    Cereceda also never legitimately supervised the business activities of CEDA Kendall, inasmuch as Cereceda never conducted reviews of the billing or treatment records from CEDA Kendall to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through CEDA Kendall.

147.    Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through CEDA Downtown, CEDA

Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing – there is simply no way that Cereceda could have legitimately supervised the business activities of those clinics to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

148.     Had Cereceda legitimately supervised the business activities of CEDA Kendall, Cereceda would have noted that CEDA Kendall was operating in violation of the Self-Referral Act.

149.     Had Cereceda legitimately supervised the business activities of CEDA Kendall, Cereceda would have ensured that CEDA Kendall's employees possessed the appropriate licenses to perform their jobs or were appropriately supervised.

150.     Had Cereceda legitimately supervised the business activities of CEDA Kendall, Cereceda would have noted that CEDA Kendall and its associates performed health care services beyond the scope of Cereceda's chiropractic license in violation of the Clinic Act.

151.     As set forth above, Cereceda is a chiropractor. Cereceda is not, and has never been, licensed as a medical doctor.

152.     Florida law defines the scope of chiropractic medicine – in pertinent – part as follows:

> Chiropractic physicians may adjust, manipulate, or treat the human body by manual, mechanical, electrical, or natural methods; by the use of physical means or physiotherapy, including light, heat, water, or exercise; by the use of acupuncture; or by the administration of foods, food concentrates, food extracts, and items for which a prescription is not required and may apply first aid and hygiene, but chiropractic physicians are expressly prohibited from prescribing or administering to any person any legend drug except as authorized under subparagraph 2., from performing any surgery except as stated herein, or from practicing obstetrics.

See Fla. Stat. § 460.403(9)(c)(1)(emphasis added).

153.    The terms "legend drug" or "prescription drug" mean drugs which are required by federal or state law to be dispensed only on a prescription. See Fla. Stat. § 465.003(8).

154.    Even so, and in keeping with the fact that Cereceda never legitimately supervised the business activities of CEDA Kendall, CEDA Kendall purported to provide services – such as the prescription of medications – that were beyond the scope of Cereceda's chiropractic license.

155.    For example:

(i)     On or about April 30, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named SS, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Motrin 800 mg to be taken as directed."

(ii)    On or about December 3, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named SL, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Mobic 15 mg and Relafen 500 mg to be taken as directed."

(iii)   On or about March 18, 2015, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named RH, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Flexeril 5 mg to be taken as directed."

(iv)    On or about April 12, 2017, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named LR, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Flexeril 5 mg to be taken as directed."

(v)     On or about May 10, 2017, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named RT, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Motrin 800 mg to be taken as directed."

156.    These are only representative examples. In the claims identified in Exhibit "2", Crespo-Smith routinely prescribed medication to Insureds at CEDA Kendall, which was a service that was beyond the scope of Cereceda's chiropractic license, thereby making it impossible for Cereceda to legitimately supervise CEDA Kendall's business activities.

38

157.     What is more, and as set forth below, CEDA Kendall, Cereceda, Crespo-Smith, and Moya subjected many Insureds to pain management injections, including, but not limited to, arthrocentesis injections and facet injections, despite the fact that the administration of pain management injections was beyond the scope of Cereceda's license and constituted business activities that Cereceda could not supervise.

158.     Accordingly, CEDA Kendall never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did CEDA Kendall have a medical director as required for a health care clinic without an exemption. As a result, CEDA Kendall operated – at all relevant times – in violation of the Clinic Act.

**3.     The Fraudulent Operation of CEDA Hialeah Without Supervision by Cereceda**

159.     What is more, Cereceda never legitimately supervised the business activities of CEDA Hialeah, inasmuch as Cereceda never conducted reviews of the billing or treatment records from CEDA Hialeah to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through CEDA Hialeah.

160.     Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing – there is simply no way that Cereceda could have legitimately supervised the business activities of those clinics to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

161.     Had Cereceda legitimately supervised the business activities of CEDA Hialeah, Cereceda would have noted that CEDA Hialeah was operating in violation of the Self-Referral Act.

162.     Had Cereceda legitimately supervised the business activities of CEDA Hialeah, Cereceda would have ensured that CEDA Hialeah's employees possessed the appropriate licenses to perform their jobs or were appropriately supervised.

163.     Had Cereceda legitimately supervised the business activities of CEDA Hialeah, Cereceda would have noted that CEDA Hialeah and its associates performed health care services beyond the scope of Cereceda's chiropractic license in violation of the Clinic Act.

164.     As set forth above, Cereceda is a chiropractor. Cereceda is not, and has never been, licensed as a medical doctor.

165.     Florida law defines the scope of chiropractic medicine – in pertinent – part as follows:

> Chiropractic physicians may adjust, manipulate, or treat the human body by manual, mechanical, electrical, or natural methods; by the use of physical means or physiotherapy, including light, heat, water, or exercise; by the use of acupuncture; or by the administration of foods, food concentrates, food extracts, and items for which a prescription is not required and may apply first aid and hygiene, but <u>chiropractic physicians are expressly prohibited from prescribing or administering to any person any legend drug except as authorized under subparagraph 2.</u>, from performing any surgery except as stated herein, or from practicing obstetrics.

<u>See</u> Fla. Stat. § 460.403(9)(c)(1)(emphasis added).

166.     The terms "legend drug" or "prescription drug" mean drugs which are required by federal or state law to be dispensed only on a prescription. <u>See</u> Fla. Stat. § 465.003(8).

167.     Even so, and in keeping with the fact that Cereceda never legitimately supervised the business activities of CEDA Hialeah, CEDA Hialeah purported to provide services – such as the prescription of medications – that were beyond the scope of Cereceda's chiropractic license.

168.     For example:

(i)      On or about May 29, 2014, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an

Insured named OT, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Mobic 15 mg to be taken as directed."

(ii)     On or about July 10, 2014, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named SY, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Motrin 800 mg to be taken as directed."

(iii)    On or about February 12, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named LF, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Omeprazole 20 mg, Flexeril 5 mg and Tramadol HCL 50 mg to be taken as directed."

(iv)    On or about June 11, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named AA, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Motrin 800 mg and Cipro 500 mg for possible urinary tract infection to be taken as directed."

(v)     On or about December 10, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named AT, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Medrol Dose Pack, Mobic 15 mg, Flexeril 5 mg and Valium 10 mg (prior to MRI) to be taken as directed."

169.    These are only representative examples. In the claims identified in Exhibit "3", Crespo-Smith routinely prescribed medication to Insureds at CEDA Hialeah, which was a service that was beyond the scope of Cereceda's chiropractic license, thereby making it impossible for Cereceda to legitimately supervise CEDA Hialeah's business activities.

170.    What is more, and as set forth below, CEDA Hialeah, Cereceda, and Pabon subjected Insureds to pain management injections, including, but not limited to, facet injections, despite the fact that the administration of pain management injections was beyond the scope of Cereceda's license and constituted business activities that Cereceda could not supervise.

171.    Accordingly, CEDA Hialeah never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did CEDA Hialeah have a medical

director as required for a health care clinic without an exemption. As a result, CEDA Hialeah operated – at all relevant times – in violation of the Clinic Act.

**4.      The Fraudulent Operation of CEDA Miami Without Supervision by Cereceda**

172.    Moreover, Cereceda never legitimately supervised the business activities of CEDA Miami, inasmuch as Cereceda never conducted reviews of the billing or treatment records from CEDA Miami to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through CEDA Miami.

173.    Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing – there is simply no way that Cereceda could have legitimately supervised the business activities of those clinics to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

174.    Had Cereceda legitimately supervised the business activities of CEDA Miami, Cereceda would have noted that CEDA Miami was operating in violation of the Self-Referral Act.

175.    Had Cereceda legitimately supervised the business activities of CEDA Miami, Cereceda would have ensured that CEDA Miami's employees possessed the appropriate licenses to perform their jobs or were appropriately supervised.

176.    Had Cereceda legitimately supervised the business activities of CEDA Miami, Cereceda would have noted that CEDA Miami and its associates performed health care services beyond the scope of Cereceda's chiropractic license in violation of the Clinic Act.

177.    As set forth above, Cereceda is a chiropractor. Cereceda is not, and has never been, licensed as a medical doctor.

178.    Florida law defines the scope of chiropractic medicine – in pertinent – part as follows:

> Chiropractic physicians may adjust, manipulate, or treat the human body by manual, mechanical, electrical, or natural methods; by the use of physical means or physiotherapy, including light, heat, water, or exercise; by the use of acupuncture; or by the administration of foods, food concentrates, food extracts, and items for which a prescription is not required and may apply first aid and hygiene, but <u>chiropractic physicians are expressly prohibited from prescribing or administering to any person any legend drug except as authorized under subparagraph 2.</u>, from performing any surgery except as stated herein, or from practicing obstetrics.

<u>See</u> Fla. Stat. § 460.403(9)(c)(1)(emphasis added).

179.    The terms "legend drug" or "prescription drug" mean drugs which are required by federal or state law to be dispensed only on a prescription. <u>See</u> Fla. Stat. § 465.003(8).

180.    Even so, and in keeping with the fact that Cereceda never legitimately supervised the business activities of CEDA Miami, CEDA Miami purported to provide services – such as the prescription of medications – that were beyond the scope of Cereceda's chiropractic license.

181.    For example:

(i)     On or about July 21, 2014, CEDA Miami, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named LH, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Motrin 800 mg to be taken as directed."

(ii)    On or about September 8, 2014, CEDA Miami, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named TR, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Flexeril 5 mg and Motrin 800 mg to be taken as directed."

(iii)   On or about July 19, 2016, CEDA Miami, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named TA, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Ibuprofen 800 mg and Flexeril 10 mg to be taken as directed."

(iv)    On or about September 12, 2016, CEDA Miami, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to

an Insured named AG, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Mobic 15 mg to be taken as directed."

(v)     On or about August 25, 2017, CEDA Miami, Cereceda, and Crespo-Smith billed GEICO for an initial examination that Crespo-Smith purportedly provided to an Insured named MH, and submitted an examination report to GEICO which indicated that "[t]he patient was prescribed Ibuprofen 800 mg to be taken as directed."

182.    These are only representative examples. In the claims identified in Exhibit "4", Crespo-Smith routinely prescribed medication to Insureds at CEDA Miami, which was a service that was beyond the scope of Cereceda's chiropractic license, thereby making it impossible for Cereceda to legitimately supervise CEDA Miami's business activities.

183.    What is more, and as set forth below, CEDA Miami, Cereceda, Crespo-Smith, Javech, and Moya subjected many Insureds to pain management injections, including, but not limited to, tendon injections, trigger point injections, arthrocentesis injections, epidural injections, and facet injections, despite the fact that the administration of pain management injections was beyond the scope of Cereceda's license and constituted business activities that Cereceda could not supervise.

184.    Accordingly, CEDA Miami never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did CEDA Miami have a medical director as required for a health care clinic without an exemption. As a result, CEDA Miami operated – at all relevant times – in violation of the Clinic Act.

**5.      The Fraudulent Operation of Springs Crossing Without Supervision by Cereceda**

185.    Furthermore, Cereceda never legitimately supervised the business activities of Springs Crossing, inasmuch as Cereceda never conducted reviews of the billing or treatment records from Springs Crossing to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Springs Crossing.

186.     Had Cereceda legitimately supervised the business activities of Springs Crossing, Cereceda would have noted that Springs Crossing was operating in pervasive violation of the Self-Referral Act.

187.     Accordingly, Springs Crossing never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did Springs Crossing have a medical director as required for a health care clinic without an exemption. As a result, Springs Crossing operated – at all relevant times – in violation of the Clinic Act.

**6.      The Fraudulent Operation of CEDA Cutler Bay**

188.     CEDA Cutler Bay was incorporated in Florida on or about June 11, 2015, had Cereceda as its owner, was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

189.     As set forth above, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

190.     What is more, and as set forth above, subject to certain limited exceptions, a license issued by the Agency for Health Care Administration is required in order to operate a clinic in Florida. See Fla. Stat. § 400.991(1)(a).

191.     At all relevant times, CEDA Cutler Bay operated as a health care clinic without a license from the Agency for Health Care Administration and without an exemption from the licensure requirements of the Clinic Act. For example, the website for the Agency for Health Care Administration contains no record of CEDA Cutler Bay, and no record of CEDA Cutler Bay ever obtaining a clinic license or an exemption.

192.    Accordingly, CEDA Cutler Bay operated – at all relevant times – in violation of the Clinic Act.

**B.    The Violations of the Chiropractor Advertising Laws**

193.    As set forth above, the Chiropractor Advertising Laws prohibit chiropractors from – among other things – advertising "under a name other than one's own", engaging in "[f]alse, deceptive, or misleading advertising", disseminating or causing the dissemination of any advertisement or advertising which is in any way fraudulent, false, deceptive or misleading, and soliciting patients, either personally or through an agent, unless such solicitation falls within a category of solicitations approved by the Florida Board of Chiropractic Medicine.

194.    "388-CEDA" is a fictitious business name owned by and registered to CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay.

195.    As set forth above, Cereceda – who is a chiropractor – is the owner of CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay.

196.    Cereceda, CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay violated the Chiropractor Advertising Laws by advertising under a name other than Cereceda's own.

197.    For example, the website for 388-CEDA – which Cereceda used to advertise for CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay – failed to disclose anywhere that 388-CEDA was owned by Cereceda or by CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay. Nor did the website for 388-CEDA disclose that it was an advertisement for Cereceda or CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay.

198.    What is more, Cereceda, CEDA Downtown, CEDA Kendall, CEDA Hialeah,

CEDA Miami, and CEDA Cutler Bay violated the Chiropractor Advertising Laws by engaging in false, deceptive, and misleading advertising.

199.    Pursuant to the Chiropractor Advertising Laws, chiropractor advertising is deemed to be fraudulent, false, deceptive, or misleading if – among other things – it "[c]onveys the impression that the chiropractor or chiropractors, disseminating the advertising or referred to therein, possess qualifications, skills, or other attributes which are superior to other chiropractors, other than a simple listing of earned professional post-doctoral or other professional achievements." See F.A.C. Rule 64B2-15.001(2)(e).

200.    Nonetheless, Cereceda, CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay used  the 388-CEDA website to falsely represent that they could strengthen claims with insurance companies and that "upon request" they had the ability to connect callers with "experienced trial attorneys". For example, the 388-CEDA website represented that "INSURANCE COMPANIES CAN DENY WEAK CLAIMS … [t]hey can go to great lengths to find ways not to pay weak claims. You need someone on your side to help you strengthen your claim … STRENGTHEN YOUR CLAIM QUICKLY … [t]he sooner you call, the more we can help. We work with you to effectively assess and address your injuries, which helps strengthen your claim. Call from the ambulance, ER department, or scene."

201.    Similarly, the 388-CEDA website represented that "[a]s your advocate, we provide … [t]he right diagnostics … [e]xtensive care, including MRIs and orthopedic surgery … [d]ocumentation on what improves…and what doesn't …. [p]hysical proof, which can help your case."

202.    What is more, the 388-CEDA website represented that "[n]ot every lawyer is cut out for the courtroom. We work with aggressive attorneys and trial lawyers whose additional

experience may result in higher compensation."

203.    Along similar lines, the 388-CEDA website represented that "WE CAN HELP MOVE YOUR CASE FULL SPEED AHEAD."

204.    In the claims identified in Exhibits "1" – "5", CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Cereceda routinely misrepresented their eligibility to collect PIP Benefits in the first instance. In fact, they never were never eligible to collect PIP Benefits, inasmuch as they operated in pervasive violation of the Chiropractor Advertising Laws.

**C.      The Violations of the Self-Referral Act**

**1.      The Illegal Self-Referrals from CEDA Downtown to Springs Crossing for Diagnostic Imaging Services**

205.    As set forth above, the Self-Referral Act prohibits any health care provider from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest. See Fla. Stat. § 456.053.

206.    What is more, and as set forth above, pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral. See Fla. Stat. § 456.053(5)(c).

207.    In addition, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount[s] on a timely basis". See Fla. Stat. § 456.053(5)(d).

208.    In the context of the Self-Referral Act, Cereceda – as a licensed chiropractor – was a "health care provider".

209.    In the context of the Self-Referral Act, the putative diagnostic imaging services that Springs Crossing purported to provide were "designated health care services".

48

210.    In the context of the Self-Referral Act, Cereceda – who was the owner and managing member of Springs Crossing – was both an investor in and had an investment interest in Springs Crossing.

211.    As a result, Cereceda could not lawfully self-refer Insureds from CEDA Downtown to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

212.    Nor could Cereceda lawfully cause any other health care providers working at CEDA Downtown to refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

213.    Even so, in the claims identified in Exhibit "1", Canizares and Crespo-Smith – at Cereceda's direction – routinely and unlawfully self-referred Insureds from CEDA Downtown to Springs Crossing for purported diagnostic imaging services.

214.    What is more, in the claims identified in Exhibit "6", Springs Crossing, Cereceda, and Alonso (collectively, the "Springs Crossing Defendants") routinely falsely represented that the resulting diagnostic imaging services billed through Springs Crossing to GEICO were lawfully provided and reimbursable, when in fact they were provided  – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

215.    These types of self-referrals violated the Self-Referral Act because they amounted to direct referrals from CEDA Downtown (which Cereceda owned and controlled) to Springs Crossing (which Cereceda also owned and controlled).

216.    For example:

(i)     On or about October 18, 2016, Crespo-Smith – at Cereceda's direction – self-referred an Insured named CK from CEDA Downtown to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic

imaging services they purported to provide to CK on November 11, 2016 at Springs Crossing, and then failed to refund the resulting payments – at least $900.00 – on a timely basis.

(ii)    On or about August 16, 2017, Canizares – at Cereceda's direction – self-referred an Insured named SF from CEDA Downtown to Springs Crossing for diagnostic imaging services. Then, on or about August 23, 2017, Crespo-Smith – at Cereceda's direction – self-referred SF from CEDA Downtown to Springs Crossing for diagnostic imaging services. Though the referrals violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to SF on August 25, 2017 at Springs Crossing, and then failed to refund the resulting payments – at least $2,200.00 – on a timely basis.

(iii)   On or about March 28, 2018, Canizares – at Cereceda's direction – self-referred an Insured named MH from CEDA Downtown to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to MH on June 4, 2018 at Springs Crossing, and then failed to refund the resulting payment – at least $1,900.00 – on a timely basis.

(iv)    On or about May 16, 2018, Canizares – at Cereceda's direction – self-referred an Insured named KK from CEDA Downtown to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to KK on June 9, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00 – on a timely basis.

(v)     On or about June 7, 2018, Canizares – at Cereceda's direction – self-referred an Insured named MP from CEDA Downtown to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to MP on June 23, 2018 at Springs Crossing, and then failed to refund the resulting payment – at least $900.00 – on a timely basis.

217.    These are only representative examples. In the claims identified in Exhibit "1", Cereceda, Canizares, and Crespo-Smith routinely and unlawfully self-referred Insureds from CEDA Downtown to Springs Crossing for purported diagnostic imaging services.

218.    What is more, in the claims identified Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services were lawfully provided

and reimbursable, when in fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

## 2. The Illegal Self-Referrals from CEDA Kendall to Springs Crossing for Diagnostic Imaging Services

219. As set forth above, the Self-Referral Act prohibits any health care provider from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest. See Fla. Stat. § 456.053.

220. What is more, and as set forth above, pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral. See Fla. Stat. § 456.053(5)(c).

221. In addition, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount[s] on a timely basis". See Fla. Stat. § 456.053(5)(d).

222. In the context of the Self-Referral Act, Cereceda – as a licensed chiropractor – was a "health care provider".

223. In the context of the Self-Referral Act, the putative diagnostic imaging services that Springs Crossing purported to provide were "designated health care services".

224. In the context of the Self-Referral Act, Cereceda – who was an owner and managing member of Springs Crossing – was both an investor in and had an investment interest in Springs Crossing.

225. As a result, Cereceda could not lawfully self-refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

226. Nor could Cereceda lawfully cause any other health care providers working at

CEDA Kendall to refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

227.    Even so, in the claims identified in Exhibit "2", Yoham – at Cereceda's direction – routinely and unlawfully self-referred Insureds from CEDA Kendall to Springs Crossing for purported diagnostic imaging services.

228.    What is more, in the claims identified in Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services billed through Springs Crossing to GEICO were lawfully provided and reimbursable, when in fact they were provided  – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

229.    These types of self-referrals violated the Self-Referral Act because they amounted to direct referrals from CEDA Kendall (which Cereceda owned and controlled) to Springs Crossing (which Cereceda also owned and controlled).

230.    For example:

(i)      On or about August 24, 2015, Yoham – at Cereceda's direction – self-referred an Insured named AA from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to AA on September 8, 2015 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00 – on a timely basis.

(ii)     On or about August 9, 2017, Yoham – at Cereceda's direction – self-referred an Insured named JM from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to JM on September 18, 2017 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00 – on a timely basis.

(iii)    On or about March 23, 2018, Yoham – at Cereceda's direction – self-referred an Insured named RM from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging

services they purported to provide to RM on July 24, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00 – on a timely basis.

(iv)     On or about May 21, 2018, Yoham – at Cereceda's direction – self-referred an Insured named EM from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to EM on May 29, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $2,700.00 – on a timely basis.

(v)      On or about May 21, 2018, Yoham – at Cereceda's direction – self-referred an Insured named GC from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to GC on May 29, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $2,800.00 – on a timely basis.

(vi)     On or about May 22, 2018, Yoham – at Cereceda's direction – self-referred an Insured named GC from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to GC on July 23, 2018 at Springs Crossing, and then failed to refund the resulting payments – more than $1,600.00 – on a timely basis.

(vii)    On or about May 31, 2018, Yoham – at Cereceda's direction – self-referred an Insured named CP from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to CP on June 6, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $900.00 – on a timely basis.

(viii)   On or about May 31, 2018, Yoham – at Cereceda's direction – self-referred an Insured named KP from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to KP on June 6, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00 – on a timely basis.

(ix)     On or about June 1, 2018, Yoham – at Cereceda's direction – self-referred an Insured named AQ from CEDA Kendall to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to AQ on June 9, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00 – on a timely basis.

231.    These are only representative examples. As set forth in the claims identified in Exhibit "2", Cereceda and Yoham routinely and unlawfully self-referred Insureds from CEDA Kendall to Springs Crossing for purported diagnostic imaging services.

232.    What is more, in the claims identified Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services were lawfully provided and reimbursable, when in fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

**3.      The Illegal Self-Referrals from CEDA Hialeah to Springs Crossing for Diagnostic Imaging Services**

233.    As set forth above, the Self-Referral Act prohibits any health care provider from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest. See Fla. Stat. § 456.053.

234.    What is more, and as set forth above, pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral. See Fla. Stat. § 456.053(5)(c).

235.    In addition, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount[s] on a timely basis". See Fla. Stat. § 456.053(5)(d).

236.    In the context of the Self-Referral Act, Cereceda – as a licensed chiropractor – was a "health care provider".

237.    In the context of the Self-Referral Act, the putative diagnostic imaging services that Springs Crossing purported to provide were "designated health care services".

238.    In the context of the Self-Referral Act, Cereceda – who was an owner and managing member of Springs Crossing – was both an investor in and had an investment interest in Springs

Crossing.

239.    As a result, Cereceda could not lawfully self-refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

240.    Nor could Cereceda lawfully cause any other health care providers working at CEDA Hialeah to refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

241.    Even so, in the claims identified in Exhibit "3", Fenelus, Fatato, and Ross – at Cereceda's direction – routinely and unlawfully self-referred Insureds from CEDA Hialeah to Springs Crossing for purported diagnostic imaging services.

242.    What is more, in the claims identified in Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services billed through Springs Crossing to GEICO were lawfully provided and reimbursable, when in fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

243.    These types of self-referrals violated the Self-Referral Act because they amounted to direct referrals from CEDA Hialeah (which Cereceda owned and controlled) to Springs Crossing (which Cereceda also owned and controlled).

244.    For example:

(i)     On or about January 7, 2015, Fenelus – at Cereceda's direction – self-referred an Insured named LF from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to LF on January 21, 2015 and February 9, 2015 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00, on a timely basis.

(ii)     On or about January 22, 2015, Fenelus – at Cereceda's direction – self-referred an Insured named JZ from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to JZ on February 10, 2015 and March 26, 2015 at Springs Crossing, and then failed to refund the resulting payments – at least $3,400.00, on a timely basis.

(iii)    On or about September 5, 2017, Fatato – at Cereceda's direction – self-referred an Insured named TR from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to TR on September 6, 2017 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00, on a timely basis.

(iv)    On or about September 12, 2017, Fatato – at Cereceda's direction – self-referred an Insured named LV from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to LV on September 21, 2017 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00, on a timely basis.

(v)     On or about February 20, 2018, Ross – at Cereceda's direction – self-referred an Insured named YN from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to YN on February 26, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $2,800.00, on a timely basis.

(vi)    On or about April 3, 2018, Ross – at Cereceda's direction – self-referred an Insured named SC from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to SC on April 9, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,700.00, on a timely basis.

(vii)   On or about April 30, 2018, Ross – at Cereceda's direction – self-referred an Insured named EV from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to EV on June 16, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00, on a timely basis.

(viii)  On or about April 30, 2018, Ross – at Cereceda's direction – self-referred an Insured named LE from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing,

Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to LE on June 16, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00, on a timely basis.

(ix) On or about May 22, 2018, Ross – at Cereceda's direction – self-referred an Insured named JM from CEDA Hialeah to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to JM on June 4, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $2,800.00, on a timely basis.

245.    These are only representative examples. As set forth in the claims identified in Exhibit "3", Cereceda, Fenelus, Fatato, and Ross routinely and unlawfully self-referred Insureds from CEDA Hialeah to Springs Crossing for purported diagnostic imaging services.

246.    What is more, in the claims identified Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services were lawfully provided and reimbursable, when in fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

**4.    The Illegal Self-Referrals from CEDA Miami to Springs Crossing for Diagnostic Imaging Services**

247.    As set forth above, the Self-Referral Act prohibits any health care provider from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest. See Fla. Stat. § 456.053.

248.    What is more, and as set forth above, pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral. See Fla. Stat. § 456.053(5)(c).

249.    In addition, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount[s] on a timely basis". See Fla. Stat. § 456.053(5)(d).

250.    In the context of the Self-Referral Act, Cereceda – as a licensed chiropractor – was a "health care provider".

251.    In the context of the Self-Referral Act, the putative diagnostic imaging services that Springs Crossing purported to provide were "designated health care services".

252.    In the context of the Self-Referral Act, Cereceda – who was an owner and managing member of Springs Crossing – was both an investor in and had an investment interest in Springs Crossing.

253.    As a result, Cereceda could not lawfully self-refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

254.    Nor could Cereceda lawfully cause any other health care providers working at CEDA Miami to refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

255.    Even so, in the claims identified in Exhibit "4", Habayeb, Javech, Moya, and Schulman – at Cereceda's direction – routinely and unlawfully self-referred Insureds from CEDA Miami to Springs Crossing for purported diagnostic imaging services.

256.    What is more, in the claims identified in Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services billed through Springs Crossing to GEICO were lawfully provided and reimbursable, when in fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

257.    These types of self-referrals violated the Self-Referral Act because they amounted to direct referrals from CEDA Miami (which Cereceda owned and controlled) to Springs Crossing

(which Cereceda also owned and controlled).

258.    For example:

(i)      On or about January 23, 2015, Schulman – at Cereceda's direction – self-referred an Insured named MG from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to MG on February 11, 2015 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00, on a timely basis.

(ii)     On or about August 31, 2015, Schulman – at Cereceda's direction – self-referred an Insured named AH from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to AH on September 4, 2015 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00, on a timely basis.

(iii)    On or about July 11, 2016, Habayeb – at Cereceda's direction – self-referred an Insured named TA from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to TA on August 1, 2016 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00, on a timely basis.

(iv)     On or about July 11, 2016, Habayeb – at Cereceda's direction – self-referred an Insured named QR from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to QR on August 1, 2016 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00, on a timely basis.

(v)      On or about September 21, 2016, Habayeb – at Cereceda's direction – self-referred an Insured named WL from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to WL on September 22, 2016 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00, on a timely basis.

(vi)     On or about July 31, 2017, Moya – at Cereceda's direction – self-referred an Insured named AM from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services

they purported to provide to AM on August 2, 2017 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00, on a timely basis.

(vii)    On or about August 28, 2017, Moya – at Cereceda's direction – self-referred an Insured named AM from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to AM on October 6, 2017 at Springs Crossing, and then failed to refund the resulting payments – at least $900.00, on a timely basis.

(viii)   On or about September 16, 2017, Habayeb – at Cereceda's direction – self-referred an Insured named MH from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to MH on September 26, 2017 at Springs Crossing, and then failed to refund the resulting payments – at least $900.00, on a timely basis.

(ix)     On or about November 4, 2017, Habayeb – at Cereceda's direction – self-referred an Insured named NH from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to NH on December 9, 2017 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00, on a timely basis.

(x)      On or about February 20, 2018, Javech – at Cereceda's direction – self-referred an Insured named MJ from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to MJ on February 26, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $800.00, on a timely basis.

(xi)     On or about May 22, 2018, Habayeb – at Cereceda's direction – self-referred an Insured named GA from CEDA Miami to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to GA on June 7, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $2,800.00, on a timely basis.

259.    These are only representative examples. As set forth in the claims identified in

Exhibit "4", Cereceda, Habayeb, Javech, Moya, and Schulman routinely and unlawfully self-

referred Insureds from CEDA Miami to Springs Crossing for purported diagnostic imaging services.

260.    What is more, in the claims identified Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services were lawfully provided and reimbursable, when in fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

**5.     The Illegal Self-Referrals from CEDA Cutler Bay to Springs Crossing for Diagnostic Imaging Services**

261.    As set forth above, the Self-Referral Act prohibits any health care provider from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest. See Fla. Stat. § 456.053.

262.    What is more, and as set forth above, pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral. See Fla. Stat. § 456.053(5)(c).

263.    In addition, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount[s] on a timely basis". See Fla. Stat. § 456.053(5)(d).

264.    In the context of the Self-Referral Act, Cereceda – as a licensed chiropractor – was a "health care provider".

265.    In the context of the Self-Referral Act, the putative diagnostic imaging services that Springs Crossing purported to provide were "designated health care services".

266.    In the context of the Self-Referral Act, Cereceda – who was an owner and managing member of Springs Crossing – was both an investor in and had an investment interest in Springs Crossing.

267.     As a result, Cereceda could not lawfully self-refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

268.     Nor could Cereceda lawfully cause any other health care providers working at CEDA Cutler Bay to refer Insureds to Springs Crossing for designated health care services such as the diagnostic imaging services that Springs Crossing purported to provide.

269.     Even so, in the claims identified in Exhibit "5", Haban – at Cereceda's direction – routinely and unlawfully self-referred Insureds from CEDA Cutler Bay to Springs Crossing for purported diagnostic imaging services.

270.     What is more, in the claims identified in Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services billed through Springs Crossing to GEICO were lawfully provided and reimbursable, when in fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

271.     These types of self-referrals violated the Self-Referral Act because they amounted to direct referrals from CEDA Cutler Bay (which Cereceda owned and controlled) to Springs Crossing (which Cereceda also owned and controlled).

272.     For example:

(i)      On or about February 23, 2018, Haban – at Cereceda's direction – self-referred an Insured named YT from CEDA Cutler Bay to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to YT on March 5, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00 – on a timely basis.

(ii)     On or about March 15, 2018, Haban – at Cereceda's direction – self-referred an Insured named JA from CEDA Cutler Bay to Springs Crossing for diagnostic

imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to JA on March 29, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,800.00 – on a timely basis.

(iii)    On or about April 12, 2018, Haban – at Cereceda's direction – self-referred an Insured named EU from CEDA Cutler Bay to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to EU on May 5, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $900.00 – on a timely basis.

(iv)    On or about May 3, 2018, Haban – at Cereceda's direction – self-referred an Insured named LJ from CEDA Cutler Bay to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to LJ on November 1, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,000.00 – on a timely basis.

(v)    On or about June 19, 2018, Haban – at Cereceda's direction – self-referred an Insured named MA from CEDA Cutler Bay to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to MA on June 28, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00 – on a timely basis.

(vi)    On or about June 19, 2018, Haban – at Cereceda's direction – self-referred an Insured named MV from CEDA Cutler Bay to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to MV on June 28, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $1,900.00 – on a timely basis.

(vii)    On or about June 19, 2018, Haban – at Cereceda's direction – self-referred an Insured named FV from CEDA Cutler Bay to Springs Crossing for diagnostic imaging services. Though the referral violated the Self-Referral Act, Springs Crossing, Cereceda, and Alonso nonetheless billed GEICO for diagnostic imaging services they purported to provide to FV on June 28, 2018 at Springs Crossing, and then failed to refund the resulting payments – at least $2,100.00 – on a timely basis.

63

273.    These are only representative examples. As set forth in the claims identified in Exhibit "5", Cereceda and Haban routinely and unlawfully self-referred Insureds from CEDA Cutler Bay to Springs Crossing for purported diagnostic imaging services.

274.    What is more, in the claims identified Exhibit "6", Springs Crossing, Cereceda, and Alonso routinely falsely represented that the diagnostic imaging services were lawfully provided and reimbursable, when in fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal self-referral scheme.

**D.      The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at CEDA Downtown, CEDA Kendall, CEDA Hialeah, and CEDA Miami**

275.    Cereceda, CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and their associates routinely falsely represented the identities of the health care providers who rendered services at CEDA Downtown, CEDA Kendall, CEDA Hialeah, and CEDA Miami, in order to obtain payment for Fraudulent Services to which they otherwise would not be entitled.

**1.      The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at CEDA Downtown**

276.    CEDA Downtown, Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Soto, Pena, and Zapata (collectively, the "CEDA Downtown Defendants") billed for multiple varieties of health care services, including: (i) initial patient examinations; (ii) follow-up examinations; (iii) chiropractic treatment; (iv) physical therapy treatment; and (v) pain management injections.

277.    However, and as set forth in Exhibit "1", the purported physical therapy services and chiropractic services constituted the majority of the services the CEDA Downtown Defendants billed through CEDA Downtown to GEICO.

278.     Canizares purported to personally perform or directly supervise the vast majority of the physical therapy services and chiropractic services in the claims identified in Exhibit "1".

279.     In fact, however, the vast majority of the physical therapy services and chiropractic services that were billed through CEDA Downtown to GEICO were performed – to the extent that they were performed at all – by Hidalgo, Soto, Pena, and Zapata, and other massage therapists or registered chiropractic assistants associated with CEDA Downtown, without legitimate supervision or oversight by Canizares, or any other licensed physician, chiropractor, or physical therapist.

280.     As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

281.     However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or to massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

282.     What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

283.     Moreover, and as set forth above, a registered chiropractic assistant must work under the direct supervision and responsibility of a licensed chiropractor or certified chiropractic physician's assistant. See Fla. Stat. § 460.4166(2).

284.     Hidalgo, Soto, Pena, and Zapata were licensed as massage therapists and/or registered chiropractic assistants. Hidalgo, Soto, Pena, and Zapata were never licensed as physical therapists or chiropractors.

285.     As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law prohibited CEDA Downtown from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Hidalgo, Soto, Pena, and Zapata.

286.     Nor could Ceda Downtown recover PIP Benefits for services performed by unsupervised registered chiropractic assistants.

287.     The Defendants were well-aware of the fact that CEDA Downtown could not legally recover PIP Benefits for services provided by unsupervised massage therapists and/or registered chiropractic assistants such as Hidalgo, Soto, Pena, and Zapata.

288.     For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or to massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

289.     In keeping with the fact that the CEDA Downtown Defendants knew that they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, or by unsupervised registered chiropractic assistants, the CEDA Downtown Defendants routinely falsely represented in their billing that Canizares personally performed, or at least directly supervised, the vast majority of the individual physical therapy services and/or chiropractic services that were billed through CEDA Downtown to GEICO.

290.     In keeping with the fact that Canizares could not have personally performed, or even directly supervised, the physical therapy services and/or chiropractic services billed to

66

GEICO through CEDA Downtown, Canizares would often purport to personally perform – or at least directly supervise – an improbable, and often impossible number of physical therapy services and/or chiropractic services in a given day.

291.   For example:

(i)   On January 22, 2014, CEDA Downtown, Cereceda, and Canizares purported to provide at least 120 individual physical therapy services and/or chiropractic services to at least 19 individual Insureds, and falsely contended in the resulting bills to GEICO that Canizares personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 16.75 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Canizares <u>also</u> purported to personally perform, or at least directly supervise: (a) at least one 30-minute patient examination; and (b) at least three 15-minute patient examinations. In all, GEICO received billing for at least 18 hours of services that Canizares purported to personally perform, or at least directly supervise, on January 22, 2014.

(ii)   On May 31, 2017, CEDA Downtown, Cereceda, and Canizares purported to provide at least 140 individual physical therapy services and/or chiropractic services to at least 23 individual Insureds, and falsely contended in the resulting bills to GEICO that Canizares personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17.75 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Canizares <u>also</u> purported to personally perform, or at least directly supervise: (a) at least one 30-minute patient examination; and (b) at least one 5-minute patient examination. In all, GEICO received billing for at least 18.25 hours of services that Canizares purported to personally perform, or at least directly supervise, on May 31, 2017.

(iii)   On March 7, 2018, CEDA Downtown, Cereceda, and Canizares purported to provide at least 170 individual physical therapy services and/or chiropractic services to at least 29 individual Insureds, and falsely contended in the resulting bills to GEICO that Canizares personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 18 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Canizares <u>also</u> purported to personally perform, or at least directly supervise: (a) at least two 30-minute patient examinations; and (b) at least six 15-minute patient examinations. In all, GEICO received billing for at least 20.5 hours of services that Canizares purported to personally perform, or at least directly supervise, on March 7, 2018.

292.    These are only representative examples. In the claims for physical therapy services and/or chiropractic services that are identified in Exhibit "1", the CEDA Downtown Defendants routinely falsely represented that Canizares had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services and/or chiropractic services on individual dates.

293.    Upon information and belief, the fraudulent billing for physical therapy services and/or chiropractic services that the CEDA Downtown Defendants submitted or caused to be submitted through CEDA Downtown constituted only a fraction of the total fraudulent billing for physical therapy services and/or chiropractic services that the CEDA Downtown Defendants submitted through CEDA Downtown to all of the automobile insurers in the Florida automobile insurance market.

294.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

295.    It is extremely improbable, to the point of impossibility, that the CEDA Downtown Defendants only submitted fraudulent billing to GEICO, and that the CEDA Downtown Defendants did not simultaneously bill other automobile insurers.

296.    Thus, upon information and belief, the improbable, and often impossible number of physical therapy services and/or chiropractic services that Canizares purported to directly supervise or provide to GEICO Insureds at CEDA Downtown on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services and/or chiropractic services that Canizares purported to directly supervise or provide at CEDA Downtown, including to individuals insured by companies other than GEICO, on those same dates of service.

297.    In fact, Canizares did not perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services that were billed through CEDA Downtown to GEICO under his name.

298.    Rather: (i) the vast majority of the putative "physical therapy" services and/or "chiropractic" services that the CEDA Downtown Defendants purported to provide through CEDA Downtown to Insureds were performed, to the extent that they were performed at all, by Hidalgo, Soto, Pena, Zapata, and other massage therapists and/or registered chiropractic assistants associated with CEDA Downtown, rather than by Canizares; (ii) Canizares did not even legitimately supervise the putative "physical therapy" services and/or "chiropractic" services that were billed through CEDA Downtown to GEICO; and (iii) virtually none of the putative "physical therapy" services and/or "chiropractic" services that were billed through CEDA Downtown to GEICO actually constituted physical therapy and/or chiropractic, because Hidalgo, Soto, Pena, Zapata, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Downtown are not and never have been licensed as physical therapists and/or chiropractors, and did not perform the pertinent services under the supervision of any licensed physical therapist, physician, chiropractor, or other health care provider.

299.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

300.    All of the billing that the CEDA Downtown Defendants submitted through CEDA Downtown to GEICO, including the billing for putative physical therapy services and/or chiropractic services, was submitted on HCFA-1500 forms.

301.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment and/or chiropractic treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

302.    To "directly supervise" a physical therapy and/or chiropractic treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

303.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy and/or chiropractic treatment, then the actual name of the person who is actually performing the treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

304.    The CEDA Downtown Defendants were well-aware of the fact that – because Hidalgo, Soto, Pena, Zapata, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Downtown were unsupervised massage therapists and/or registered chiropractic assistants, rather than physical therapists and/or chiropractors – CEDA Downtown could not recover PIP Benefits for any services that Hidalgo, Soto, Pena, Zapata or the

70

other unsupervised massage therapists and/or registered chiropractic assistants associated with CEDA Downtown purported to provide.

305.    As a result, and in order to conceal the fact that Hidalgo, Soto, Pena, Zapata, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Downtown unlawfully provided, without any legitimate supervision by Canizares, the vast majority of the "physical therapy" services and/or "chiropractic" services that were billed through CEDA Downtown to GEICO, the CEDA Downtown Defendants deliberately omitted any reference to Hidalgo, Soto, Pena, Zapata, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Downtown on the HCFA-1500 forms that they used to bill for the putative physical therapy services and/or chiropractic services.

306.    Instead, in the claims for physical therapy services and/or chiropractic services identified in Exhibit "1", the CEDA Downtown Defendants routinely falsely listed Canizares on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services and/or chiropractic services.

307.    For example:

(i)     On or about May 14, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Downtown to an Insured named MG on May 14, 2018. The HCFA-1500 form falsely represented that Canizares performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Downtown, Cereceda, and Canizares deliberately omitted any reference to Zapata from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Zapata performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(ii)    On or about May 25, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Downtown to an Insured named MB on May 25, 2018. The HCFA-1500 form falsely represented that Canizares performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic

services, and CEDA Downtown, Cereceda, and Canizares deliberately omitted any reference to Hidalgo and Soto from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Hidalgo or Soto performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(iii)     On or about May 29, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Downtown to an Insured named MR on May 29, 2018. The HCFA-1500 form falsely represented that Canizares performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Downtown, Cereceda, and Canizares deliberately omitted any reference to Hidalgo from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Hidalgo performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(iv)     On or about May 30, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Downtown to an Insured named MR on May 30, 2018. The HCFA-1500 form falsely represented that Canizares performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Downtown, Cereceda, and Canizares deliberately omitted any reference to Zapata or Pena from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Zapata and Pena performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(v)      On or about June 15, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Downtown to an Insured named ZY on June 15, 2018. The HCFA-1500 form falsely represented that Canizares performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Downtown, Cereceda, and Canizares deliberately omitted any reference to Zapata or Pena from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Zapata and Pena performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

308.     These are only representative examples. In the vast majority of the claims for physical therapy services and/or chiropractic services that are identified in Exhibit "1", the CEDA Downtown Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Canizares had performed or at least directly supervised the underlying physical therapy services

and/or chiropractic services, when in fact the services were performed by Hidalgo, Soto, Pena, Zapata, or other massage therapists and/or registered chiropractic assistants, to the extent that they were performed at all, without any legitimate supervision by Canizares or anyone else.

309.    In the claims the physical therapy services and/or chiropractic services identified in Exhibit "1", the CEDA Downtown Defendants routinely fraudulently misrepresented that the physical therapy services and/or chiropractic services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services and/or chiropractic services were illegally performed – to the extent they were performed at all – by massage therapists and/or registered chiropractic assistants, without any supervision by any licensed physicians, chiropractors, or physical therapists, in contravention of Florida law;

(ii)    CEDA Downtown could not lawfully recover PIP Benefits for the putative physical therapy services and/or chiropractic services, because they were illegally performed by massage therapists and/or registered chiropractic assistants, without any supervision by any licensed physicians, chiropractors, or physical therapists, in contravention of Florida law; and

(iii)   the CEDA Downtown Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services and/or chiropractic services in their billing for the putative "physical therapy" services and/or "chiropractic" services.

310.    In this context, Cereceda – who at all relevant times purported to own CEDA Downtown – did not, and could not have legitimately supervised the business activities of CEDA Downtown.

311.    Had Cereceda actually supervised the business activities of CEDA Downtown, Cereceda would have noted – among other things – that the CEDA Downtown Defendants routinely fraudulently represented and concealed in CEDA Downtown's billing the identities of the individuals who performed the putative physical therapy services and/or chiropractic services.

**2.      The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at CEDA Kendall**

312.    CEDA Kendall, Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez (collectively, the "CEDA Kendall Defendants") billed for multiple varieties of health care services, including: (i) initial patient examinations; (ii) follow-up examinations; (iii) chiropractic treatment; (iv) physical therapy treatment; and/or (v) pain management injections.

313.    However, and as set forth in Exhibit "2", the purported physical therapy services and/or chiropractic services constituted the majority of the services the CEDA Kendall Defendants billed through CEDA Kendall to GEICO.

314.    Yoham purported to personally perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services in the claims identified in Exhibit "2".

315.    In fact, however, the majority of the physical therapy services and/or chiropractic services that were billed through CEDA Kendall to GEICO were performed – to the extent that they were performed at all – by Aguayo, Baires, Ceballos, Hernandez, Sanchez, and other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall, without legitimate supervision or oversight by Yoham, or any other licensed physician, chiropractor, or physical therapist.

316.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

317.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1,

2013, to prohibit PIP reimbursement for massage or to massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

318.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

319.    Moreover, and as set forth above, a registered chiropractic assistant must work under the direct supervision and responsibility of a licensed chiropractor or certified chiropractic physician's assistant. See Fla. Stat. § 460.4166(2).

320.    Aguayo, Baires, Ceballos, Hernandez, and Sanchez were licensed as massage therapists and/or registered chiropractic assistants. Aguayo, Baires, Ceballos, Hernandez, and Sanchez were never licensed as physical therapists or chiropractors.

321.    As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law has prohibited CEDA Kendall from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Ceballos, Hernandez, and Sanchez.

322.    The Defendants were well-aware of the fact that CEDA Kendall could not legally recover PIP Benefits for services provided by unsupervised massage therapists and/or registered chiropractic assistants such as Ceballos, Hernandez, and Sanchez.

323.    For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or to massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

324.    In keeping with the fact that the CEDA Kendall Defendants knew that – with respect to insurance policies issued after January 1, 2013 – they could not lawfully recover PIP

Benefits for services provided by unsupervised massage therapists, the CEDA Kendall Defendants routinely falsely represented in their billing that Yoham personally performed, or at least directly supervised, the vast majority of the individual physical therapy services and/or chiropractic services that were billed through CEDA Kendall to GEICO.

325.    Similarly, in keeping with the fact that the CEDA Kendall Defendants knew that they could not lawfully recover PIP Benefits for services provided by unsupervised registered chiropractic assistants, the CEDA Kendall Defendants routinely falsely represented in their billing that Yoham personally performed, or at least directly supervised, the vast majority of the individual physical therapy services and/or chiropractic services that were billed through CEDA Kendall to GEICO.

326.    In keeping with the fact that Yoham could not have personally performed, or even directly supervised, the underlying physical therapy services and/or chiropractic services billed to GEICO through CEDA Kendall, Yoham would often purport to personally perform – or at least directly supervise – an improbable, and often impossible number of physical therapy services and/or chiropractic services in a given day.

327.    For example:

(i)     On January 29, 2014, CEDA Kendall, Cereceda, and Yoham purported to provide at least 140 individual physical therapy services and/or chiropractic services to at least 23 individual Insureds, and falsely contended in the resulting bills to GEICO that Yoham personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Yoham <u>also</u> purported to personally perform, or at least directly supervise at least one 30-minute patient examination. In all, GEICO received billing for at least 17.5 hours of services that Yoham purported to personally perform, or at least directly supervise, on January 29, 2014.

(ii)    On September 9, 2015, CEDA Kendall, Cereceda, and Yoham purported to provide at least 170 individual physical therapy services and/or chiropractic services to at

76

least 29 individual Insureds, and falsely contended in the resulting bills to GEICO that Yoham personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 18 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Yoham <u>also</u> purported to personally perform, or at least directly supervise: (a) at least two 30-minute patient examinations; (b) at least one 25-minute patient examination; and (c) at least one 15-minute patient examination. In all, GEICO received billing for at least 19.5 hours of services that Yoham purported to personally perform, or at least directly supervise, on September 9, 2015.

(iii)    On September 21, 2015, CEDA Kendall, Cereceda, and Yoham purported to provide at least 180 individual physical therapy services and/or chiropractic services to at least 28 individual Insureds, and falsely contended in the resulting bills to GEICO that Yoham personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 18 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Yoham <u>also</u> purported to personally perform, or at least directly supervise: (a) at least two 30-minute patient examinations; and (b) at least one 15-minute patient examination. In all, GEICO received billing for at least 19.25 hours of services that Yoham purported to personally perform, or at least directly supervise, on September 21, 2015.

328.    These are only representative examples. In the claims for physical therapy services and/or chiropractic services that are identified in Exhibit "2", the CEDA Kendall Defendants routinely falsely represented that Yoham had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services and/or chiropractic services on individual dates.

329.    Upon information and belief, the fraudulent billing for physical therapy services and/or chiropractic services that the CEDA Kendall Defendants submitted or caused to be submitted through CEDA Kendall constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services and/or chiropractic services that the CEDA Kendall Defendants submitted through CEDA Kendall to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

77

330.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

331.    It is extremely improbable, to the point of impossibility, that the CEDA Kendall Defendants only submitted fraudulent billing to GEICO, and that the CEDA Kendall Defendants did not simultaneously bill other automobile insurers.

332.    Thus, upon information and belief, the improbable, and often impossible number of physical therapy services and/or chiropractic services that Yoham purported to directly supervise or provide to GEICO Insureds at CEDA Kendall on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services and/or chiropractic services that Yoham purported to directly supervise or provide at CEDA Kendall, including to individuals insured by companies other than GEICO, on those same dates of service.

333.    In fact, Yoham did not perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services that were billed through CEDA Kendall to GEICO.

334.    Rather: (i) the vast majority of the putative "physical therapy" services and/or "chiropractic" services that the CEDA Kendall Defendants purported to provide through CEDA Kendall to Insureds were performed, to the extent that they were performed at all, by Aguayo, Baires, Ceballos, Hernandez, Sanchez, and other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall, rather than by Yoham; (ii) Yoham did not even legitimately supervise the putative "physical therapy" services and/or "chiropractic" services that were billed through CEDA Kendall to GEICO; and (iii) virtually none of the putative "physical therapy" services and/or "chiropractic" services that were billed through CEDA Kendall to GEICO

actually constituted physical therapy and/or chiropractic, because Aguayo, Baires, Ceballos, Hernandez, Sanchez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall are not and never have been licensed as physical therapists and/or chiropractors, and did not perform the pertinent services under the supervision of any licensed physical therapist, physician, chiropractor, or other health care provider.

335.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

336.    All of the billing that the CEDA Kendall Defendants submitted through CEDA Kendall to GEICO, including the billing for putative physical therapy services and/or chiropractic services, was submitted on HCFA-1500 forms.

337.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment and/or chiropractic treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

338.    To "directly supervise" a physical therapy treatment and/or chiropractic treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

79

339.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment and/or chiropractic treatment, then the actual name of the person who is actually performing the treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

340.    The CEDA Kendall Defendants were well-aware of the fact that – because Aguayo, Baires, Ceballos, Hernandez, Sanchez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall were unsupervised massage therapists and/or registered chiropractic assistants, rather than physical therapists and/or chiropractors – CEDA Kendall could not recover PIP Benefits for any services that Aguayo, Baires, Ceballos, Hernandez, Sanchez or the other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall purported to provide.

341.    As a result, and in order to conceal the fact that Aguayo, Baires, Ceballos, Hernandez, Sanchez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall unlawfully provided, without any legitimate supervision by Yoham, the majority of the "physical therapy" services and/or "chiropractic" services that were billed through CEDA Kendall to GEICO, the CEDA Kendall Defendants deliberately omitted any reference to Aguayo, Baires, Ceballos, Hernandez, Sanchez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall on the HCFA-1500 forms that they used to bill for the putative physical therapy services and/or chiropractic services.

342.    Instead, in the claims for physical therapy services and/or chiropractic services identified in Exhibit "2", the CEDA Kendall Defendants routinely falsely listed Yoham on the

80

HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services and/or chiropractic services.

343. For example:

(i) On or about August 25, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO for purported physical therapy services and/or chiropractic services that purportedly were provided through CEDA Kendall to an Insured named MC on August 25, 2014. The HCFA-1500 form falsely represented that Yoham performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Kendall, Cereceda, and Yoham deliberately omitted any reference to Hernandez or Aguayo from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Hernandez and Aguayo performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(ii) On or about March 21, 2015, CEDA Kendall, Cereceda, and Yoham billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Kendall to an Insured named RH on March 21, 2015. The HCFA-1500 form falsely represented that Yoham performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Kendall, Cereceda, and Yoham deliberately omitted any reference to Hernandez from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Hernandez performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(iii) On or about September 25, 2015, CEDA Kendall, Cereceda, and Yoham billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Kendall to an Insured named JH on September 25, 2015. The HCFA-1500 form falsely represented that Yoham performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Kendall, Cereceda, and Yoham deliberately omitted any reference to Garcia or Aguayo from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Garcia and Aguayo performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(iv) On or about May 15, 2017, the CEDA Kendall, Cereceda, and Yoham billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Kendall to an Insured named SP on May 15, 2017. The HCFA-1500 form falsely represented that Yoham performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Kendall, Cereceda, and Yoham deliberately omitted any reference to Sanchez or Baires from the HCFA-1500 form. However, the

underlying physical therapy and/or chiropractic treatment notes indicated that Sanchez and Baires performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(v)     On or about June 13, 2018, the CEDA Kendall, Cereceda, and Yoham billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Kendall to an Insured named AB on June 13, 2018. The HCFA-1500 form falsely represented that Yoham performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Kendall, Cereceda, and Yoham deliberately omitted any reference to Ceballos or Baires from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Ceballos and Baires performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

344.    These are only representative examples. In most of the claims for physical therapy services and/or chiropractic services that are identified in Exhibit "2", the CEDA Kendall Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Yoham had performed or at least directly supervised the underlying physical therapy services and/or chiropractic services, when in fact the services were performed by Aguayo, Baires, Ceballos, Hernandez, Sanchez, or other massage therapists and/or registered chiropractic assistants, to the extent that they were performed at all, without any legitimate supervision by Yoham.

345.    In the claims the physical therapy services and/or chiropractic services identified in Exhibit "2", the CEDA Kendall Defendants routinely fraudulently misrepresented that the physical therapy services and/or chiropractic services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services and/or chiropractic services were illegally performed – to the extent they were performed at all – by massage therapists and/or registered chiropractic assistants, without any supervision by any licensed physicians, chiropractors, or physical therapists, in contravention of Florida law;

(ii)    CEDA Kendall could not lawfully recover PIP Benefits for the putative physical therapy services and/or chiropractic services, because they were illegally performed by massage therapists and/or registered chiropractic assistants, without any

supervision by any licensed physicians, chiropractors, or physical therapists, in contravention of Florida law; and

(iii)     the CEDA Kendall Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services and/or chiropractic services in their billing for the putative "physical therapy" services and/or "chiropractic" services.

346.     In this context, Cereceda – who at all relevant times purported to own CEDA Kendall – did not, and could not have legitimately supervised the business activities of CEDA Kendall.

347.     Had Cereceda actually supervised the business activities of CEDA Kendall, Cereceda would have noted – among other things – that the CEDA Kendall Defendants routinely fraudulently represented and concealed in CEDA Kendall's billing the identities of the individuals who performed the putative physical therapy services and/or chiropractic services.

**3.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at CEDA Hialeah**

348.     CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Ross, Pabon, Otero, Pascucci, and Rodriguez (collectively, the "CEDA Hialeah Defendants") billed for multiple varieties of health care services, including: (i) initial patient examinations; (ii) follow-up examinations; (iii) chiropractic treatment; (iv) physical therapy treatment; and/or (v) pain management injections.

349.     As set forth in Exhibit "3", the purported physical therapy services and/or chiropractic services constituted the vast majority of the services the CEDA Hialeah Defendants billed through CEDA Hialeah to GEICO.

350.     Habayeb and Fenelus purported to personally perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services in the claims identified in Exhibit "3".

351.    In fact, however, the majority of the physical therapy services and/or chiropractic services that were billed through CEDA Hialeah to GEICO were performed – to the extent that they were performed at all – by Otero, Pascucci, Rodriguez, and other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah, without legitimate supervision or oversight by Habayeb, Fenelus, or any other licensed physician, chiropractor, or physical therapist.

352.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

353.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or to massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

354.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

355.    Moreover, and as set forth above, a registered chiropractic assistant must work under the direct supervision and responsibility of a licensed chiropractor or certified chiropractic physician's assistant. See Fla. Stat. § 460.4166(2).

356.    Otero, Pascucci, and Rodriguez were licensed as massage therapists and/or registered chiropractic assistants. Otero, Pascucci, and Rodriguez were never licensed as physical therapists or chiropractors.

357.    As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law has prohibited CEDA Hialeah from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Otero, Pascucci, and Rodriguez.

358.    The Defendants were well-aware of the fact that CEDA Hialeah could not legally recover PIP Benefits for services provided by unsupervised massage therapists and/or registered chiropractic assistants such as Otero, Pascucci, and Rodriguez.

359.    For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or to massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

360.    In keeping with the fact that the CEDA Hialeah Defendants knew that – with respect to insurance policies issued after January 1, 2013 – they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, the CEDA Hialeah Defendants routinely falsely represented in their billing that Habayeb or Fenelus personally performed, or at least directly supervised, the vast majority of the individual physical therapy services and/or chiropractic services that were billed through CEDA Hialeah to GEICO.

361.    Similarly, in keeping with the fact that the CEDA Hialeah Defendants knew that they could not lawfully recover PIP Benefits for services provided by unsupervised registered chiropractic assistants, the CEDA Hialeah Defendants routinely falsely represented in their billing that Habayeb or Fenelus personally performed, or at least directly supervised, the vast majority of

85

the individual physical therapy services and/or chiropractic services that were billed through CEDA Hialeah to GEICO.

362.    In keeping with the fact that neither Habayeb nor Fenelus could have personally performed, or at least directly supervised, the underlying physical therapy services and/or chiropractic services billed to GEICO through CEDA Hialeah, Habayeb and Fenelus would often purport to personally perform – or at least directly supervise – an improbable, and often impossible number of physical therapy services and/or chiropractic services in a given day.

363.    For example:

(i)     On April 2, 2014, CEDA Hialeah, Cereceda, and Habayeb purported to provide at least 140 individual physical therapy and/or chiropractic services to at least 23 individual Insureds, and falsely contended in the resulting bills to GEICO that Habayeb personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Habayeb also purported to personally perform, or at least directly supervise: (a) at least two 30-minute patient examinations; and (b) at least four 15-minute patient examinations. In all, GEICO received billing for at least 17 hours of services that Habayeb purported to personally perform, or at least directly supervise, on April 2, 2014.

(ii)    On March 1, 2017, CEDA Hialeah, Cereceda, and Fenelus purported to provide at least 110 individual physical therapy and/or chiropractic services to at least 16 individual Insureds, and falsely contended in the resulting bills to GEICO that Fenelus personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Fenelus also purported to personally perform, or at least directly supervise: (a) at least one 30-minute patient examination; (b) at least one 25-minute patient examination; and (c) at least one 5-minute patient examination. In all, GEICO received billing for at least 15 hours of services that Fenelus purported to personally perform, or at least directly supervise, on March 1, 2017.

364.    These are only representative examples. In the claims for physical therapy services and/or chiropractic services that are identified in Exhibit "3", the CEDA Hialeah Defendants

routinely falsely represented that Habayeb and Fenelus had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services and/or chiropractic services on individual dates.

365.    Upon information and belief, the fraudulent billing for physical therapy services and/or chiropractic services that the CEDA Hialeah Defendants submitted or caused to be submitted through CEDA Hialeah constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services and/or chiropractic services that the CEDA Hialeah Defendants submitted through CEDA Hialeah to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

366.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

367.    It is extremely improbable, to the point of impossibility, that the CEDA Hialeah Defendants only submitted fraudulent billing to GEICO, and that the CEDA Hialeah Defendants did not simultaneously bill other automobile insurers.

368.    Thus, upon information and belief, the improbable, and often impossible number of physical therapy services and/or chiropractic services that Habayeb and Fenelus purported to directly supervise or provide to GEICO Insureds at CEDA Hialeah on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services and/or chiropractic services that Habayeb and Fenelus purported to directly supervise or provide at CEDA Hialeah, including to individuals insured by companies other than GEICO, on those same dates of service.

369.    In fact, Habayeb and Fenelus did not perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services that were billed through CEDA Hialeah to GEICO.

370.    Rather: (i) the vast majority of the putative "physical therapy" services and/or "chiropractic" services that the CEDA Hialeah Defendants purported to provide through CEDA Hialeah to Insureds were performed, to the extent that they were performed at all, by Otero, Pascucci, Rodriguez, and other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah, rather than by Habayeb or Fenelus; (ii) Habayeb and Fenelus did not even legitimately supervise the putative "physical therapy" services and/or "chiropractic" services that were billed through CEDA Hialeah to GEICO; and (iii) virtually none of the putative "physical therapy" services and/or "chiropractic" services that were billed through CEDA Hialeah to GEICO actually constituted physical therapy and/or chiropractic, because Otero, Pascucci, Rodriguez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah are not and never have been licensed as physical therapists and/or chiropractors, and did not perform the pertinent services under the supervision of any licensed physical therapist, physician, or other health care provider.

371.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

372.    All of the billing that the CEDA Hialeah Defendants submitted through CEDA Hialeah to GEICO, including the billing for putative physical therapy services and/or chiropractic services, was submitted on HCFA-1500 forms.

373.     Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment and/or chiropractic treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

374.     To "directly supervise" a physical therapy treatment and/or chiropractic treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

375.     Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment and/or chiropractic treatment, then the actual name of the person who is actually performing the treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

376.     The CEDA Hialeah Defendants were well-aware of the fact that – because Otero, Pascucci, Rodriguez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah were unsupervised massage therapists and/or registered chiropractic assistants, rather than physical therapists and/or chiropractors – CEDA Hialeah could not recover PIP Benefits for any services that Otero, Pascucci, Rodriguez or the other massage

therapists and/or registered chiropractic assistants associated with CEDA Hialeah purported to provide.

377.    As a result, and in order to conceal the fact that Otero, Pascucci, Rodriguez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah unlawfully provided, without any legitimate supervision by Habayeb or Fenelus, the majority of the "physical therapy" services that were billed through CEDA Hialeah to GEICO, the CEDA Hialeah Defendants deliberately omitted any reference to Otero, Pascucci, Rodriguez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah on the HCFA-1500 forms that they used to bill for the putative physical therapy services and/or chiropractic services.

378.    Instead, in the claims for physical therapy services and/or chiropractic services identified in Exhibit "3", the CEDA Hialeah Defendants routinely falsely listed Habayeb and Fenelus on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services and/or chiropractic services.

379.    For example:

(i)    On or about October 7, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Hialeah to an Insured named MF on October 7, 2014. The HCFA-1500 form falsely represented that Habayeb performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Hialeah, Cereceda, and Habayeb deliberately omitted any reference to Otero or Pascucci from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Otero and Pascucci performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(ii)    On or about October 9, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Hialeah to an Insured named MF on October 9, 2014. The HCFA-1500 form falsely represented that Habayeb performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic

services, and CEDA Hialeah, Cereceda, and Habayeb deliberately omitted any reference to Otero or Pascucci from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Otero and Pascucci performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(iii)     On or about March 8, 2017, CEDA Hialeah, Cereceda, and Fenelus billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Hialeah to an Insured named TP on March 8, 2017. The HCFA-1500 form falsely represented that Fenelus performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Hialeah, Cereceda, and Fenelus deliberately omitted any reference to Rodriguez from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Rodriguez performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(iv)     On or about March 8, 2017, CEDA Hialeah, Cereceda, and Fenelus billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Hialeah to an Insured named MH on March 8, 2017. The HCFA-1500 form falsely represented that Fenelus performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Hialeah, Cereceda, and Fenelus deliberately omitted any reference to Rodriguez from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Rodriguez performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

380.     These are only representative examples. In the vast majority of the claims for physical therapy services and/or chiropractic services that are identified in Exhibit "3", the CEDA Hialeah Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Habayeb and Fenelus had performed or at least directly supervised the underlying physical therapy services and/or chiropractic services, when in fact the services were performed by Otero, Pascucci, Rodriguez, or other massage therapists and/or registered chiropractic assistants, to the extent that they were performed at all, without any legitimate supervision by Habayeb or Fenelus.

381.     In the claims the physical therapy services and/or chiropractic services identified in Exhibit "3", the CEDA Hialeah Defendants routinely fraudulently misrepresented that the physical

therapy services and/or chiropractic services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

    (i)    the putative physical therapy services and/or chiropractic services were illegally performed – to the extent they were performed at all – by massage therapists and/or registered chiropractic assistants, without any supervision by any licensed physicians, chiropractors, or physical therapists, in contravention of Florida law;

    (ii)    CEDA Hialeah could not lawfully recover PIP Benefits for the putative physical therapy services and/or chiropractic services, because they were illegally performed by massage therapists and/or registered chiropractic assistants, without any supervision by any licensed physicians, chiropractors, or physical therapists, in contravention of Florida law; and

    (iii)    the CEDA Hialeah Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services and/or chiropractic services in their billing for the putative "physical therapy" services and/or "chiropractic" services.

382.   In this context, Cereceda – who at all relevant times purported to own CEDA Hialeah – did not, and could not have legitimately supervised the business activities of CEDA Hialeah.

383.   Had Cereceda actually supervised the business activities of CEDA Hialeah, Cereceda would have noted – among other things – that the CEDA Hialeah Defendants routinely fraudulently represented and concealed in CEDA Hialeah's billing the identities of the individuals who performed the putative physical therapy services and/or chiropractic services.

## 4.   The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at CEDA Miami

384.   CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Yoham, Nunez, Otero, Paredes, Pascucci, and Sanchez (collectively, the "CEDA Miami Defendants") billed for multiple varieties of health care services, including: (i) initial patient examinations; (ii) follow-up examinations; (iii) chiropractic treatment; (iv) physical therapy treatment; and/or (v) pain management injections.

385.    As set forth in Exhibit "4", the purported physical therapy services and/or chiropractic services constituted the vast majority of the services the CEDA Miami Defendants billed through CEDA Miami to GEICO.

386.    Habayeb and Schulman purported to personally perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services in the claims identified in Exhibit "4".

387.    In fact, however, the vast majority of the physical therapy services and/or chiropractic services that were billed through CEDA Miami to GEICO were performed – to the extent that they were performed at all – by Nunez, Otero, Paredes, Pascucci, Sanchez, and other massage therapists and/or registered chiropractic assistants associated with CEDA Miami, without legitimate supervision or oversight by Habayeb, Schulman, or any other licensed physician or chiropractor.

388.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

389.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or to massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

390.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

391.    Moreover, and as set forth above, a registered chiropractic assistant must work under the direct supervision and responsibility of a licensed chiropractor or certified chiropractic physician's assistant. See Fla. Stat. § 460.4166(2).

392.    Nunez, Otero, Paredes, Pascucci, and Sanchez were licensed as massage therapists and/or registered chiropractic assistants. Nunez, Otero, Paredes, Pascucci, and Sanchez were never licensed as physical therapists or chiropractors.

393.    As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law has prohibited CEDA Miami from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Nunez, Otero, Paredes, Pascucci, and Sanchez.

394.    The CEDA Miami Defendants were well-aware of the fact that CEDA Miami could not legally recover PIP Benefits for services provided by unsupervised massage therapists and/or registered chiropractic assistants such as Nunez, Otero, Paredes, Pascucci, and Sanchez.

395.    For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or to massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

396.    In keeping with the fact that the CEDA Miami Defendants knew that – with respect to insurance policies issued after January 1, 2013 – they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, the CEDA Miami Defendants routinely falsely represented in their billing that Habayeb or Schulman personally performed, or at least

directly supervised, the vast majority of the individual physical therapy services and/or chiropractic services that were billed through CEDA Miami to GEICO.

397.    Similarly, in keeping with the fact that the CEDA Miami Defendants knew that they could not lawfully recover PIP Benefits for services provided by unsupervised registered chiropractic assistants, the CEDA Miami Defendants routinely falsely represented in their billing that Habayeb or Schulman personally performed, or at least directly supervised, the vast majority of the individual physical therapy services and/or chiropractic services that were billed through CEDA Miami to GEICO.

398.    In keeping with the fact that neither Habayeb nor Schulman could have personally performed, or at least directly supervised, the underlying physical therapy services and/or chiropractic services billed to GEICO through CEDA Miami, Habayeb and Schulman would often purport to personally perform – or at least directly supervise – an improbable, and often impossible number of physical therapy services and/or chiropractic services in a given day.

399.    For example:

(i)     On October 28, 2015, CEDA Miami, Cereceda, and Schulman purported to provide at least 140 individual physical therapy services and/or chiropractic services to at least 23 individual Insureds, and falsely contended in the resulting bills to GEICO that Schulman personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Schulman also purported to personally perform, or at least directly supervise: (a) at least two 30-minute patient examinations; and (b) at least three 15-minute patient examinations. In all, GEICO received billing for at least 18.75 hours of services that Schulman purported to personally perform, or at least directly supervise, on October 28, 2015.

(ii)    On November 11, 2015, CEDA Miami, Cereceda, and Schulman purported to provide at least 150 individual physical therapy services and/or chiropractic services to at least 23 individual Insureds, and falsely contended in the resulting bills to GEICO that Schulman personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at

least 19.25 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Schulman also purported to personally perform, or at least directly supervise at least one 30-minute patient examination. In all, GEICO received billing for at least 19.75 hours of services that Schulman purported to personally perform, or at least directly supervise, on November 11, 2015.

(iii)    On September 29, 2017, CEDA Miami, Cereceda, and Habayeb purported to provide at least 140 individual physical therapy services and/or chiropractic services to at least 24 individual Insureds, and falsely contended in the resulting bills to GEICO that Habayeb personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 16.5 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Habayeb also purported to personally perform, or at least directly supervise: (a) at least one 30-minute patient examination; and (b) at least one 15-minute patient examination. In all, GEICO received billing for at least 17.25 hours of services that Habayeb purported to personally perform, or at least directly supervise, on September 29, 2017.

(iv)    On December 4, 2017, CEDA Miami, Cereceda, and Habayeb purported to provide at least 130 individual physical therapy services and/or chiropractic services to at least 21 individual Insureds, and falsely contended in the resulting bills to GEICO that Habayeb personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15.5 hours of physical therapy services and/or chiropractic services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Habayeb also purported to personally perform, or at least directly supervise: (a) at least one 30-minute patient examination; (b) at least one 25-minute patient examination; and (c) at least three 15-minute patient examinations. In all, GEICO received billing for at least 17 hours of services that Habayeb purported to personally perform, or at least directly supervise, on December 4, 2017.

400.    These are only representative examples. In the claims for physical therapy services and/or chiropractic services that are identified in Exhibit "4", the CEDA Miami Defendants routinely falsely represented that Habayeb and Schulman had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services and/or chiropractic services on individual dates.

96

401.    Upon information and belief, the fraudulent billing for physical therapy services and/or chiropractic services that the CEDA Miami Defendants submitted or caused to be submitted through CEDA Miami constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services and/or chiropractic services that the CEDA Miami Defendants submitted through CEDA Miami to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

402.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

403.    It is extremely improbable, to the point of impossibility, that the CEDA Miami Defendants only submitted fraudulent billing to GEICO, and that the CEDA Miami Defendants did not simultaneously bill other automobile insurers.

404.    Thus, upon information and belief, the improbable, and often impossible number of physical therapy services and/or chiropractic services that Habayeb and Schulman purported to directly supervise or provide to GEICO Insureds at CEDA Miami on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services and/or chiropractic services that Habayeb and Schulman purported to directly supervise or provide at CEDA Miami, including to individuals insured by companies other than GEICO, on those same dates of service.

405.    In fact, Habayeb and Schulman did not perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services that were billed through CEDA Miami to GEICO.

406.    Rather: (i) the vast majority of the putative "physical therapy" services and/or "chiropractic" services that the CEDA Miami Defendants purported to provide through CEDA Miami to Insureds were performed, to the extent that they were performed at all, by Nunez, Otero,

Paredes, Pascucci, Sanchez, and other massage therapists and/or registered chiropractic assistants associated with CEDA Miami, rather than by Habayeb or Schulman; (ii) Habayeb and Schulman did not even legitimately supervise the putative "physical therapy" services and/or "chiropractic" services that were billed through CEDA Miami to GEICO; and (iii) virtually none of the putative "physical therapy" services and/or "chiropractic" services that were billed through CEDA Miami to GEICO actually constituted physical therapy and/or chiropractic, because Nunez, Otero, Paredes, Pascucci, Sanchez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Miami are not and never have been licensed as physical therapists and/or chiropractors, and did not perform the pertinent services under the supervision of any licensed physical therapist, physician, or other health care provider.

407.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

408.    All of the billing that the CEDA Miami Defendants submitted through CEDA Miami to GEICO, including the billing for putative physical therapy services and/or chiropractic services, was submitted on HCFA-1500 forms.

409.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment and/or chiropractic treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

410.    To "directly supervise" a physical therapy treatment and/or chiropractic treatment, a physician "must be present in the office suite and immediately available to furnish assistance and

direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." <u>See</u>, <u>e.g.</u>, Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, <u>citing</u> 42 C.F.R. 410.32.

411.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment and/or chiropractic treatment, then the actual name of the person who is actually performing the treatment must be listed on the HCFA-1500 form. <u>See</u>, <u>e.g.</u>, Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

412.    The CEDA Miami Defendants were well-aware of the fact that – because Nunez, Otero, Paredes, Pascucci, Sanchez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Miami were unsupervised massage therapists and/or registered chiropractic assistants, rather than physical therapists – CEDA Miami could not recover PIP Benefits for any services that Nunez, Otero, Paredes, Pascucci, Sanchez or the other massage therapists and/or registered chiropractic assistants associated with CEDA Miami purported to provide.

413.    As a result, and in order to conceal the fact that Nunez, Otero, Paredes, Pascucci, Sanchez, and the other massage therapists and/or registered chiropractic assistants associated with CEDA Miami unlawfully provided, without any legitimate supervision by Habayeb or Schulman, the majority of the "physical therapy" services and/or "chiropractic" services that were billed through CEDA Miami to GEICO, the CEDA Miami Defendants deliberately omitted any reference to Nunez, Otero, Paredes, Pascucci, Sanchez, and the other massage therapists and/or registered

99

chiropractic assistants associated with CEDA Miami on the HCFA-1500 forms that they used to bill for the putative physical therapy services and/or chiropractic services.

414. Instead, in the claims for physical therapy services and/or chiropractic services identified in Exhibit "4", the CEDA Miami Defendants routinely falsely listed Habayeb and Schulman on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services and/or chiropractic services.

415. For example:

(i)     On or about February 1, 2014, CEDA Miami, Cereceda, and Schulman billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Miami to an Insured named YM on February 1, 2014. The HCFA-1500 form falsely represented that Schulman performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Miami, Cereceda, and Schulman deliberately omitted any reference to Nunez from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Nunez performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(ii)    On or about February 5, 2014, CEDA Miami, Cereceda, and Schulman billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Miami to an Insured named YM on February 5, 2014. The HCFA-1500 form falsely represented that Schulman performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Miami, Cereceda, and Schulman deliberately omitted any reference to Paredes from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Paredes performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(iii)   On or about June 14, 2017, CEDA Miami, Cereceda, and Habayeb billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Miami to an Insured named BM on June 14, 2017. The HCFA-1500 form falsely represented that Habayeb performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Miami, Cereceda, and Habayeb deliberately omitted any reference to Otero from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Otero performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

(iv)     On or about July 10, 2018, CEDA Miami, Cereceda, and Habayeb billed GEICO for physical therapy services and/or chiropractic services that purportedly were provided through CEDA Miami to an Insured named NH on July 10, 2018. The HCFA-1500 form falsely represented that Habayeb performed, or at least directly supervised, the pertinent physical therapy services and/or chiropractic services, and CEDA Miami, Cereceda, and Habayeb deliberately omitted any reference to Pascucci or Sanchez from the HCFA-1500 form. However, the underlying physical therapy and/or chiropractic treatment notes indicated that Pascucci and Sanchez performed the purported physical therapy services and/or chiropractic services – to the extent that they were performed at all.

416.    These are only representative examples. In most of the claims for physical therapy services and/or chiropractic services that are identified in Exhibit "4", the CEDA Miami Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Habayeb and Schulman had performed or at least directly supervised the underlying physical therapy services and/or chiropractic services, when in fact the services were performed by Nunez, Otero, Paredes, Pascucci, Sanchez, or other massage therapists and/or registered chiropractic assistants, to the extent that they were performed at all, without any legitimate supervision by Habayeb or Schulman.

417.    In the claims the physical therapy services and/or chiropractic services identified in Exhibit "4", the CEDA Miami Defendants routinely fraudulently misrepresented that the physical therapy services and/or chiropractic services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services and/or chiropractic services were illegally performed – to the extent they were performed at all – by massage therapists and/or registered chiropractic assistants, without any supervision by any licensed physicians, chiropractors, or physical therapists, in contravention of Florida law;

(ii)    CEDA Miami could not lawfully recover PIP Benefits for the putative physical therapy services and/or chiropractic services, because they were illegally performed by massage therapists and/or registered chiropractic assistants, without any supervision by any licensed physicians, chiropractors, or physical therapists, in contravention of Florida law; and

(iii)    the CEDA Miami Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services and/or chiropractic services in their billing for the putative "physical therapy" services and/or "chiropractic" services.

418.    In this context, Cereceda – who at all relevant times purported to own CEDA Miami – did not, and could not have legitimately supervised the business activities of CEDA Miami.

419.    Had Cereceda actually supervised the business activities of CEDA Miami, Cereceda would have noted – among other things – that the CEDA Miami Defendants routinely fraudulently represented and concealed in CEDA Miami's billing the identities of the individuals who performed the putative physical therapy services and/or chiropractic services.

**E.    The Defendants' Fraudulent Treatment and Billing Protocol**

420.    The Defendants used CEDA Downtown, CEDA Hialeah, CEDA Kendall, CEDA Miami, and CEDA Cutler Bay as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

421.    The billing not only misrepresented CEDA Downtown, CEDA Hialeah, CEDA Kendall, CEDA Miami, and CEDA Cutler Bay's compliance with the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws, but also misrepresented the medical necessity of the underlying health care services, and whether the underlying health care services actually were performed in the first instance.

422.    The vast majority of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the minor accidents they experienced or purported to experience.

102

423.    Even so, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol.

424.    This pre-determined, fraudulent protocol was designed to maximize the billing that the Defendants could submit to insurers, including GEICO, not to benefit the Insureds who purportedly were subjected to it.

425.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or – in many cases – the total absence of any actual medical problems arising from any actual automobile accidents.

426.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing for each Insured.

427.    No legitimate chiropractor, physician, physical therapist, chiropractic practice, or other health care provider would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

428.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to continue profiting from their fraudulent scheme.

**1.      The CEDA Downtown Defendants' Fraudulent Treatment and Billing Protocol**

**(i)      The Fraudulent Charges for Initial Examinations at CEDA Downtown**

429.     As an initial step in the CEDA Downtown Defendants' fraudulent treatment and billing protocol, CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh purported to provide the Insureds in the claims identified in Exhibit "1" with a putative initial examination.

430.     Canizares, Crespo-Smith, and Facuseh purported to personally perform most of the initial examinations in the claims identified in Exhibit "1".

431.     As set forth in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in charges of between $280.00 and $539.00 for each initial examination that they purported to provide.

432.     In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented CEDA Downtown's eligibility to collect PIP Benefits in the first instance.

433.     In fact, and as set forth above, CEDA Downtown never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

434.     As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a.     **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

435.     As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

436.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

437.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

438.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

439.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

440.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

441.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

442.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "1" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

443.    What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

444.    Even so, in the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Crespo-Smith routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

445.    For example:

(i)    On May 31, 2014, an Insured named GZ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GZ's vehicle did not deploy and that GZ's vehicle was drivable following the accident. The police report further indicated that GZ was not injured in the accident. In keeping with the fact that GZ was not seriously injured in the accident, GZ did not visit any hospital emergency room following the accident. To the extent that GZ experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of GZ by Canizares on June 11, 2014, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial

examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)    On June 4, 2014, an Insured named VC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in VC's vehicle did not deploy, and that VC's vehicle was drivable following the accident. The police report further indicated that VC was not injured in the accident. In keeping with the fact that VC was not seriously injured in the accident, VC did not visit any hospital emergency room following the accident. To the extent that VC experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of VC by Canizares on June 4, 2014, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of VC by Crespo-Smith on June 10, 2014, CEDA Downtown, Cereceda and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)    On June 3, 2015, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in CT's vehicle did not deploy, that the damage to CT's vehicle was minor, that there was minor damage to the other vehicle, and that CT's vehicle was drivable following the accident. The police report further indicated that CT was not injured in the accident. In keeping with the fact that CT was not seriously injured in the accident, CT did not visit any hospital emergency room following the accident. To the extent that CT experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of CT by Canizares on June 10, 2015, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of CT by Crespo-Smith on June 16, 2015, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On December 29, 2015, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MP's vehicle did not deploy, that the damage to MP's vehicle was minor, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured in the accident. In keeping with the fact that MP was not seriously injured in the accident, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a

purported initial examination of MP by Canizares on December 30, 2015, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)     On December 28, 2017, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in JH's vehicle did not deploy, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured in the accident. In keeping with the fact that JH was not seriously injured in the accident, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of JH by Canizares on January 9, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)    On February 8, 2018, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DS's vehicle did not deploy and that DS's vehicle was drivable following the accident. The police report further indicated that DS was not injured in the accident. Nonetheless, thirteen days later, on February 21, 2018, DS traveled on her own to Coral Gables Hospital Emergency Department. The contemporaneous hospital records indicated that DS complained of neck and back pain. The hospital records further indicated that DS was briefly observed on an outpatient basis and then discharged with a routine neck and back pain diagnosis. To the extent that DS experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of DS by Canizares on March 12, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)   On March 23, 2018, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MH's vehicle did not deploy, that the damage to MH's vehicle was minor, that there was minor damage to the other vehicle, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured in the accident. In keeping with the fact that MH was not seriously injured in the accident, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MH by Canizares on March 28, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of MH by Crespo-Smith

on April 5, 2018, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)    On May 7, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MB's vehicle did not deploy and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured in the accident. In keeping with the fact that MB was not seriously injured in the accident, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MB by Canizares on May 17, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of MB by Crespo-Smith on May 22, 2018, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)    On May 7, 2018, an Insured named CG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CG's vehicle did not deploy and that CG's vehicle was drivable following the accident. The police report further indicated that CG was not injured in the accident. In keeping with the fact that CG was not seriously injured in the accident, CG did not visit any hospital emergency room following the accident. To the extent that CG experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of CG by Canizares on May 21, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)    On May 25, 2018, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MR's vehicle did not deploy, that the damage to MR's vehicle was minor, that there was minor damage to the other vehicle, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured in the accident. In keeping with the fact that MR was not seriously injured in the accident, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MR by Canizares on May 29, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of MR by Crespo-Smith on June 7, 2018, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO for

the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

446.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Crespo-Smith routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

447.    In the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Crespo-Smith routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

448.    In the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Crespo-Smith also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the CEDA Downtown Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy services and/or chiropractic services, and pain management injections.

b.    **Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

449.    What is more, in the claims identified in Exhibit "1" for initial examinations under CPT code 99203, CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely

misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

450.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

451.    As set forth in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh virtually always billed for the putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

452.    In fact, in most of the claims for initial examinations identified in Exhibit "1", neither Canizares, Crespo-Smith, nor Facuseh ever spent more than 15 minutes – let alone 30 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

453.    For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not entail more than 15 minutes of face-to-face time between Canizares, Crespo-Smith, and Facuseh and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh used a template in purporting to conduct the initial examinations.

454.    The template that CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

455.     The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

456.     These brief patient interviews and limited examinations did not require Canizares, Crespo-Smith, or Facuseh, nor any other physician or chiropractor associated with CEDA Downtown, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

457.     What is more, Canizares could not legitimately have personally performed the initial examinations at CEDA Downtown, or even directly supervised them, much less have spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

458.     For example:

(i)      On or about March 22, 2017, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for two initial examinations that Canizares falsely purported to perform on Insureds named SR and AQ. On that same day, Canizares also purported to personally provide or directly supervise at least 16 hours of physical therapy services and/or chiropractic services to at least twenty individual Insureds at CEDA Downtown, all of which were billed to GEICO. What is more, on that same day, Canizares also purported to perform at least one 25-minute follow-up examination and at least two 5-minute follow-up examinations which were billed to GEICO through CEDA Downtown.

(ii)     On or about May 30, 2017, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for three initial examinations that Canizares falsely purported to perform on Insureds named RG, AG, and JM. On that same day, Canizares also purported to personally provide or directly supervise at least 15 hours of physical therapy services and/or chiropractic services to at least twenty-seven individual Insureds at CEDA Downtown, all of which were billed to GEICO. What is more, on that same day, Canizares also purported to perform at least one 15-minute follow-up examination and at least one five-minute follow-up examination which were billed to GEICO through CEDA Downtown.

(iii)    On or about May 31, 2017, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares falsely purported to perform on an Insured named MB. On that same day, Canizares also purported to personally provide or directly supervise at least 17 hours of physical therapy services and/or chiropractic services to at least twenty-two individual Insureds at CEDA Downtown, all of which were billed to GEICO. What is more,

on that same day, Canizares also purported to perform at least one 5-minute follow-up examination which was billed to GEICO through CEDA Downtown.

(iv)     On or about March 7, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for two initial examinations that Canizares falsely purported to perform on Insureds named AG and KL. On that same day, Canizares also purported to personally provide or directly supervise at least 18 hours of physical therapy services and/or chiropractic services to at least twenty-eight individual Insureds at CEDA Downtown, all of which were billed to GEICO. What is more, on that same day, Canizares also purported to perform at least six 15-minute follow-up examinations which were billed to GEICO through CEDA Downtown.

(v)      On or about May 2, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares falsely purported to perform on an Insured named NG. On that same day, Canizares also purported to personally provide or directly supervise at least 15 hours of physical therapy services and/or chiropractic services to at least twenty-four individual Insureds at CEDA Downtown, all of which were billed to GEICO. What is more, on that same day, Canizares also purported to perform at least two 25-minute follow-up examinations, at least one 15-minute follow-up examination, and at least one 5-minute follow-up examination which were billed to GEICO through CEDA Downtown.

459.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, and Canizares routinely falsely represented that Canizares had spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Canizares also purported to personally perform or directly supervise a massive amount of physical therapy services and/or chiropractic services to large numbers of Insureds.

460.    What is more, and as set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

461.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

462.     Thus, upon information and belief, the massive, impossible number of examination and physical therapy services and/or chiropractic services that Canizares purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the underlined total number of examination and physical therapy services and/or chiropractic services that Canizares purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

463.     In the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely falsely represented that the initial examinations involved 30 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

c.     **Misrepresentations Regarding "Detailed" Physical Examinations**

464.     Moreover, in many of the claims identified in Exhibit "1" for initial examinations under CPT code 99203, CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely falsely represented the extent of the underlying physical examinations.

465.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination conducted a "detailed" physical examination.

466.     As set forth in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations conducted detailed physical examinations of the Insureds who purportedly received

114

the examinations.

467.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or chiropractor performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

468.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

469.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

470.    In the claims for initial examinations identified in Exhibit "1", when CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh billed for the initial examinations under CPT code 99203, they falsely represented that the physician or chiropractor who purported to perform the examinations – namely Canizares, Crespo-Smith, and Facuseh – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

471.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

472.    For instance, in the vast majority of the claims under CPT code 99203 identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)  inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)  examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)  examination of sensation.

473.   For example:

(i)  On or about September 19, 2013, CEDA Downtown, Cereceda, and Facuseh billed GEICO under CPT code 99203 for an initial examination that Facuseh purported to perform on an Insured named MO, and thereby represented that Facuseh had provided a "detailed" physical examination to MO. However, Facuseh did not document an extended examination of MO's musculoskeletal system, despite the fact that – to the extent MO had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)  On or about December 16, 2013, CEDA Downtown, Cereceda, and Facuseh billed GEICO under CPT code 99203 for an initial examination that Facuseh purported to perform on an Insured named HM, and thereby represented that Facuseh had provided a "detailed" physical examination to HM. However, Facuseh did not document an extended examination of HM's musculoskeletal system, despite the fact that – to the extent HM had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)  On or about December 23, 2013, CEDA Downtown, Cereceda, and Facuseh billed GEICO under CPT code 99203 for an initial examination that Facuseh purported to perform on an Insured named BM, and thereby represented that Facuseh had provided a "detailed" physical examination to BM. However, Facuseh did not document an extended examination of BM's musculoskeletal system, despite the fact that – to the extent BM had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)  On or about June 4, 2014, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named VC, and thereby represented that Canizares had provided a "detailed" physical examination to VC. However, Canizares did not document an extended examination of VC's musculoskeletal system, despite the fact that – to the extent VC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On or about June 10, 2014, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named VC, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to VC. However, Crespo-Smith did not document an extended examination of VC's musculoskeletal system, despite the fact that – to the extent VC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)    On or about June 11, 2014, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named GZ, and thereby represented that Canizares had provided a "detailed" physical examination to GZ. However, Canizares did not document an extended examination of GZ's musculoskeletal system, despite the fact that – to the extent GZ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)   On or about June 10, 2015, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named CT, and thereby represented that Canizares had provided a "detailed" physical examination to CT. However, Canizares did not document an extended examination of CT's musculoskeletal system, despite the fact that – to the extent CT had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)  On or about June 16, 2015, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named CT, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to CT. However, Crespo-Smith did not document an extended examination of CT's musculoskeletal system, despite the fact that – to the extent CT had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)    On or about December 30, 2015, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named MP, and thereby represented that Canizares had provided a "detailed" physical examination to MP. However, Canizares did not document an extended examination of MP's musculoskeletal system, despite the fact that – to the extent MP had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)     On or about January 9, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named JH, and thereby represented that Canizares had provided a "detailed" physical examination to JH. However, Canizares did not document an extended examination of JH's musculoskeletal system, despite the

fact that – to the extent JH had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xi)     On or about March 12, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named DS, and thereby represented that Canizares had provided a "detailed" physical examination to DS. However, Canizares did not document an extended examination of DS's musculoskeletal system, despite the fact that – to the extent DS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xii)    On or about March 28, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named MH, and thereby represented that Canizares had provided a "detailed" physical examination to MH. However, Canizares did not document an extended examination of MH's musculoskeletal system, despite the fact that – to the extent MH had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xiii)   On or about April 5, 2018, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named MH, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to MH. However, Crespo-Smith did not document an extended examination of MH's musculoskeletal system, despite the fact that – to the extent MH had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xiv)    On or about May 17, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named MB, and thereby represented that Canizares had provided a "detailed" physical examination to MB. However, Canizares did not document an extended examination of MB's musculoskeletal system, despite the fact that – to the extent MB had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xv)     On or about May 21, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named CG, and thereby represented that Canizares had provided a "detailed" physical examination to CG. However, Canizares did not document an extended examination of CG's musculoskeletal system, despite the fact that – to the extent CG had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xvi)    On or about May 22, 2018, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith

purported to perform on an Insured named MB, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to MB. However, Crespo-Smith did not document an extended examination of MB's musculoskeletal system, despite the fact that – to the extent MB had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xvii)  On or about May 29, 2018, CEDA Downtown, Cereceda, and Canizares billed GEICO under CPT code 99203 for an initial examination that Canizares purported to perform on an Insured named MR, and thereby represented that Canizares had provided a "detailed" physical examination to MR. However, Canizares did not document an extended examination of MR's musculoskeletal system, despite the fact that – to the extent MR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xviii)  On or about June 7, 2018, CEDA Downtown, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named MR, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to MR. However, Crespo-Smith did not document an extended examination of MR's musculoskeletal system, despite the fact that – to the extent MR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

474.    These are only representative examples. In the vast majority of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Canizares, Crespo-Smith, and Facuseh had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

475.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because

examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.      Misrepresentations Regarding the Extent of Medical Decision-Making**

476.    Furthermore, pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in medical decision making of "low complexity".

477.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

478.    As set forth above, the CPT Assistant provides various clinical examples of the kinds of presenting problems that might support the use of CPT code 99203 to bill for a patient examination, and therefore entail legitimate, low complexity medical decision-making, including:

(i)      Office visit for initial evaluation of a 48–year–old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49–year–old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13–year–old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)      Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering

questions. (Urology)

479.    Thus, pursuant to the CPT Assistant, the kinds of presenting problems that entail legitimate, low-complexity medical decision-making typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

480.    By contrast, when the Insureds in the claims identified in Exhibit "1" presented at CEDA Downtown for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

481.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

482.    First, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

483.    When the Insureds in the claims identified in Exhibit "1" presented to CEDA Downtown for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

484.    Furthermore, prior to the initial examinations, CEDA Downtown, Cereceda, and Canizares did not request any medical records from other providers.

485.    Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

486.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at CEDA Downtown, to the extent that CEDA Downtown provided any such diagnostic procedures or treatment options in the first instance.

487.    In almost every instance, any "treatments" that the CEDA Downtown Defendants actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

488.    Third, in the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, and Canizares did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

489.    Rather, to the extent that the initial examinations were conducted in the first instance, CEDA Downtown, Cereceda, and Canizares provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

490.    Specifically, in most of the claims identified in Exhibit "1", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

491.    Even so, CEDA Downtown, Cereceda, and Canizares prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

492.    Then, based upon these phony "diagnoses", CEDA Downtown, Cereceda, and Canizares directed virtually every Insured: (i) to receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; and (ii) in the majority of cases, referred

the Insureds to a medical doctor for further evaluation and treatment, regardless of the Insureds'

true circumstances or presentation.

493.    For example:

(i)    On May 31, 2014, an Insured named GZ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GZ's vehicle did not deploy and that GZ's vehicle was drivable following the accident. The police report further indicated that GZ was not injured in the accident. In keeping with the fact that GZ was not seriously injured in the accident, GZ did not visit any hospital emergency room following the accident. To the extent that GZ experienced any health problems at all as a result of the accident, they were of low severity. On June 11, 2014, Canizares purported to conduct an initial examination of GZ at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided GZ with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GZ's presenting problems, nor the treatment plan provided to GZ by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, GZ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to GZ. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On June 4, 2014, an Insured named VC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in VC's vehicle did not deploy, and that VC's vehicle was drivable following the accident. The police report further indicated that VC was not injured in the accident. In keeping with the fact that VC was not seriously injured in the accident, VC did not visit any hospital emergency room following the accident. To the extent that VC experienced any health problems at all as a result of the accident, they were of low severity. On June 4, 2014, Canizares purported to conduct an initial examination of VC at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided VC with

124

the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither VC's presenting problems, nor the treatment plan provided to VC by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, VC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to VC. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On June 3, 2015, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in CT's vehicle did not deploy, that the damage to CT's vehicle was minor, that there was minor damage to the other vehicle, and that CT's vehicle was drivable following the accident. The police report further indicated that CT was not injured in the accident. In keeping with the fact that CT was not seriously injured in the accident, CT did not visit any hospital emergency room following the accident. To the extent that CT experienced any health problems at all as a result of the accident, they were of low severity. On June 10, 2015, Canizares purported to conduct an initial examination of CT at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided CT with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CT's presenting problems, nor the treatment plan provided to CT by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, CT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to CT. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On December 29, 2015, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MP's vehicle did not deploy, that the damage to MP's vehicle was minor, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured in the accident. In keeping with the fact that MP was not

seriously injured in the accident, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of low severity. On December 30, 2015, Canizares purported to conduct an initial examination of MP at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided MP with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MP. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On December 28, 2017, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in JH's vehicle did not deploy, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured in the accident. In keeping with the fact that JH was not seriously injured in the accident, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low severity. On January 9, 2018, Canizares purported to conduct an initial examination on JH at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided JH with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to JH. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some

126

legitimate, low complexity medical decision-making during the purported examination.

(vi)    On February 8, 2018, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DS's vehicle did not deploy and that DS's vehicle was drivable following the accident. The police report further indicated that DS was not injured in the accident. Nonetheless, thirteen days later, on February 21, 2018, DS traveled on her own to Coral Gables Hospital Emergency Department. The contemporaneous hospital records indicated that DS complained of neck and back pain. The hospital records further indicated that DS was briefly observed on an outpatient basis and then discharged with a routine neck and back pain diagnosis. To the extent that DS experienced any health problems at all as a result of the accident, they were of low severity. On March 12, 2018, Canizares purported to conduct an initial examination of DS at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided DS with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DS's presenting problems, nor the treatment plan provided to DS by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, DS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to DS. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On March 23, 2018, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MH's vehicle did not deploy, that the damage to MH's vehicle was minor, that there was minor damage to the other vehicle, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured in the accident. In keeping with the fact that MH was not seriously injured in the accident, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of low severity. On March 28, 2018, Canizares purported to conduct an initial examination of MH at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the

examination. Instead, Canizares provided MH with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MH's presenting problems, nor the treatment plan provided to MH by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, MH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MH. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)    On May 7, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MB's vehicle did not deploy and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured in the accident. In keeping with the fact that MB was not seriously injured in the accident, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low severity. On May 17, 2018, Canizares purported to conduct an initial examination of MB at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided MB with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MB's presenting problems, nor the treatment plan provided to MB by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, MB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MB. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)    On May 7, 2018, an Insured named CG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CG's vehicle did not deploy and that CG's vehicle was drivable following the accident. The police report further indicated that CG was not injured in the accident. In keeping with the fact that CG was not seriously injured in the accident, CG did not visit any hospital emergency room following the accident. To the extent that CG experienced any health problems at all as a result of the accident, they were of low severity. On May

128

21, 2018, Canizares purported to conduct an initial examination of CG at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided CG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CG's presenting problems, nor the treatment plan provided to CG by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, CG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to CG. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)     On May 25, 2018, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MR's vehicle did not deploy, that the damage to MR's vehicle was minor, that there was minor damage to the other vehicle, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured in the accident. In keeping with the fact that MR was not seriously injured in the accident, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as a result of the accident, they were of low severity. On May 29, 2018, Canizares purported to conduct an initial examination of MR at CEDA Downtown. To the extent that Canizares performed the examination in the first instance, Canizares did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Canizares did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Canizares provided MR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MR's presenting problems, nor the treatment plan provided to MR by Canizares, Cereceda, and CEDA Downtown, presented any risk of significant complications, morbidity, or mortality. To the contrary, MR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Canizares, Cereceda, and CEDA Downtown consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MR. Even so, Canizares, Cereceda, and CEDA Downtown billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Canizares engaged in some legitimate, low complexity medical decision-making during the purported examination.

494. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

495. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

496. As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom the CEDA Downtown Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

497. It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

498. It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh with substantially identical injuries on or about the exact same dates after their accidents.

499. Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Downtown, Cereceda, Canizares, and Facuseh frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

130

500.     Similarly, CEDA Downtown, Cereceda, and Crespo-Smith frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident.

501.     For example:

(i)      On January 19, 2013, two Insureds – AF and PF – were involved in the same automobile accident. Thereafter, AF and PF presented – incredibly – <u>on the exact same date</u>, January 25, 2013, at CEDA Downtown for initial examinations by Facuseh. AF and PF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AF and PF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Facuseh provided AF and PF with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ii)     On October 20, 2013, two Insureds – TR and AR – were involved in the same automobile accident. Thereafter, TR and AR presented – incredibly – <u>on the exact same date</u>, October 21, 2013, at CEDA Downtown for initial examinations by Facuseh. TR and AR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that TR and AR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Facuseh provided TR and AR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)    On November 17, 2013, two Insureds – MD and SR – were involved in the same automobile accident. Thereafter, MD and SR presented – incredibly – <u>on the exact same date</u>, December 2, 2013, at CEDA Downtown for initial examinations by Crespo-Smith. MD and SR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MD and SR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Crespo-Smith provided MD and SR with substantially identical, phony "diagnoses".

(iv)     On February 14, 2015, two Insureds – SL and ES – were involved in the same automobile accident. Thereafter, SL and ES presented – incredibly – <u>on the exact same date</u>, February 26, 2015, at CEDA Downtown for initial examinations by Canizares. SL and ES were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SL and ES suffered any injuries at all in their accident, the injuries were different. Even

so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Canizares provided SL and ES with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)    On February 4, 2016, two Insureds – CR and JR – were involved in the same automobile accident. Thereafter, CR and JR presented – incredibly – on the exact same date, February 16, 2016, at CEDA Downtown for initial examinations by Crespo-Smith. CR and JR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CR and JR a suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Crespo-Smith provided CR and JR with substantially identical, phony "diagnoses".

(vi)   On April 18, 2016, two Insureds – CD and MF – were involved in the same automobile accident. Thereafter, CD and MF presented – incredibly – on the exact same date, May 3, 2016, at CEDA Downtown for initial examinations by Crespo-Smith. CD and MF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CD and MF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Crespo-Smith provided CD and MF with substantially identical, phony "diagnoses".

(vii)  On November 13, 2016, three Insureds – AK, JK, and NP – were involved in the same automobile accident. Thereafter, AK, JK, and NP presented – incredibly – on the exact same date, November 15, 2016, at CEDA Downtown for initial examinations by Canizares. AK, JK, and NP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AK, JK, and NP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Canizares provided AK, JK, and NP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(viii) On November 1, 2017, two Insureds – LD and TS – were involved in the same automobile accident. Thereafter, LD and TS presented – incredibly – on the exact same date, November 8, 2017, at CEDA Downtown for initial examinations by Canizares. LD and TS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LD and TS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Canizares provided LD and TS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix) On March 3, 2018, two Insureds – JG and SH – were involved in the same automobile accident. Thereafter, JG and SH presented – incredibly – <u>on the exact same date</u>, March 21, 2018, at CEDA Downtown for initial examinations by Crespo-Smith. JG and SH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JG and SH a suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Crespo-Smith provided JG and SH with substantially identical, phony "diagnoses".

(x) On August 6, 2018, two Insureds – FC and DF – were involved in the same automobile accident. Thereafter, FC and DF presented – incredibly – <u>on the exact same date</u>, August 10, 2018, at CEDA Downtown for initial examinations by Canizares. FC and DF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that FC and DF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Downtown, Cereceda, and Canizares provided FC and DF with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

502. These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Facuseh frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

503. What is more, in the claims for initial examinations that are identified in Exhibit "1", CEDA Downtown, Cereceda, and Crespo-Smith frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated.

504. CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in

order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

505.    In keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Downtown, Cereceda, and Canizares falsely purported to report results of a "Soto-Hall" test purportedly conducted on the Insureds during initial examinations in order to create the appearance of genuine, serious injuries, and to create the false impression that the initial examinations required some legitimate medical decision-making.

506.    For example, and as set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

507.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

508.    It is extremely improbable – to the point of medical impossibility – that a sizable number of the Insureds examined by CEDA Downtown, Cereceda, and Canizares would present with identical "Soto-Hall" test results during initial examinations.

509.    Even so, in a large number of the initial examination reports in the claims identified in Exhibit "1", CEDA Downtown, Cereceda, and Canizares falsely reported that the Insureds had the following identical "Soto-Hall" results: "Soto-Hall test was positive in the cervical spine. This test is primarily indicative of a vertebral prominens fracture at C-7 and/or T-1."

510.    These phony, identical "findings" were reported in a statistically impossible number of initial examination reports created by CEDA Downtown, Cereceda, and Canizares, including but not limited to reports for the following Insureds on the following dates:

(i)       SC, on September 9, 2014;

(ii)     GS, on March 17, 2015;

(iii)    AC, on November 9, 2015;

(iv)     MT, on August 10, 2016;

(v)      OP, on February 15, 2017;

(vi)     EW, on March 7, 2017;

(vii)    MC, on October 14, 2017;

(viii)   CL, on January 22, 2018;

(ix)     JH, on January 9, 2018;

(x)      CA, on February 21, 2018;

(xi)     DS, on March 12, 2018;

(xii)    MH, on March 28, 2018;

(xiii)   MG, on May 14, 2018;

(xiv)    MB, on May 17, 2018; and

(xv)     MR, on May 29, 2018.

511.    These are only representative examples. CEDA Downtown, Cereceda, and Canizares routinely purported to report these same, identical "Soto-Hall" test results for many of the Insureds Canizares purported to examine, to an extent that was statistically impossible.

512.    Moreover, and in keeping with the fact that CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely inserted false "diagnoses" and/or "findings" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making for the Insureds in the claims for initial examinations that are identified in Exhibit "1", CEDA Downtown, Cereceda, and Crespo-Smith inserted into many of the initial examination reports the following language: the Insured "presented in this office after

undergoing a course of conservative treatment … [the Insured] has sought medical care due to the persistence of pain … [the Insured] suffered an emergency medical condition" as a result of the accident.

513.   What is more, CEDA Downtown, Cereceda, and Crespo-Smith routinely appended to the initial examination reports a "**NOTICE OF EMERGENCY MEDICAL CONDITION**" which stated that "1. The below injured patient, has in the opinion of this medical provider, suffered an **Emergency Medical Condition**, as a result of the patient's injuries sustained in an automobile accident … 2. The basis for the finding of an **Emergency Medical Condition** is that the patient has sustained acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention <u>could</u> reasonable be expected to result in any of the following: a) serious jeopardy to patient health; b) serious impairment to bodily functions; or c) serious dysfunction of a bodily organ or part."

514.   It is extremely improbable that virtually all of the Insureds in the claims for initial examinations identified in Exhibit "1" would suffer from an "emergency medical condition" as a result of their relatively minor automobile accidents.

515.   For example:

(i)   On June 4, 2014, an Insured named VC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in VC's vehicle did not deploy, and that VC's vehicle was drivable following the accident. The police report further indicated that VC was not injured in the accident. In keeping with the fact that VC was not seriously injured in the accident, VC did not visit any hospital emergency room following the accident. To the extent that VC experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of VC by Crespo-Smith on  June 10, 2014, CEDA Downtown, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that VC "presented in this office after undergoing a course of conservative treatment" – despite the fact that VC purportedly began chiropractic and/or physical therapy treatment at CEDA Downtown less than a week earlier – that VC "has sought medical care due to the persistence of pain", and that VC

"suffered an emergency medical condition" supposedly caused by VC's relatively minor automobile accident.

(ii)  On June 3, 2015, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in CT's vehicle did not deploy, that the damage to CT's vehicle was minor, that there was minor damage to the other vehicle, and that CT's vehicle was drivable following the accident. The police report further indicated that CT was not injured in the accident. In keeping with the fact that CT was not seriously injured in the accident, CT did not visit any hospital emergency room following the accident. To the extent that CT experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of CT by Crespo-Smith on June 16, 2015, CEDA Downtown, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that CT "presented in this office after undergoing a course of conservative treatment" – despite the fact that CT purportedly began chiropractic and/or physical therapy treatment at CEDA Downtown less than a week earlier – that CT "has sought medical care due to the persistence of pain", and that CT "suffered an emergency medical condition" supposedly caused by CT's relatively minor automobile accident.

(iii)  On March 23, 2018, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MH's vehicle did not deploy, that the damage to MH's vehicle was minor, that there was minor damage to the other vehicle, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured in the accident. In keeping with the fact that MH was not seriously injured in the accident, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MH by Crespo-Smith on April 5, 2018, CEDA Downtown, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that MH "presented in this office after undergoing a course of conservative treatment" – despite the fact that MH purportedly began chiropractic and/or physical therapy treatment at CEDA Downtown less than a week and a half earlier – that MH "has sought medical care due to the persistence of pain", and that MH "suffered an emergency medical condition" supposedly caused by MH's relatively minor automobile accident.

(iv)  On May 7, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MB's vehicle did not deploy and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured in the accident. In keeping with the fact that MB was not seriously injured in the accident, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low

severity. Even so, following a purported initial examination of MB by Crespo-Smith on May 22, 2018, CEDA Downtown, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that MB "presented in this office after undergoing a course of conservative treatment" – despite the fact that MB purportedly began chiropractic and/or physical therapy treatment at CEDA Downtown less than a week earlier – that MB "has sought medical care due to the persistence of pain", and that MB "suffered an emergency medical condition" supposedly caused by MB's relatively minor automobile accident.

(v)     On May 25, 2018, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MR's vehicle did not deploy, that the damage to MR's vehicle was minor, that there was minor damage to the other vehicle, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured in the accident. In keeping with the fact that MR was not seriously injured in the accident, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MR by Crespo-Smith on June 7, 2018, CEDA Downtown, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that MR "presented in this office after undergoing a course of conservative treatment" – despite the fact that MR purportedly began chiropractic and/or physical therapy treatment at CEDA Downtown less than two weeks earlier – that MR "has sought medical care due to the persistence of pain", and that MR "suffered an emergency medical condition" supposedly caused by MR's relatively minor automobile accident.

516.    These are only representative examples. In many of the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, and Crespo-Smith falsely reported that the Insureds suffered from "persistent pain" and were experiencing "emergency medical condition[s]" as the result of their minor accidents.

517.    CEDA Downtown, Cereceda, and Crespo-Smith routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the CEDA Downtown Defendants purported to provide to the Insureds.

138

518.    As set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any health care problems at all as the result of their relatively minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

519.    The diagnosis and treatment of these ordinary soft tissue injuries did not require any "low complexity" medical decision-making on the part of Canizares, Crespo-Smith, Facuseh or anyone else.

520.    To the contrary, and as set forth above, Canizares, Crespo-Smith, Facuseh, and the other physicians and chiropractors who purported to perform the initial examinations at CEDA Downtown did not engage in legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "1", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the other Fraudulent Services that the Defendants purported to provide.

521.    In the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

522.    In the claims for initial examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, Crespo-Smith, and Facuseh routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   CEDA Downtown never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

523.    In this context, Cereceda – who at all relevant times purported to own CEDA Downtown – did not, and could not have, legitimately supervised the business activities of CEDA Downtown.

524.    Had Cereceda actually supervised the business activities of CEDA Downtown, Cereceda would have noted – among other things – that the CEDA Downtown Defendants routinely fraudulently represented in CEDA Downtown's billing that the putative initial examinations were legitimately and lawfully performed.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at CEDA Downtown**

525.    In addition to their fraudulent initial examinations, CEDA Downtown, Cereceda, Canizares, and Facuseh purported to subject many of the Insureds in the claims identified in Exhibit "1" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

526.    Canizares and Facuseh purported to personally perform the majority of the follow-up examinations in the claims identified in Exhibit "1".

527.    As set forth in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Facuseh then billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in charges of between $180.00 and $356.00 for each follow-up examination they purported to

provide; or (ii) CPT code 99214, typically resulting in charges of between $230.00 and $521.00 for each follow-up examination they purported to provide.

528. In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented CEDA Downtown's eligibility to collect PIP Benefits in the first instance.

529. In fact, and as set forth above, CEDA Downtown never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

530. As set forth below, CEDA Downtown, Cereceda, Canizares, and Facuseh's charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the examinations.

**a.** **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

531. Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

532. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

533. For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)    Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)   Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)     Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)   Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

534.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

535.    What is more, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

536.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

537.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

538.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

539.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their relatively minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

540.    In keeping with the fact that the Insureds in the claims identified in Exhibit "1" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as

sprains and strains, in the many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

541.    Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

542.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

543.    By the time the Insureds in the claims identified in Exhibit "1" presented at CEDA Downtown for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

544.    Even so, in the claims for follow-up examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Facuseh routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity.

545.    For example:

(i)    On October 8, 2013, an Insured named RN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RN's vehicle did not deploy and that RN's vehicle was drivable following the accident. The police report further indicated that RN was not injured in the accident. In keeping with the fact that RN was not seriously injured in the accident, RN did not visit any hospital emergency room following the accident. To the extent that RN experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported follow-up examination of RN by Facuseh on November 27, 2013 – more than a month and a half after the accident – CEDA Downtown, Cereceda, and Facuseh billed GEICO for the follow-up examination using CPT

code 99213, and thereby falsely represented that RN presented with problems of low to moderate severity at the follow-up examination.

(ii)     On June 4, 2014, an Insured named VC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in VC's vehicle did not deploy, and that VC's vehicle was drivable following the accident. The police report further indicated that VC was not injured in the accident. In keeping with the fact that VC was not seriously injured in the accident, VC did not visit any hospital emergency room following the accident. To the extent that VC experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination of VC by Canizares on August 9, 2014 – more than two months after the accident – CEDA Downtown, Cereceda, and Canizares billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that VC presented with problems of low to moderate severity at the follow-up examination.

(iii)    On February 8, 2018, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DS's vehicle did not deploy and that DS's vehicle was drivable following the accident. The police report further indicated that DS was not injured in the accident. Nonetheless, thirteen days later, on February 21, 2018, DS traveled on her own to Coral Gables Hospital Emergency Department. The contemporaneous hospital records indicated that DS complained of neck and back pain. The hospital records further indicated that DS was briefly observed on an outpatient basis and then discharged with a routine neck and back pain diagnosis. To the extent that DS experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to four months of the accident. Even so, following a purported follow-up examination of DS by Canizares on May 15, 2018 – more than three months after the accident – CEDA Downtown, Cereceda, and Canizares billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that DS presented with problems of low to moderate severity at the follow-up examination.

(iv)    On May 7, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MB's vehicle did not deploy and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured in the accident. In keeping with the fact that MB was not seriously injured in the accident, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination of MB by Canizares on July 10, 2018 – more than two months after the accident – CEDA Downtown, Cereceda, and Canizares billed GEICO for the follow-up examination

using CPT code 99214, and thereby falsely represented that MB presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that MB had no presenting problems of moderate to high severity, CEDA Downtown, Cereceda, and Canizares actually stopped treating MB after July 10, 2018.

546.    These are only representative examples. In many of the claims for follow-up examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Facuseh falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

547.    In the claims for follow-up examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Facuseh routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

548.    In the claims for follow-up examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Facuseh also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

b.    **Misrepresentations Regarding the Results of the Follow-Up Examinations**

549.    What is more, pursuant to the CPT Assistant, when CEDA Downtown, Cereceda, Canizares, and Facuseh billed for their putative follow-up examinations under CPT code 99214, they represented that Canizares and Facuseh performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

550.    Similarly, pursuant to the CPT Assistant, when CEDA Downtown, Cereceda, Canizares, and Facuseh billed for their putative follow-up examinations under CPT code 99213, they represented that Canizares and Facuseh performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

551.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Canizares and Facuseh did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

552.    Rather, following their purported follow-up examinations, CEDA Downtown, Canizares, and Facuseh – at the direction of Cereceda – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds back to CEDA Downtown for even more medically unnecessary physical therapy services and/or chiropractic services, despite the fact that the Insureds purportedly already had received significant physical therapy services and/or chiropractic services from CEDA Downtown that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

553. In the claims for follow-up examinations identified in Exhibit "1", CEDA Downtown, Cereceda, Canizares, and Facuseh routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii) the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii) CEDA Downtown never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

554. In this context, Cereceda – who at all relevant times purported to own CEDA Downtown – did not, and could not have, legitimately supervised the business activities of CEDA Downtown.

555. Had Cereceda actually supervised the business activities of CEDA Downtown, Cereceda would have noted – among other things – that the CEDA Downtown Defendants routinely fraudulently represented in CEDA Downtown's billing that the putative follow-up examinations were legitimately and lawfully performed.

**(iii) The Fraudulent Charges for Physical Therapy and/or Chiropractic Treatment at CEDA Downtown**

556. In addition to the fraudulent initial examinations and follow-up examinations, the CEDA Downtown Defendants routinely purported to subject each of the Insureds in the claims identified in Exhibit "1" to medically unnecessary physical therapy and/or chiropractic treatment.

557. As set forth above, though Canizares falsely purported to personally perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services in

the claims identified in Exhibit "1", the physical therapy services and/or chiropractic services actually were performed without supervision by Hidalgo, Pena, Soto, Zapata or other massage therapists and/or registered chiropractic assistants associated with CEDA Downtown, to the extent that they were even provided at all.

558.   As set forth in Exhibit "1", the CEDA Downtown Defendants routinely billed the purported physical therapy services and/or chiropractic services to GEICO under:

(i)     CPT code 97010 for putative hot/cold pack therapy, typically resulting in a charge of $25.00 for each round of hot/cold pack therapy they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of between $44.00 and $76.00 for each round of mechanical traction therapy they purported to provide;

(iii)   CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $40.00 for each round of electrical stimulation they purported to provide;

(iv)    CPT code 97018, for putative paraffin bath therapy, typically resulting in a charge of between $32.00 and $55.00 for each round of paraffin bath therapy they purported to provide;

(v)     CPT code 97035, for putative ultrasound, typically resulting in a charge of between $35.00 and $61.00 for each round of ultrasound they purported to provide;

(vi)    CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of between $80.00 and $151.00 for each round of therapeutic exercises they purported to provide;

(vii)   CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of between $91.00 and $157.00 for each round of neuromuscular reeducation they purported to provide;

(viii)  CPT code 97124, for putative massage therapy, typically resulting in a charge of between $72.00 and $124.00 for each round of massage therapy they purported to provide;

(ix)    CPT code 97140, for putative manual therapy, typically resulting in a charge of between $82.00 and $141.00 for each round of manual therapy they purported to provide;

(x)     CPT code 97150, for putative group therapeutic procedures, typically resulting in a

charge of between $55.00 and $83.00 for each round of group therapeutic procedures they purported to provide.

559. In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

560. In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and/or chiropractic treatment is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy and/or chiropractic treatment.

561. By contrast, at CEDA Downtown, the nature and extent of the physical therapy and/or chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol. Accordingly, the physical therapy and/or chiropractic treatment was medically unnecessary.

562. In the claims for physical therapy services and/or chiropractic services identified in Exhibit "1", the charges for the physical therapy services and/or chiropractic services also were fraudulent in that they misrepresented CEDA Downtown's eligibility to collect PIP Benefits in the first instance.

563. In fact, and as set forth above, CEDA Downtown never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

564. What is more, and as set forth above, in most of the claims for physical therapy services and/or chiropractic services identified in Exhibit "1", the CEDA Downtown Defendants falsely represented that the services lawfully had been performed by or directly supervised by

150

Canizares, when in fact they were unlawfully performed without any supervision by Hidalgo, Pena, Soto, Zapata or other massage therapists and/or registered chiropractic assistants associated with CEDA Downtown, who are not and never have been licensed as physical therapists.

565.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

566.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

567.    In each of the claims for physical therapy services and/or chiropractic services identified in Exhibit "1", the CEDA Downtown Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

568.    In fact, in most of the claims for physical therapy services and/or chiropractic services identified in Exhibit "1", the services were not lawfully provided, inasmuch as: (i) the putative services were performed – to the extent that they were performed at all – without supervision by Hidalgo, Pena, Soto, Zapata or other massage therapists and/or registered chiropractic assistants associated with CEDA Downtown, who were individuals who were not licensed to practice physical therapy and/or chiropractic; and (ii) the CEDA Downtown Defendants deliberately misrepresented the identities of the individuals who purported to perform or directly supervise the physical therapy services and/or chiropractic services in their billing for the services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

**(iv)    The Fraudulent Charges for Pain Management Injections**

569.    As part and parcel of the CEDA Downtown Defendants' fraudulent scheme, CEDA Downtown, Cereceda, and Pabon subjected many Insureds to medically unnecessary pain

management injections, including, but not limited to, arthrocentesis injections, epidural injections, and facet injections.

570.    Typically, Pabon purported to perform the injections.

571.    As set forth in Exhibit "1", CEDA Downtown, Cereceda, and Pabon then billed the injections through CEDA Downtown to GEICO, typically under CPT codes 20610, 62311, 64490, 64491, and 64492.

572.    As set forth below, the charges for pain management injections were fraudulent because the pain management injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

573.    Furthermore, the charges for pain management injections were fraudulent in that they misrepresented CEDA Downtown's eligibility to collect PIP Benefits in the first instance.

574.    In fact, and as set forth above, CEDA Downtown never was eligible to collect PIP Benefits, because it was operating in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

a.      **Basic, Legitimate Use of Pain Management Injections**

575.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

576.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

152

577.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require health care services providers to begin demonstrating at regular intervals why continued soft tissue injury treatment is necessary beyond the four-week mark.

578.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

579.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in conservative forms of treatment.

580.    In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

581.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**b.    The Medically Unnecessary Pain Management Injections**

582.     However, in the claims for pain management injections identified in Exhibit "1", CEDA Downtown, Cereceda, and Pabon often purported to administer pain management injections to Insureds before the Insureds had tried and failed any course of legitimate, conservative treatment.

583.     For example:

(i)      On April 9, 2013, an Insured named WL was involved in an automobile accident. CEDA Downtown, Cereceda, and Pabon purported to provide an epidural injection to WL on May 21, 2013 – less than two months after the accident – even though WL could not have failed conservative treatment less than two months after the purported automobile accident.

(ii)     On June 14, 2013, an Insured named GJ was involved in an automobile accident. CEDA Downtown, Cereceda, and Pabon purported to provide an epidural injection to GJ on August 20, 2013 – less than three months after the accident – even though GJ could not have failed conservative treatment less than three months after the purported automobile accident.

(iii)    On July 13, 2013, an Insured named NC was involved in an automobile accident. CEDA Downtown, Cereceda, and Pabon purported to provide an epidural injection to NC on August 27, 2013 – less than two months after the accident – even though NC could not have failed conservative treatment less than two months after the purported automobile accident.

(iv)     On August 26, 2013, an Insured named VC was involved in an automobile accident. CEDA Downtown, Cereceda, and Pabon purported to provide an epidural injection to VC on October 29, 2013 – less than three months after the accident – even though VC could not have failed conservative treatment less than three months after the purported automobile accident.

(v)      On September 1, 2013, an Insured named WE was involved in an automobile accident. CEDA Downtown, Cereceda, and Pabon purported to provide an arthrocentesis injection to WE on October 29, 2013 – less than two months after the accident – even though WE could not have failed conservative treatment less than two months after the purported automobile accident.

584.     In the claims for pain management injections identified in Exhibit "1", CEDA Downtown, Cereceda, and Pabon often purported to provide medically unnecessary pain management injections to Insureds before the Insureds could have tried and failed any course of

legitimate, conservative treatment in order to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**2.     The CEDA Kendall Defendants' Fraudulent Treatment and Billing Protocol**

**(i)     The Fraudulent Charges for Initial Examinations at CEDA Kendall**

585.    As an initial step in the CEDA Kendall Defendants' fraudulent treatment and billing protocol, CEDA Kendall, Cereceda, Crespo-Smith, and Yoham purported to provide the Insureds in the claims identified in Exhibit "2" with a putative initial examination.

586.    Crespo-Smith and Yoham purported to personally perform most of the initial examinations in the claims identified in Exhibit "2".

587.    As set forth in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in charges of between $280.00 and $539.00 for each initial examination that they purported to provide.

588.    In the claims for initial examinations identified in Exhibit "2", the charges for the initial examinations were fraudulent in that they misrepresented CEDA Kendall's eligibility to collect PIP Benefits in the first instance.

589.    In fact, and as set forth above, CEDA Kendall never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

590.    As set forth below, the charges for the initial examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

591.    As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

592.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

593.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

594.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

595.    For example, the CPT Assistant provides the following clinical examples of presenting problems that  might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

596.     Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

597.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

598.     For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "2" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "2" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

599.     What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "2" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

600.     Even so, in the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

601.     For example:

(i)      On August 29, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end

collision, that the airbags in AR's vehicle did not deploy, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured in the accident. In keeping with the fact that AR was not seriously injured in the accident, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of AR by Yoham on August 30, 2013, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of AR by a now deceased physician named Robert J. Lorello, M.D. ("Lorello") on September 9, 2013, CEDA Kendall, Cereceda, and Lorello billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)     On November 4, 2013, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AS's vehicle did not deploy and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured in the accident. In keeping with the fact that AS was not seriously injured in the accident, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of AS by Yoham on November 4, 2013, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)    On December 18, 2013, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MA's vehicle did not deploy and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured in the accident. In keeping with the fact that MA was not seriously injured in the accident, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MA by Yoham on December 18, 2013, CEDA Kendall, Cereceda and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On April 12, 2014, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in MC's vehicle did not deploy, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a

result of the accident, they were of low severity. Even so, following a purported initial examination of MC by Yoham on April 19, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What it more, following a purported initial examination of MC by Crespo-Smith on April 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)     On April 12, 2014, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in JW's vehicle did not deploy, and that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured in the accident. In keeping with the fact that JW was not seriously injured in the accident, JW did not visit any hospital emergency room following the accident. To the extent that JW experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of JW by Yoham on April 19, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that  the examination involved moderately severe presenting problems. What is more, following a purported initial examination of JW by Crespo-Smith on April 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)    On April 27, 2014, an Insured named GL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in GL's vehicle did not deploy, and that GL's vehicle was drivable following the accident. The police report further indicated that GL was not injured in the accident. In keeping with the fact that GL was not seriously injured in the accident, GL did not visit any hospital emergency room following the accident. To the extent that GL experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of GL by Yoham on May 1, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of GL by Crespo-Smith on May 7, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)   On June 23, 2014, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in YS's vehicle did not deploy, that the damage to YS's

vehicle was minor, and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured in the accident. In keeping with the fact that YS was not seriously injured in the accident, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of YS by Yoham on July 5, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of YS by Crespo-Smith on July 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)    On June 23, 2014, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in VS's vehicle did not deploy, that the damage to VS's vehicle was minor, and that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured in the accident. In keeping with the fact that VS was not seriously injured in the accident, VS did not visit any hospital emergency room following the accident. To the extent that VS experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of VS by Yoham on July 5, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of VS by Crespo-Smith on July 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)    On August 26, 2014, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MD's vehicle did not deploy and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MD by Yoham on August 26, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)    On November 21, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in SL's vehicle did not deploy, that the damage to

SL's vehicle was minor, that there was minor damage to the other two vehicles, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured in the accident. In keeping with the fact that SL was not seriously injured in the accident, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of SL by Yoham on November 26, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of SL by Crespo-Smith on December 3, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xi)     On July 8, 2015, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JH's vehicle did not deploy, that the damage to JH's vehicle was minor, that there was minor damage to the other vehicle, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured in the accident. In keeping with the fact that JH was not seriously injured in the accident, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of JH by Yoham on July 17, 2015, CEDA Kendall, Cereceda, and Yoham billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

602.     These are only representative examples. In the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

603.     In the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations

under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

604.    In the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the CEDA Kendall Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy services and/or chiropractic services, and pain management injections.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

605.    What is more, in the claims identified in Exhibit "2" for initial examinations under CPT code 99203, CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

606.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

607.    As set forth in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham virtually always billed for the putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

608.    In fact, in most of the claims for initial examinations identified in Exhibit "2", neither Crespo-Smith, nor Yoham ever spent more than 15 minutes – let alone 30 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

609.    For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "2" did not entail more than 15 minutes of face-to-face time between Crespo-Smith, Yoham and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, CEDA Kendall, Cereceda, Crespo-Smith, and Yoham used a template in purporting to conduct the initial examinations.

610.    The template that CEDA Kendall, Cereceda, Crespo-Smith, and Yoham used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

611.    The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

612.    These brief patient interviews and limited examinations did not require Crespo-Smith, Yoham, nor any other physician or chiropractor associated with CEDA Kendall, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

613.    What is more, Yoham could not legitimately have personally performed the initial examinations at CEDA Kendall, or even directly supervised them, much less have spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

614.    For example:

(i)    On or about January 29, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for an initial examination that Yoham falsely purported to perform on an Insured named LL. On that same day, Yoham also purported to personally provide or directly supervise at least 17 hours of physical therapy services and/or chiropractic services to at least twenty-three individual Insureds at CEDA Kendall, all of which were billed to GEICO.

(ii)     On or about September 9, 2015, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for two initial examinations that Yoham falsely purported to perform on Insureds named LD and MD. On that same day, Yoham also purported to personally provide or directly supervise at least 18 hours of physical therapy services and/or chiropractic services to at least twenty-seven individual Insureds at CEDA Kendall, all of which were billed to GEICO. What is more, on that same day, Yoham also purported to perform at least one 25-minute follow-up examination and at least one 15-minute follow-up examination which were billed to GEICO through CEDA Kendall.

(iii)    On or about September 21, 2015, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for two initial examinations that Yoham falsely purported to perform on Insureds named NC and RC. On that same day, Yoham also purported to personally provide or directly supervise at least 18 hours of physical therapy services and/or chiropractic services to at least twenty-eight individual Insureds at CEDA Kendall, all of which were billed to GEICO. What is more, on that same day, Yoham also purported to perform at least one 15-minute follow-up examination which was billed to GEICO through CEDA Kendall.

(iv)    On or about May 31, 2018, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for two initial examinations that Yoham falsely purported to perform on Insureds named CP and KP. On that same day, Yoham also purported to personally provide or directly supervise at least 17 hours of physical therapy services and/or chiropractic services to at least twenty-eight individual Insureds at CEDA Kendall, all of which were billed to GEICO. What is more, on that same day, Yoham also purported to perform at least two 15-minute follow-up examinations and at least one 5-minute follow-up examination which were billed to GEICO through CEDA Kendall.

(v)     On or about June 25, 2018, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for an initial examination that Yoham falsely purported to perform on an Insured named BF. On that same day, Yoham also purported to personally provide or directly supervise at least 16 hours of physical therapy services and/or chiropractic services to at least twenty-five individual Insureds at CEDA Kendall, all of which were billed to GEICO. What is more, on that same day, Yoham also purported to perform at least one 25-minute follow-up examination, at least two 15-minute follow-up examinations, and at least one 5-minute follow-up examination which were billed to GEICO through CEDA Kendall.

615.    These are only representative examples. In the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, and Yoham routinely falsely represented that Yoham had spent at least 30 minutes of face-to-face time with the Insureds or their families during

the examinations, despite the fact that – on those same dates – Yoham also purported to personally perform or directly supervise a massive amount of physical therapy services and/or chiropractic services that supposedly were provided to large numbers of Insureds.

616.    What is more, and as set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

617.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

618.    Thus, upon information and belief, the massive, impossible number of examination and physical therapy services and/or chiropractic services that Yoham purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of examination and physical therapy services and/or chiropractic services that Yoham purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

619.    In the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely falsely represented that the initial examinations involved 30 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

c.    **Misrepresentations Regarding "Detailed" Physical Examinations**

620.    Moreover, in many of the claims identified in Exhibit "2" for initial examinations under CPT code 99203, CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely falsely

represented the extent of the underlying physical examinations.

621. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

622. As set forth in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations conducted detailed physical examinations of the Insureds who purportedly received the examinations.

623. Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or chiropractor performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

624. To the extent that the Insureds in the claims identified in Exhibit "2" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

625. Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i) measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii) general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii) examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

626.    In the claims for initial examinations identified in Exhibit "2", when CEDA Kendall, Cereceda, Crespo-Smith, and Yoham billed for the initial examinations under CPT code 99203, they falsely represented that the physician or chiropractor who purported to perform the examinations – namely Crespo-Smith and Yoham – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

627.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

628.    For instance, in many of the claims under CPT code 99203 identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)      examination of sensation.

629.    For example:

(i)      On or about September 9, 2013, CEDA Kendall, Cereceda, and a now deceased physician named Robert J. Lorello, M.D. ("Lorello") billed GEICO under CPT code 99203 for an initial examination that Lorello purported to perform on an Insured named AR, and thereby represented that Lorello had provided a "detailed" physical examination to AR. However, Lorello did not document an extended examination of AR's musculoskeletal system, despite the fact that – to the extent AR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)     On or about November 4, 2013, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for an initial examination that Yoham purported to perform on an Insured named AS, and thereby represented that Yoham had provided a "detailed" physical examination to AS. However, Yoham did not document an extended examination of AS's musculoskeletal system, despite the fact that – to the extent AS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)    On or about April 19, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for an initial examination that Yoham purported to perform on an Insured named MC, and thereby represented that Yoham had provided a

"detailed" physical examination to MC. However, Yoham did not document an extended examination of MC's musculoskeletal system, despite the fact that – to the extent MC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)     On or about April 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named MC, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to MC. However, Crespo-Smith did not document an extended examination of MC's musculoskeletal system, despite the fact that – to the extent MC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)      On or about April 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named JW, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to JW. However, Crespo-Smith did not document an extended examination of JW's musculoskeletal system, despite the fact that – to the extent JW had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)     On or about May 1, 2014, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for an initial examination that Yoham purported to perform on an Insured named GL, and thereby represented that Yoham had provided a "detailed" physical examination to GL. However, Yoham did not document an extended examination of GL's musculoskeletal system, despite the fact that – to the extent GL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)    On or about July 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named YS, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to YS. However, Crespo-Smith did not document an extended examination of YS's musculoskeletal system, despite the fact that – to the extent YS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)   On or about July 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named VS, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to VS. However, Crespo-Smith did not document an extended examination of VS's musculoskeletal system, despite the fact that – to the extent VS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)    On or about December 3, 2014, CEDA Kendall, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named SL, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to SL. However, Crespo-Smith did not document an extended examination of SL's musculoskeletal system, despite the fact that – to the extent SL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)    On or about July 17, 2015, CEDA Kendall, Cereceda, and Yoham billed GEICO under CPT code 99203 for an initial examination that Yoham purported to perform on an Insured named JH, and thereby represented that Yoham had provided a "detailed" physical examination to JH. However, Yoham did not document an extended examination of JH's musculoskeletal system, despite the fact that – to the extent JH had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

630.    These are only representative examples. In the vast majority of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Crespo-Smith, and Yoham had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

631.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

632.    Furthermore, pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT 99203 to bill for a patient examination represents that the

physician or chiropractor who performed the examination engaged in medical decision making of "low complexity".

633.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

634.    As set forth above, the CPT Assistant provides various clinical examples of the kinds of presenting problems that might support the use of CPT code 99203 to bill for a patient examination, and therefore entail legitimate, low complexity medical decision-making, including:

(i)      Office visit for initial evaluation of a 48–year–old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49–year–old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13–year–old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)      Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

635.    Thus, pursuant to the CPT Assistant, the kinds of presenting problems that entail legitimate, low-complexity medical decision-making typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

636.    By contrast, when the Insureds in the claims identified in Exhibit "2" presented at CEDA Kendall for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

637.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

638.    First, in the claims for initial examinations identified in Exhibit "2", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

639.    When the Insureds in the claims identified in Exhibit "2" presented to CEDA Kendall for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

640.    Furthermore, prior to the initial examinations, CEDA Kendall, Cereceda, and Yoham did not request any medical records from other providers.

641.    Second, in the claims for initial examinations identified in Exhibit "2", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

642.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at CEDA Kendall, to the extent that CEDA Kendall provided any such diagnostic procedures or treatment options in the first instance.

643.    In almost every instance, any "treatments" that the CEDA Kendall Defendants

actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

644.    Third, in the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, and Yoham did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

645.    Rather, to the extent that the initial examinations were conducted in the first instance, CEDA Kendall, Cereceda, and Yoham provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

646.    Specifically, in most of the claims identified in Exhibit "2", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

647.    Even so, CEDA Kendall, Cereceda, and Yoham prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

648.    Then, based upon these phony "diagnoses", CEDA Kendall, Cereceda, and Yoham directed virtually every Insured: (i) to receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; and (ii) in the majority of cases, referred the Insureds to a medical doctor for further evaluation and treatment, regardless of the Insureds' true circumstances or presentation.

649.    For example:

(i)      On August 29, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in AR's vehicle did not deploy, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not

injured in the accident. In keeping with the fact that AR was not seriously injured in the accident, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low severity. On August 30, 2013, Yoham purported to conduct an initial examination of AR at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided AR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AR's presenting problems, nor the treatment plan provided to AR by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, AR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to AR. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)  On November 4, 2013, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AS's vehicle did not deploy and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured in the accident. In keeping with the fact that AS was not seriously injured in the accident, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low severity. On November 4, 2013, Yoham purported to conduct an initial examination of AS at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided AS with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AS's presenting problems, nor the treatment plan provided to AS by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, AS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to AS. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in

174

some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On December 18, 2013, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MA's vehicle did not deploy and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured in the accident. In keeping with the fact that MA was not seriously injured in the accident, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as a result of the accident, they were of low severity. On December 18, 2013, Yoham purported to conduct an initial examination of MA at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided MA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MA. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On April 12, 2014, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in MC's vehicle did not deploy, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low severity. On April 19, 2014, Yoham purported to conduct an initial examination of MC at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided MC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MC's presenting problems, nor the treatment plan provided to MC by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant

complications, morbidity, or mortality. To the contrary, MC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MC. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On April 12, 2014, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in JW's vehicle did not deploy, and that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured in the accident. In keeping with the fact that JW was not seriously injured in the accident, JW did not visit any hospital emergency room following the accident. To the extent that JW experienced any health problems at all as a result of the accident, they were of low severity. On April 19, 2014, Yoham purported to conduct an initial examination of JW at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided JW with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JW's presenting problems, nor the treatment plan provided to JW by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, JW did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to JW. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On April 27, 2014, an Insured named GL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in GL's vehicle did not deploy, and that GL's vehicle was drivable following the accident. The police report further indicated that GL was not injured in the accident. In keeping with the fact that GL was not seriously injured in the accident, GL did not visit any hospital emergency room following the accident. To the extent that GL experienced any health problems at all as a result of the accident, they were of low severity. On May 1, 2014, Yoham purported to conduct an initial examination of GL at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other

information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided GL with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GL's presenting problems, nor the treatment plan provided to GL by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, GL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to GL. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)    On June 23, 2014, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in YS's vehicle did not deploy, that the damage to YS's vehicle was minor, and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured in the accident. In keeping with the fact that YS was not seriously injured in the accident, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as a result of the accident, they were of low severity. On July 5, 2014, Yoham purported to conduct an initial examination of YS at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided YS with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YS's presenting problems, nor the treatment plan provided to YS by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, YS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to YS. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)    On June 23, 2014, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in VS's vehicle did not deploy, that the damage to VS's vehicle was minor, and that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured in the accident. In keeping

177

with the fact that VS was not seriously injured in the accident, VS did not visit any hospital emergency room following the accident. To the extent that VS experienced any health problems at all as a result of the accident, they were of low severity. On July 5, 2014, Yoham purported to conduct an initial examination of VS at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided VS with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither VS's presenting problems, nor the treatment plan provided to VS by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, VS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to VS. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)    On August 26, 2014, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MD's vehicle did not deploy and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of low severity. On August 26, 2014, Yoham purported to conduct an initial examination of MD at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided MD with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MD's presenting problems, nor the treatment plan provided to MD by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, MD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MD. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)     On November 21, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in SL's vehicle did not deploy, that the damage to SL's vehicle was minor, that there was minor damage to the other two vehicles, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured in the accident. In keeping with the fact that SL was not seriously injured in the accident, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as a result of the accident, they were of low severity. On November 26, 2014, Yoham purported to conduct an initial examination of SL at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided SL with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SL's presenting problems, nor the treatment plan provided to SL by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the contrary, SL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to SL. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)    On July 8, 2015, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JH's vehicle did not deploy, that the damage to JH's vehicle was minor, that there was minor damage to the other vehicle, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured in the accident. In keeping with the fact that JH was not seriously injured in the accident, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low severity. On July 17, 2015, Yoham purported to conduct an initial examination of JH at CEDA Kendall. To the extent that Yoham performed the examination in the first instance, Yoham did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoham did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoham provided JH with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by Yoham, Cereceda, and CEDA Kendall, presented any risk of significant complications, morbidity, or mortality. To the

contrary, JH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Yoham, Cereceda, and CEDA Kendall consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to JH. Even so, Yoham, Cereceda, and CEDA Kendall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoham engaged in some legitimate, low complexity medical decision-making during the purported examination.

650.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

651.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

652.   As set forth above, in the claims identified in Exhibit "2", virtually all of the Insureds whom the CEDA Kendall Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

653.   It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

654.   It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by CEDA Kendall, Cereceda, Crespo-Smith, and Yoham with substantially identical injuries on or about the exact same dates after their accidents.

655.   Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-

180

making at all, CEDA Kendall, Cereceda, and Yoham frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

656. Similarly, CEDA Kendall, Cereceda, and Crespo-Smith frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident.

657. For example:

(i)     On September 12, 2013, two Insureds – GM and YS – were involved in the same automobile accident. Thereafter, GM and YS presented – incredibly – on the exact same date, November 4, 2013, at CEDA Kendall for initial examinations by a now deceased physician named Robert J. Lorello, M.D. ("Lorello"). GM and YS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that GM and YS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Lorello provided GM and YS with substantially identical, phony "diagnoses".

(ii)    On December 14, 2013, two Insureds – JH and OM – were involved in the same automobile accident. Thereafter, JH and OM presented – incredibly – on the exact same date, December 16, 2013, at CEDA Kendall for initial examinations by Yoham. JH and OM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JH and OM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Yoham provided JH and OM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)   On May 27, 2014, two Insureds – IA and NV – were involved in the same automobile accident. Thereafter, IA and NV presented – incredibly – on the exact same date, June 9, 2014, at CEDA Kendall for initial examinations by Yoham. IA and NV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that IA and NV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Yoham provided IA and NV with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)    On August 15, 2015, two Insureds – AA and AL – were involved in the same automobile accident. Thereafter, AA and AL presented – incredibly – on the exact

same date, September 2, 2015, at CEDA Kendall for initial examinations by Crespo-Smith. AA and AL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AA and AL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Crespo-Smith provided AA and AL with substantially identical, phony "diagnoses".

(v)      On December 4, 2015, two Insureds – AM and RM – were involved in the same automobile accident. Thereafter, AM and RM presented – incredibly – on the exact same date, December 16, 2015, at CEDA Kendall for initial examinations by Crespo-Smith. AM and RM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AM and RM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Crespo-Smith provided AM and RM with substantially identical, phony "diagnoses".

(vi)     On April 20, 2016, two Insureds – PC and PC – were involved in the same automobile accident. Thereafter, PC and PC presented – incredibly – on the exact same date, April 27, 2016, at CEDA Kendall for initial examinations by Crespo-Smith. PC and PC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that PC and PC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Crespo-Smith provided PC and PC with substantially identical, phony "diagnoses".

(vii)    On April 24, 2016, two Insureds – ER and NJ – were involved in the same automobile accident. Thereafter, ER and NJ presented – incredibly – on the exact same date, April 26, 2016, at CEDA Kendall for initial examinations by Yoham. ER and NJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ER and NJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Yoham provided ER and NJ with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)   On July 9, 2016, two Insureds – DE and YM – were involved in the same automobile accident. Thereafter, DE and YM presented – incredibly – on the exact same date, July 12, 2016, at CEDA Kendall for initial examinations by Yoham. DE and YM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DE and YM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Yoham provided DE and YM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)     On March 4, 2017, two Insureds – DR and AV – were involved in the same automobile accident. Thereafter, DR and AV presented – incredibly – <u>on the exact same date</u>, March 15, 2017, at CEDA Kendall for initial examinations by Crespo-Smith. DR and AV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DR and AV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Crespo-Smith provided DR and AV with substantially identical, phony "diagnoses".

(x)      On April 4, 2018, two Insureds – MB and AS – were involved in the same automobile accident. Thereafter, MB and AS presented – incredibly – <u>on the exact same date</u>, April 5, 2018, at CEDA Kendall for initial examinations by Yoham. MB and AS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MB and AS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Kendall, Cereceda, and Yoham provided MB and AS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

658.     These are only representative examples. In the claims for initial examinations that are identified in Exhibit "2", CEDA Kendall, Cereceda, and Yoham frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were different situated.

659.     What is more, in the claims for initial examinations that are identified in Exhibit "2", CEDA Kendall, Cereceda, and Crespo-Smith frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated.

660.     CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false

justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

661. In keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Kendall, Cereceda, and Yoham falsely purported to report results of a "Soto-Hall" test purportedly conducted on the Insureds during initial examinations in order to create the appearance of genuine, serious injuries, and to create the false impression that the initial examinations required some legitimate medical decision-making.

662. For example, and as set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

663. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

664. It is extremely improbable – to the point of medical impossibility – that many of the Insureds examined by CEDA Kendall, Cereceda, and Yoham would present with identical "Soto-Hall" test results during initial examinations.

665. Even so, in many of the initial examination reports in the claims identified in Exhibit "2", CEDA Kendall, Cereceda, and Yoham falsely reported that the Insureds had the following identical "Soto-Hall" results: "Soto-Hall test was positive in the cervical spine. This test is primarily indicative of a vertebral prominens fracture at C-7 and/or T-1."

666. These phony, identical "findings" were reported in a statistically impossible number of initial examination reports created by CEDA Kendall, Cereceda, and Yoham, including but not limited to reports for the following Insureds on the following dates:

(i) AR, on August 30, 2013;

184

(ii)      MA, on December 18, 2013;

(iii)     JW, on April 19, 2014;

(iv)     GL, on May 1, 2014;

(v)      WR, on May 23, 2014;

(vi)     VS, on July 5, 2014;

(vii)    YS, on July 5, 2014;

(viii)   SL, on November 16, 2014;

(ix)     AE, on August 28, 2017;

(x)      AP, on August 28, 2017;

(xi)     OR, on September 27, 2017;

(xii)    MB, on September 28, 2017;

(xiii)   MF, on March 31, 2018;

(xiv)   AB, on June 1, 2018; and

(xv)    AM, on June 1, 2018.

667.    These are only representative examples. CEDA Kendall, Cereceda, and Yoham routinely purported to report these same, identical "Soto-Hall" test results for the Insureds they purported to examine, to an extent that was statistically impossible.

668.    Moreover, and in keeping with the fact that CEDA Kendall, Cereceda, and Crespo-Smith routinely inserted false "diagnoses" and/or "findings" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making for the Insureds in the claims for initial examinations that are identified in Exhibit "2", CEDA Kendall, Cereceda, and Crespo-Smith inserted into many of the initial examination reports the following language: the Insured "presented in this office after undergoing a course of

185

conservative treatment … [the Insured] has sought medical care due to the persistence of pain … [the Insured] suffered an emergency medical condition" as a result of the accident.

669.    What is more, CEDA Kendall, Cereceda, and Crespo-Smith routinely appended to the initial examination reports a "**NOTICE OF EMERGENCY MEDICAL CONDITION**" which stated that "1. The below injured patient, has in the opinion of this medical provider, suffered an **Emergency Medical Condition**, as a result of the patient's injuries sustained in an automobile accident … 2. The basis for the finding of an **Emergency Medical Condition** is that the patient has sustained acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention <u>could</u> reasonable be expected to result in any of the following: a) serious jeopardy to patient health; b) serious impairment to bodily functions; or c) serious dysfunction of a bodily organ or part."

670.    It is extremely improbable that many Insureds in the claims for initial examinations identified in Exhibit "2" would suffer from an "emergency medical condition" as a result of their relatively minor automobile accidents.

671.    For example:

(i)     On April 12, 2014, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in MC's vehicle did not deploy, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MC by Crespo-Smith on April 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that MC "presented in this office after undergoing a course of conservative treatment" – despite the fact that MC purportedly began chiropractic and/or physical therapy treatment at CEDA Kendall less than a week earlier – that MC "has sought medical care due to the persistence of pain", and that MC "suffered an emergency medical condition" supposedly caused by MC's relatively minor automobile accident.

(ii)     On April 12, 2014, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in JW's vehicle did not deploy, and that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured in the accident. In keeping with the fact that JW was not seriously injured in the accident, JW did not visit any hospital emergency room following the accident. To the extent that JW experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of JW by Crespo-Smith on April 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that JW "presented in this office after undergoing a course of conservative treatment" – despite the fact that JW purportedly began chiropractic and/or physical therapy treatment at CEDA Kendall less than a week earlier – that JW "has sought medical care due to the persistence of pain", and that JW "suffered an emergency medical condition" supposedly caused by JW's relatively minor automobile accident.

(iii)    On April 27, 2014, an Insured named GL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in GL's vehicle did not deploy, and that GL's vehicle was drivable following the accident. The police report further indicated that GL was not injured in the accident. In keeping with the fact that GL was not seriously injured in the accident, GL did not visit any hospital emergency room following the accident. To the extent that GL experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of GL by Crespo-Smith on May 7, 2014, CEDA Kendall, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that GL "presented in this office after undergoing a course of conservative treatment" – despite the fact that GL purportedly began chiropractic and/or physical therapy treatment at CEDA Kendall less than a week earlier – that GL "has sought medical care due to the persistence of pain", and that GL "suffered an emergency medical condition" supposedly caused by GL's relatively minor automobile accident.

(iv)     On June 23, 2014, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in YS's vehicle did not deploy, that the damage to YS's vehicle was minor, and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured in the accident. In keeping with the fact that YS was not seriously injured in the accident, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of YS by Crespo-Smith on July 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that YS "presented in this

187

office after undergoing a course of conservative treatment" – despite the fact that YS purportedly began chiropractic and/or physical therapy treatment at CEDA Kendall less than three weeks earlier – that YS "has sought medical care due to the persistence of pain", and that YS "suffered an emergency medical condition" supposedly caused by YS's relatively minor automobile accident.

(v)     On June 23, 2014, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in VS's vehicle did not deploy, that the damage to VS's vehicle was minor, and that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured in the accident. In keeping with the fact that VS was not seriously injured in the accident, VS did not visit any hospital emergency room following the accident. To the extent that VS experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of VS by Crespo-Smith on July 23, 2014, CEDA Kendall, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that VS "presented in this office after undergoing a course of conservative treatment" – despite the fact that VS purportedly began chiropractic and/or physical therapy treatment at CEDA Kendall less than three weeks earlier – that VS "has sought medical care due to the persistence of pain", and that VS "suffered an emergency medical condition" supposedly caused by VS's relatively minor automobile accident.

(vi)    On November 21, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in SL's vehicle did not deploy, that the damage to SL's vehicle was minor, that there was minor damage to the other two vehicles, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured in the accident. In keeping with the fact that SL was not seriously injured in the accident, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of SL by Crespo-Smith on December 3, 2014, CEDA Kendall, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that SL "presented in this office after undergoing a course of conservative treatment" – despite the fact that SL purportedly began chiropractic and/or physical therapy treatment at CEDA Kendall a week earlier – that SL "has sought medical care due to the persistence of pain", and that SL "suffered an emergency medical condition" supposedly caused by SL's relatively minor automobile accident.

672.    These are only representative examples. In the the vast majority of the claims for

initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, and Crespo-Smith falsely

reported that the Insureds suffered from "persistent pain" and that it was an "emergency medical condition".

673.    CEDA Kendall, Cereceda, and Crespo-Smith routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

674.    As set forth above, to the extent that the Insureds in the claims identified in Exhibit "2" suffered any health care problems at all as the result of their relatively minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

675.    The diagnosis and treatment of these ordinary soft tissue injuries did not require any "low complexity" medical decision-making on the part of Crespo-Smith, Yoham, or anyone else.

676.    To the contrary, and as set forth above, Crespo-Smith, Yoham, and the other physicians or chiropractors who purported to perform the initial examinations did not engage in legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "2", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the other Fraudulent Services that the Defendants purported to provide.

677.    In the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a

higher rate than examinations that do not require low complexity medical decision-making.

678.    In the claims for initial examinations identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Yoham routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   CEDA Kendall never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

679.    In this context, Cereceda – who at all relevant times purported to own CEDA Kendall – did not, and could not have, legitimately supervised the business activities of CEDA Kendall.

680.    Had Cereceda actually supervised the business activities of CEDA Kendall, Cereceda would have noted – among other things – that the CEDA Kendall Defendants routinely fraudulently represented in CEDA Kendall's billing that the putative initial examinations were legitimately and lawfully performed.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at CEDA Kendall**

681.    In addition to their fraudulent initial examinations, CEDA Kendall, Cereceda, and Yoham purported to subject many of the Insureds in the claims identified in Exhibit "2" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

682.     Yoham purported to personally perform the majority of the follow-up examinations in the claims identified in Exhibit "2".

683.     As set forth in Exhibit "2", CEDA Kendall, Cereceda, and Yoham then billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in charges of between $206.00 and $356.00 for each follow-up examination they purported to provide; or (ii) CPT code 99214, typically resulting in charges of between $301.00 and $521.00 for each follow-up examination they purported to provide.

684.     In the claims for follow-up examinations identified in Exhibit "2", the charges for the follow-up examinations were fraudulent in that they misrepresented CEDA Kendall's eligibility to collect PIP Benefits in the first instance.

685.     In fact, and as set forth above, CEDA Kendall never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

686.     As set forth below, CEDA Kendall, Cereceda, and Yoham's charges for the follow-up examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature and extent of the examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

687.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

688.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

689.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)      Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)   Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

690.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

691.    What is more, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

692.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

693.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

694.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

695.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "2" suffered any injuries at all in their relatively minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

696.    In keeping with the fact that the Insureds in the claims identified in Exhibit "2" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in many of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

697.    Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

698.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

699.    By the time the Insureds in the claims identified in Exhibit "2" presented at CEDA Kendall for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

700.    Even so, in the claims for follow-up examinations identified in Exhibit "2", CEDA Kendall, Cereceda, and Yoham routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity.

701.    For example:

(i)     On August 29, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in AR's vehicle did not deploy, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured in the accident. In keeping with the fact that AR was not seriously injured in the accident, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to eight months of the accident. Even so, following purported follow-up examinations of AR by Yoham on December 10, 2013 and January 10, 2014 – more than three months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AR presented with problems of low to moderate severity at the follow-up examinations. What is more, following a purported follow-up examination of AR by Yoham on April 2, 2014 – more than seven months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AR presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that AR had no presenting problems of moderate to high severity, CEDA Kendall, Cereceda, and Yoham actually stopped treating AR after April 2, 2014.

(ii)    On November 4, 2013, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AS's vehicle did not deploy and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured in the accident. In keeping with the fact that AS was not seriously injured in the accident, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months after the accident. Even so, following a purported follow-up examination of AS by Yoham on January 8, 2014 – more than two months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that AS presented with problems of low to moderate severity at the follow-up examination. What is more, following a purported follow-up examination of AS by Yoham on January 31, 2014 – more than two months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AS presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that AS had no presenting problems of moderate to high severity, CEDA Kendall, Cereceda, and Yoham actually stopped treating AS after January 31, 2014.

(iii)   On April 12, 2014, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in MC's vehicle did not deploy, and that MC's vehicle

was drivable following the accident. The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to five months of the accident. Even so, following purported follow-up examinations of MC by Yoham on June 30, 2014 and July 29, 2014 – between two and four months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that MC presented with problems of low to moderate severity at the follow-up examinations. What is more, following a purported follow-up examination of MC by Yoham on August 29, 2014 – more than four months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MC presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that MC had no presenting problems of moderate to high severity, CEDA Kendall, Cereceda, and Yoham actually stopped treating MC after August 29, 2014.

(iv)     On April 12, 2014, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in JW's vehicle did not deploy, and that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured in the accident. In keeping with the fact that JW was not seriously injured in the accident, JW did not visit any hospital emergency room following the accident. To the extent that JW experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination of JW by Yoham on June 24, 2014 – more than two months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JW presented with problems of low to moderate severity at the follow-up examination.

(v)      On June 23, 2014, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in YS's vehicle did not deploy, that the damage to YS's vehicle was minor, and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured in the accident. In keeping with the fact that YS was not seriously injured in the accident, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to four months of the accident. Even so, following purported follow-up examinations of YS by Yoham on September 4, 2014 and October 9, 2014 – between two and four months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up

196

examinations using CPT code 99213, and thereby falsely represented that YS presented with problems of low to moderate severity at the follow-up examinations.

(vi)     On June 23, 2014, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in VS's vehicle did not deploy, that the damage to VS's vehicle was minor, and that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured in the accident. In keeping with the fact that VS was not seriously injured in the accident, VS did not visit any hospital emergency room following the accident. To the extent that VS experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to four months of the accident. Even so, following purported follow-up examinations of VS by Yoham on September 4, 2014 and October 9, 2014 – between two and four months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that VS presented with problems of low to moderate severity at the follow-up examinations.

(vii)    On November 21, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in SL's vehicle did not deploy, that the damage to SL's vehicle was minor, that there was minor damage to the other two vehicles, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured in the accident. In keeping with the fact that SL was not seriously injured in the accident, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to four months of the accident. Even so, following a purported follow-up examination of SL by Yoham on March 13, 2015, CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that SL presented with problems of low to moderate severity at the follow-up examination.

(viii)   On July 8, 2015, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JH's vehicle did not deploy, that the damage to JH's vehicle was minor, that there was minor damage to the other vehicle, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured in the accident. In keeping with the fact that JH was not seriously injured in the accident, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to four months of the accident. Even so, following purported follow-up examinations of JH by Yoham on September 25, 2015 and October 26, 2015 – more than two months after the accident – CEDA Kendall, Cereceda, and Yoham billed GEICO for the follow-up

examinations using CPT code 99213, and thereby falsely represented that JH presented with problems of low to moderate severity at the follow-up examinations.

702.    These are only representative examples. In the vast majority of the claims for follow-up examinations identified in Exhibit "2", CEDA Kendall, Cereceda, and Yoham falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

703.    In the claims for follow-up examinations identified in Exhibit "1", CEDA Kendall, Cereceda, and Yoham routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

704.    In the claims for follow-up examinations identified in Exhibit "2", CEDA Kendall, Cereceda, and Yoham also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

705.    What is more, pursuant to the CPT Assistant, when CEDA Kendall, Cereceda, and Yoham billed for their putative follow-up examinations under CPT code 99214, they represented that Yoham performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

706.     Similarly, pursuant to the CPT Assistant, when CEDA Kendall, Cereceda, and Yoham billed for their putative follow-up examinations under CPT code 99213, they represented that Yoham performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

707.     In actuality, however, in the claims for follow-up examinations identified in Exhibit "2", Yoham did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

708.     Rather, following their purported follow-up examinations, CEDA Kendall and Yoham – at the direction of Cereceda – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds back to CEDA Kendall for even more medically unnecessary physical therapy services and/or chiropractic services, despite the fact that the Insureds purportedly already had received extensive physical therapy services and/or chiropractic services from CEDA Kendall that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

709.     In the claims for follow-up examinations identified in Exhibit "2", CEDA Kendall, Cereceda, and Yoham routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    CEDA Kendall never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

710.    In this context, Cereceda – who at all relevant times purported to own CEDA Kendall – did not, and could not have, legitimately supervised the business activities of CEDA Kendall.

711.    Had Cereceda actually supervised the business activities of CEDA Kendall, Cereceda would have noted – among other things – that the CEDA Kendall Defendants routinely fraudulently represented in CEDA Kendall's billing that the putative follow-up examinations were legitimately and lawfully performed.

**(iii)   The Fraudulent Charges for Physical Therapy and/or Chiropractic Treatment at CEDA Kendall**

712.    In addition to the fraudulent initial examinations and follow-up examinations, the CEDA Kendall Defendants routinely purported to subject each of the Insureds in the claims identified in Exhibit "2" to medically unnecessary physical therapy and/or chiropractic treatment.

713.    As set forth above, though Yoham purported to personally perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services in the claims identified in Exhibit "2", the physical therapy services and/or chiropractic services actually were performed without supervision by Aguayo, Baires, Ceballos, Hernandez, Sanchez or other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall, to the extent that they were even provided at all.

714.    As set forth in Exhibit "2", the CEDA Kendall Defendants routinely billed the purported physical therapy services and/or chiropractic services to GEICO under:

200

(i)     CPT code 97010 for putative hot/cold pack therapy, typically resulting in a charge of $25.00 for each round of hot/cold pack therapy they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of between $44.00 and $76.00 for each round of mechanical traction therapy they purported to provide;

(iii)   CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $40.00 for each round of electrical stimulation they purported to provide;

(iv)    CPT code 97018, for putative paraffin bath therapy, typically resulting in a charge of between $32.00 and $55.00 for each round of paraffin bath therapy they purported to provide;

(v)     CPT code 97035, for putative ultrasound, typically resulting in a charge of between $35.00 and $61.00 for each round of ultrasound they purported to provide;

(vi)    CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of between $80.00 and $151.00 for each round of therapeutic exercises they purported to provide;

(vii)   CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of between $90.00 and $157.00 for each round of neuromuscular reeducation they purported to provide;

(viii)  CPT code 97124, for putative massage therapy, typically resulting in a charge of between $72.00 and $124.00 for each round of massage therapy they purported to provide;

(ix)    CPT code 97140, for putative manual therapy, typically resulting in a charge of between $55.00 and $94.00 for each round of manual therapy they purported to provide;

(x)     CPT code 97150, for putative group therapeutic procedures, typically resulting in a charge of between $55.00 and $83.00 for each round of group therapeutic procedures they purported to provide.

715.    In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

716.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and/or chiropractic treatment is constantly adjusted for each individual patient based on

201

each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy and/or chiropractic treatment.

717.     By contrast, at CEDA Kendall, the nature and extent of the physical therapy and/or chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol. Accordingly, the supposed treatment was medically unnecessary.

718.     In the claims for physical therapy services and/or chiropractic services identified in Exhibit "2", the charges for the physical therapy services and/or chiropractic services were fraudulent in that they misrepresented CEDA Kendall's eligibility to collect PIP Benefits in the first instance.

719.     In fact, and as set forth above, CEDA Kendall never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

720.     What is more, and as set forth above, in most of the claims for physical therapy services and/or chiropractic services identified in Exhibit "2", the CEDA Kendall Defendants falsely represented that the services lawfully had been performed by or directly supervised by Yoham, when in fact they were unlawfully performed without any supervision by Aguayo, Baires, Ceballos, Hernandez, Sanchez or other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall, who are not and never have been licensed as physical therapists and/or chiropractors.

721.     As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

202

722.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

723.     In each of the claims for physical therapy services and/or chiropractic services identified in Exhibit "2", the CEDA Kendall Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

724.     In fact, in the vast majority of the claims for physical therapy services and/or chiropractic services identified in Exhibit "2", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services and/or chiropractic services were performed – to the extent that they were performed at all – without supervision by Aguayo, Baires, Ceballos, Hernandez, Sanchez, and other massage therapists and/or registered chiropractic assistants associated with CEDA Kendall, who were individuals who were not licensed to practice physical therapy and/or chiropractic; and (ii) the CEDA Kendall Defendants deliberately misrepresented the identities of the individuals who purported to perform or directly supervise the physical therapy services and/or chiropractic services in their billing for the services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

(iv)     **The Fraudulent Charges for Pain Management Injections**

725.     As part and parcel of the CEDA Kendall Defendants' fraudulent scheme, CEDA Kendall, Cereceda, Crespo-Smith, and Moya subjected many Insureds to medically unnecessary pain management injections, including, but not limited to, arthrocentesis injections and facet injections.

726.     Typically, Crespo-Smith or Moya purported to perform the injections.

727.    As set forth in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Moya then billed the injections through CEDA Kendall to GEICO, typically under CPT codes 20610, 64493, 64494, and 64495.

728.    As set forth below, the charges for pain management injections were fraudulent because the pain management injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

729.    Furthermore, the charges for pain management injections were fraudulent in that they misrepresented CEDA Kendall's eligibility to collect PIP Benefits in the first instance.

730.    In fact, and as set forth above, CEDA Kendall never was eligible to collect PIP Benefits, because it was operating in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

**a.      Basic, Legitimate Use of Pain Management Injections**

731.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

732.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

733.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require health care services providers to begin

204

demonstrating at regular intervals why continued soft tissue injury treatment is necessary beyond the four-week mark.

734.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

735.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in conservative forms of treatment.

736.    In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

737.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

b.    **The Medically Unnecessary Pain Management Injections**

738.    However, in the claims for pain management injections identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Moya often purported to administer pain management injections to Insureds before the Insureds had tried and failed any course of

legitimate, conservative treatment.

739.   For example:

(i)   On July 11, 2014, an Insured named HV was involved in an automobile accident. CEDA Kendall, Cereceda, and Crespo-Smith purported to provide an arthrocentesis injection to HV on August 13, 2014 – less than two months after the accident – even though HV could not have failed conservative treatment less than two months after the purported automobile accident.

(ii)   On September 2, 2014, an Insured named MB was involved in an automobile accident. CEDA Kendall, Cereceda, and Moya purported to provide multiple facet injections to MB on November 19, 2014 – less than three months after the accident – even though MB could not have failed conservative treatment less than three months after the purported automobile accident.

(iii)   On November 30, 2014, an Insured named NT was involved in an automobile accident. CEDA Kendall, Cereceda, and Moya purported to provide an arthrocentesis injection to NT on December 4, 2014 – less than a week after the accident – even though NT could not have failed conservative treatment less than a week after the purported automobile accident.

(iv)   On September 27, 2014, an Insured named MG was involved in an automobile accident. CEDA Kendall, Cereceda, and Moya purported to provide an arthrocentesis injection to MG on December 17, 2014 – less than three months after the accident – even though MG could not have failed conservative treatment less than three months after the purported automobile accident.

(v)   On September 23, 2016, an Insured named NF was involved in an automobile accident. CEDA Kendall, Cereceda, and Moya purported to provide an arthrocentesis injection to NF on December 20, 2016 – less than three months after the accident – even though NF could not have failed conservative treatment less than three months after the purported automobile accident.

740.   In the claims for pain management injections identified in Exhibit "2", CEDA Kendall, Cereceda, Crespo-Smith, and Moya often purported to provide medically unnecessary pain management injections to Insureds before the Insureds could have tried and failed any course of legitimate, conservative treatment in order to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

3.      **The CEDA Hialeah Defendants' Fraudulent Treatment and Billing Protocol**

(i)     **The Fraudulent Charges for Initial Examinations at CEDA Hialeah**

741.    As an initial step in the CEDA Hialeah Defendants' fraudulent treatment and billing protocol, CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross purported to provide the Insureds in the claims identified in Exhibit "3" with a putative initial examination.

742.    Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross purported to personally perform most of the initial examinations in the claims identified in Exhibit "3".

743.    As set forth in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in charges of between $280.00 and $539.00 for each initial examination that they purported to provide.

744.    In the claims for initial examinations identified in Exhibit "3", the charges for the initial examinations were fraudulent in that they misrepresented CEDA Hialeah's eligibility to collect PIP Benefits in the first instance.

745.    In fact, and as set forth above, CEDA Hialeah never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

746.    As set forth below, the charges for the initial examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

747.    As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American

Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

748.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

749.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

750.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

751.    For example, the CPT Assistant provides the following clinical examples of presenting problems that  might support the use of CPT code 99203 to bill for an initial patient examination:

    (i)    Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

    (ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

    (iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

    (iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

    (v)    Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

752.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically

are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

753.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "3" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

754.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "3" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "3" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

755.    What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "3" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

756.    Even so, in the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

757.    For example:

(i)    On February 15, 2013, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in CR's vehicle did not deploy, and that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured in the accident. In keeping with the fact that CR was not seriously injured in the accident, CR did not visit any hospital emergency room following the

209

accident. To the extent that CR experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of CR by Habayeb on February 19, 2013, CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)    On February 16, 2013, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GH's vehicle did not deploy and that GH's vehicle was drivable following the accident. The police report further indicated that GH was not injured in the accident. In keeping with the fact that GH was not seriously injured in the accident, GH did not visit any hospital emergency room following the accident. To the extent that GH experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of GH by Habayeb on February 18, 2013, CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)    On March 25, 2014, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in LM's vehicle did not deploy, and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured in the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of LM by Habayeb on March 25, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of LM by Crespo-Smith on April 3, 2014, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On August 13, 2014, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that MF's vehicle was drivable following the accident and that MF was not injured in the accident. In keeping with the fact that MF was not seriously injured in the accident, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MF by Habayeb on August 14, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more,

following a purported initial examination of MF by Crespo-Smith on August 28, 2014, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)    On December 9, 2014, an Insured named LF was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LF's vehicle did not deploy and that LF's vehicle was drivable following the accident. The police report further indicated that LF was not injured in the accident. In keeping with the fact that LF was not seriously injured in the accident, LF did not visit any hospital emergency room following the accident. To the extent that LF experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of LF by Fenelus on December 11, 2014, CEDA Hialeah, Cereceda, and Fenelus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of LF by Crespo-Smith on February 12, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)    On June 17, 2015, an Insured named KD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KD's vehicle did not deploy and that KD's vehicle was drivable following the accident. The police report further indicated that KD was not injured in the accident. In keeping with the fact that KD was not seriously injured in the accident, KD did not visit any hospital emergency room following the accident. To the extent that KD experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of KD by Fenelus on June 24, 2015, CEDA Hialeah, Cereceda, and Fenelus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of KD by Crespo-Smith on July 9, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)    On February 24, 2017, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the damage to MH's vehicle was minor, that there was minor damage to the other vehicle, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured in the accident. In keeping with the fact that MH was not seriously injured in the accident, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MH by Fenelus on March 7, 2017, CEDA Hialeah,

Cereceda, and Fenelus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)   On September 24, 2017, an Insured named ES was involved in an automobile accident. The contemporaneous police report indicated that the airbags in ES's vehicle did not deploy, that the damage to ES's vehicle was minor, that there was minor damage to the other vehicle, and that ES's vehicle was drivable following the accident. The police report further indicated that ES was not injured in the accident. In keeping with the fact that ES was not seriously injured in the accident, ES did not visit any hospital emergency room following the accident. To the extent that ES experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of ES by Fatato on September 28, 2017, CEDA Hialeah, Cereceda, and Fatato billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)   On December 15, 2017, an Insured named NM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in NM's vehicle did not deploy, and that NM's vehicle was drivable following the accident. The police report further indicated that NM was not injured in the accident. In keeping with the fact that NM was not seriously injured in the accident, NM did not visit any hospital emergency room following the accident. To the extent that NM experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of NM by Ross on January 22, 2018, CEDA Hialeah, Cereceda, and Ross billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)   On December 15, 2017, an Insured named XM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in XM's vehicle did not deploy, and that XM's vehicle was drivable following the accident. The police report further indicated that XM was not injured in the accident. In keeping with the fact that XM was not seriously injured in the accident, XM did not visit any hospital emergency room following the accident. To the extent that XM experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of XM by Ross on January 22, 2018, CEDA Hialeah, Cereceda, and Ross billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

758.   These are only representative examples. In the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and

Ross routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

759.    In the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

760.    In the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the CEDA Hialeah Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy services and/or chiropractic services, and pain management injections.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

761.    What is more, in the claims identified in Exhibit "3" for initial examinations under CPT code 99203, CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

762.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

763.     As set forth in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross virtually always billed for the putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

764.     In fact, in most of the claims for initial examinations identified in Exhibit "3", neither Crespo-Smith, Fatato, Fenelus, Habayeb, nor Ross ever spent more than 15 minutes – let alone 30 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

765.     For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "3" did not entail more than 15 minutes of face-to-face time between Crespo-Smith, Fatato, Fenelus, Habayeb, Ross and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross used a template in purporting to conduct the initial examinations.

766.     The template that CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

767.     The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

768.     These brief patient interviews and limited examinations did not require Crespo-Smith, Fatato, Fenelus, Habayeb, Ross, nor any other physician or chiropractor associated with

CEDA Hialeah, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

769.    What is more, Fatato, Fenelus, and Habayeb could not legitimately have personally performed the initial examinations at CEDA Hialeah, or even directly supervised them, much less have spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

770.    For example:

(i)     On or about February 17, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO under CPT code 99203 for an initial examination that Habayeb falsely purported to perform on an Insured named YA. On that same day, Habayeb also purported to personally provide or directly supervise at least 15 hours of physical therapy services and/or chiropractic services to at least eighteen individual Insureds at CEDA Hialeah, all of which were billed to GEICO.

(ii)    On or about March 24, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO under CPT code 99203 for an initial examination that Habayeb falsely purported to perform on an Insured named JC. On that same day, Habayeb also purported to personally provide or directly supervise at least 15 hours of physical therapy services and/or chiropractic services to at least nineteen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Habayeb also purported to perform at least two 15-minute follow-up examinations which were billed to GEICO through CEDA Hialeah.

(iii)   On or about April 1, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO under CPT code 99203 for three initial examinations that Habayeb falsely purported to perform on Insureds named EG, DR, and HT. On that same day, Habayeb also purported to personally provide or directly supervise at least nine hours of physical therapy services and/or chiropractic services to at least seventeen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Habayeb also purported to perform at least one 15-minute follow-up examination and at least five 5-minute follow-up examinations which were billed to GEICO through CEDA Hialeah.

(iv)    On or about April 2, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO under CPT code 99203 for two initial examinations that Habayeb falsely purported to perform on Insureds named AN and LB. On that same day, Habayeb also purported to personally provide or directly supervise at least 15 hours of physical therapy services and/or chiropractic services to at least twenty-three individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on

215

that same day, Habayeb also purported to perform at least four 15-minute follow-up examinations which were billed to GEICO through CEDA Hialeah.

(v)      On or about April 7, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO under CPT code 99203 for two initial examinations that Habayeb falsely purported to perform on Insureds named AD and JA. On that same day, Habayeb also purported to personally provide or directly supervise at least 14 hours of physical therapy services and/or chiropractic services to at least twenty-three individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Habayeb also purported to perform at least one 25-minute follow-up examination, at least one 15-minute follow-up examination, and at least one 5-minute follow-up examination which were billed to GEICO through CEDA Hialeah.

(vi)     On or about July 20, 2015, CEDA Hialeah, Cereceda, and Fenelus billed GEICO under CPT code 99203 for two initial examinations that Fenelus falsely purported to perform on Insureds named KG and MM. On that same day, Fenelus also purported to personally provide or directly supervise at least 12 hours of physical therapy services and/or chiropractic services to at least sixteen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Fenelus also purported to perform at least one 15-minute follow-up examination which was billed to GEICO through CEDA Hialeah.

(vii)    On or about July 27, 2016, CEDA Hialeah, Cereceda, and Fenelus billed GEICO under CPT code 99203 for an initial examination that Fenelus falsely purported to perform on an Insured named LH. On that same day, Fenelus also purported to personally provide or directly supervise at least 13 hours of physical therapy services and/or chiropractic services to at least sixteen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Fenelus also purported to perform at least one 25-minute follow-up examination which was billed to GEICO through CEDA Hialeah.

(viii)   On or about March 1, 2017, CEDA Hialeah, Cereceda, and Fenelus billed GEICO under CPT code 99203 for an initial examination that Fenelus falsely purported to perform on an Insured named RL. On that same day, Fenelus also purported to personally provide or directly supervise at least 14 hours of physical therapy services and/or chiropractic services to at least sixteen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Fenelus also purported to perform at least one 25-minute follow-up examination and at least one 5-minute follow-up examination which were billed to GEICO through CEDA Hialeah.

(ix)     On or about March 8, 2017, CEDA Hialeah, Cereceda, and Fenelus billed GEICO under CPT code 99203 for an initial examination that Fenelus falsely purported to perform on an Insured named RH. On that same day, Fenelus also purported to personally provide or directly supervise at least 14 hours of physical therapy

services and/or chiropractic services to at least nineteen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Fenelus also purported to perform at least one 5-minute follow-up examination which was billed to GEICO through CEDA Hialeah.

(x)     On or about May 24, 2017, CEDA Hialeah, Cereceda, and Fenelus billed GEICO under CPT code 99203 for an initial examination that Fenelus falsely purported to perform on an Insured named AG. On that same day, Fenelus also purported to personally provide or directly supervise at least 13 hours of physical therapy services and/or chiropractic services to at least seventeen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Fenelus also purported to perform at least one 25-minute follow-up examination and at least one 15-minute follow-up examination which were billed to GEICO through CEDA Hialeah.

(xi)    On or about September 20, 2017, CEDA Hialeah, Cereceda, and Fatato billed GEICO under CPT code 99203 for four initial examinations that Fatato falsely purported to perform on Insureds named HC, MM, GM, and KB. On that same day, Fatato also purported to personally provide or directly supervise at least 14 hours of physical therapy services and/or chiropractic services to at least eighteen individual Insureds at CEDA Hialeah, all of which were billed to GEICO.

(xii)   On or about October 4, 2017, CEDA Hialeah, Cereceda, and Fatato billed GEICO under CPT code 99203 for three initial examinations that Fatato falsely purported to perform on Insureds named NM, IA, and AC. On that same day, Fatato also purported to personally provide or directly supervise at least 13 hours of physical therapy services and/or chiropractic services to at least seventeen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Fatato also purported to perform at least one 5-minute follow-up examination which was billed to GEICO through CEDA Hialeah.

(xiii)  On or about October 11, 2017, CEDA Hialeah, Cereceda, and Fatato billed GEICO under CPT code 99203 for an initial examination that Fatato falsely purported to perform on an Insured named EC. On that same day, Fatato also purported to personally provide or directly supervise at least 14 hours of physical therapy services and/or chiropractic services to at least eighteen individual Insureds at CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Fatato also purported to perform at least one 25-minute follow-up examination and at least one 15-minute follow-up examination which were billed to GEICO through CEDA Hialeah.

(xiv)   On or about October 16, 2017, CEDA Hialeah, Cereceda, and Fatato billed GEICO under CPT code 99203 for an initial examination that Fatato falsely purported to perform on an Insured named YP. On that same day, Fatato also purported to personally provide or directly supervise at least 19 hours of physical therapy services and/or chiropractic services to at least twenty-three individual Insureds at

CEDA Hialeah, all of which were billed to GEICO. What is more, on that same day, Fatato also purported to perform at least two 5-minute follow-up examinations which were billed to GEICO through CEDA Hialeah.

(xv)     On or about October 23, 2017, CEDA Hialeah, Cereceda, and Fatato billed GEICO under CPT code 99203 for two initial examinations that Fatato falsely purported to perform on Insureds named ID and BH. On that same day, Fatato also purported to personally provide or directly supervise at least 16 hours of physical therapy services and/or chiropractic services to at least twenty-one individual Insureds at CEDA Hialeah, all of which were billed to GEICO.

771.    These are only representative examples. In the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Fatato, Fenelus, and Habayeb routinely falsely represented that Fatato, Fenelus, and Habayeb had spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Fatato, Fenelus, and Habayeb also purported to personally perform or directly supervise a massive amount of physical therapy services and/or chiropractic services provided to large numbers of Insureds.

772.    What is more, and as set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

773.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

774.    Thus, upon information and belief, the massive, impossible number of examination and physical therapy services and/or chiropractic services that Fatato, Fenelus, and Habayeb purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of examination and physical therapy services and/or chiropractic services that Fatato, Fenelus, and

218

Habayeb purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

775.    In the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely falsely represented that the initial examinations involved 30 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

**c.    Misrepresentations Regarding "Detailed" Physical Examinations**

776.    Moreover, in many of the claims identified in Exhibit "3" for initial examinations under CPT code 99203, CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely falsely represented the extent of the underlying physical examinations.

777.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

778.    As set forth in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations conducted detailed physical examinations of the Insureds who purportedly received the examinations.

779.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or chiropractor performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

780.     To the extent that the Insureds in the claims identified in Exhibit "3" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

781.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

782.     In the claims for initial examinations identified in Exhibit "3", when CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross billed for the initial examinations under CPT code 99203, they falsely represented that the physician or chiropractor

220

who purported to perform the examinations – namely Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

783.   In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

784.   For instance, in many of the claims under CPT code 99203 identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

  (i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

  (ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

  (iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

  (iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

  (v)     brief assessment of mental status;

  (vi)    examination of gait and station;

  (vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

  (viii)  coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)      examination of sensation.

785.    For example:

(i)      On or about February 19, 2013, CEDA Hialeah, Cereceda, and Habayeb billed GEICO under CPT code 99203 for an initial examination that Habayeb purported to perform on an Insured named CR, and thereby represented that Habayeb had provided a "detailed" physical examination to CR. However, Habayeb did not document an extended examination of CR's musculoskeletal system, despite the fact that – to the extent CR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)     On or about April 3, 2014, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named LM, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to LM. However, Crespo-Smith did not document an extended examination of LM's musculoskeletal system, despite the fact that – to the extent LM had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)    On or about August 14, 2014, CEDA Hialeah, Cereceda, and Habayeb billed GEICO under CPT code 99203 for an initial examination that Habayeb purported to perform on an Insured named MF, and thereby represented that Habayeb had provided a "detailed" physical examination to MF. However, Habayeb did not document an extended examination of MF's musculoskeletal system, despite the fact that – to the extent MF had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)     On or about August 28, 2014, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named MF, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to MF. However, Crespo-Smith did not document an extended examination of MF's musculoskeletal system, despite the fact that – to the extent MF had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)      On or about December 11, 2014, CEDA Hialeah, Cereceda, and Fenelus billed GEICO under CPT code 99203 for an initial examination that Fenelus purported to perform on an Insured named LF, and thereby represented that Fenelus had provided a "detailed" physical examination to LF. However, Fenelus did not document an extended examination of LF's musculoskeletal system, despite the

222

fact that – to the extent LF had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)     On or about February 12, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named LF, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to LF. However, Crespo-Smith did not document an extended examination of LF's musculoskeletal system, despite the fact that – to the extent LF had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)    On or about June 11, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named AA, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to AA. However, Crespo-Smith did not document an extended examination of AA's musculoskeletal system, despite the fact that – to the extent AA had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)   On or about July 9, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named KD, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to KD. However, Crespo-Smith did not document an extended examination of KD's musculoskeletal system, despite the fact that – to the extent KD had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)     On or about September 28, 2017, CEDA Hialeah, Cereceda, and Fatato billed GEICO under CPT code 99203 for an initial examination that Fatato purported to perform on an Insured named ES, and thereby represented that Fatato had provided a "detailed" physical examination to ES. However, Fatato did not document an extended examination of ES's musculoskeletal system, despite the fact that – to the extent ES had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)      On or about January 22, 2018, CEDA Hialeah, Cereceda, and Ross billed GEICO under CPT code 99203 for an initial examination that Ross purported to perform on an Insured named NM, and thereby represented that Ross had provided a "detailed" physical examination to NM. However, Ross did not document an extended examination of NM's musculoskeletal system, despite the fact that – to the extent NM had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

786.    These are only representative examples. In many of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

787.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

788.    Furthermore, pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in medical decision making of "low complexity".

789.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant

complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

790.    As set forth above, the CPT Assistant provides various clinical examples of the kinds of presenting problems that might support the use of CPT code 99203 to bill for a patient examination, and therefore entail legitimate, low complexity medical decision-making, including:

(i)    Office visit for initial evaluation of a 48–year–old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49–year–old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13–year–old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)    Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

791.    Thus, pursuant to the CPT Assistant, the kinds of presenting problems that entail legitimate, low-complexity medical decision-making typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

792.    By contrast, when the Insureds in the claims identified in Exhibit "3" presented at CEDA Hialeah for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

793.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

225

794.    First, in the claims for initial examinations identified in Exhibit "3", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

795.    When the Insureds in the claims identified in Exhibit "3" presented to CEDA Hialeah for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

796.    Furthermore, prior to the initial examinations, CEDA Hialeah, Cereceda, Fatato, Fenelus, Habayeb, and Ross did not request any medical records from other providers.

797.    Second, in the claims for initial examinations identified in Exhibit "3", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

798.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by CEDA Hialeah, Cereceda, Fatato, Fenelus, Habayeb, and Ross, to the extent that CEDA Hialeah, Cereceda, Fatato, Fenelus, Habayeb, and Ross provided any such diagnostic procedures or treatment options in the first instance.

799.    In almost every instance, any "treatments" that the CEDA Hialeah Defendants actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health or life-threatening if properly administered.

800.    Third, in the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Fatato, Fenelus, Habayeb, and Ross did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

801.    Rather, to the extent that the initial examinations were conducted in the first instance, CEDA Hialeah, Cereceda, Fatato, Fenelus, Habayeb, and Ross provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

802.    Specifically, in most of the claims identified in Exhibit "3", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

803.    Even so, CEDA Hialeah, Cereceda, Fatato, Fenelus, Habayeb, and Ross prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

804.    Then, based upon these phony "diagnoses", CEDA Hialeah, Cereceda, Fatato, Fenelus, Habayeb, and Ross directed virtually every Insured: (i) to receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; and (ii) in the majority of cases, referred the Insureds to a medical doctor for further evaluation and treatment, regardless of the Insureds' true circumstances or presentation.

805.    For example:

(i)      On February 15, 2013, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in CR's vehicle did not deploy, and that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured in the accident. In keeping with the fact that CR was not seriously injured in the accident, CR did not visit any hospital emergency room following the accident. To the extent that CR experienced any health problems at all as a result of the accident, they were of low severity. On February 19, 2013, Habayeb purported to conduct an initial examination of CR at CEDA Hialeah. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided CR with the same,

phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CR's presenting problems, nor the treatment plan provided to CR by Habayeb, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, CR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to CR. Even so, Habayeb, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On February 16, 2013, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GH's vehicle did not deploy and that GH's vehicle was drivable following the accident. The police report further indicated that GH was not injured in the accident. In keeping with the fact that GH was not seriously injured in the accident, GH did not visit any hospital emergency room following the accident. To the extent that GH experienced any health problems at all as a result of the accident, they were of low severity. On February 18, 2013, Habayeb purported to conduct an initial examination of GH at CEDA Hialeah. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided GH with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GH's presenting problems, nor the treatment plan provided to GH by Habayeb, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, GH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to GH. Even so, Habayeb, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)   On March 25, 2014, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in LM's vehicle did not deploy, and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured in the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low severity. On March 25, 2014, Habayeb

228

purported to conduct an initial examination of LM at CEDA Hialeah. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided LM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LM's presenting problems, nor the treatment plan provided to LM by Habayeb, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, LM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to LM. Even so, Habayeb, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)     On August 13, 2014, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that MF's vehicle was drivable following the accident and that MF was not injured in the accident. In keeping with the fact that MF was not seriously injured in the accident, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as a result of the accident, they were of low severity. On August 14, 2014, Habayeb purported to conduct an initial examination of MF at CEDA Hialeah. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided MF with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MF's presenting problems, nor the treatment plan provided to MF by Habayeb, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, MF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MF. Even so, Habayeb, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On December 9, 2014, an Insured named LF was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LF's vehicle did not deploy and that LF's vehicle was drivable following the accident.

The police report further indicated that LF was not injured in the accident. In keeping with the fact that LF was not seriously injured in the accident, LF did not visit any hospital emergency room following the accident. To the extent that LF experienced any health problems at all as a result of the accident, they were of low severity. On December 11, 2014, Fenelus purported to conduct an initial examination of LF at CEDA Hialeah. To the extent that Fenelus performed the examination in the first instance, Fenelus did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fenelus did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fenelus provided LF with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LF's presenting problems, nor the treatment plan provided to LF by Fenelus, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, LF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Fenelus, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to LF. Even so, Fenelus, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fenelus engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)     On June 17, 2015, an Insured named KD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KD's vehicle did not deploy and that KD's vehicle was drivable following the accident. The police report further indicated that KD was not injured in the accident. In keeping with the fact that KD was not seriously injured in the accident, KD did not visit any hospital emergency room following the accident. To the extent that KD experienced any health problems at all as a result of the accident, they were of low severity. On June 24, 2015, Fenelus purported to conduct an initial examination of KD at CEDA Hialeah. To the extent that Fenelus performed the examination in the first instance, Fenelus did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fenelus did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fenelus provided KD with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither KD's presenting problems, nor the treatment plan provided to KD by Fenelus, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, KD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Fenelus, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to KD. Even so, Fenelus, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code

99203, and thereby falsely represented that Fenelus engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On February 24, 2017, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the damage to MH's vehicle was minor, that there was minor damage to the other vehicle, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured in the accident. In keeping with the fact that MH was not seriously injured in the accident, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of low severity. On March 7, 2017, Fenelus purported to conduct an initial examination of MH at CEDA Hialeah. To the extent that Fenelus performed the examination in the first instance, Fenelus did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fenelus did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fenelus provided MH with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MH's presenting problems, nor the treatment plan provided to MH by Fenelus, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, MH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Fenelus, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MH. Even so, Fenelus, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fenelus engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On September 24, 2017, an Insured named ES was involved in an automobile accident. The contemporaneous police report indicated that the airbags in ES's vehicle did not deploy, that the damage to ES's vehicle was minor, that there was minor damage to the other vehicle, and that ES's vehicle was drivable following the accident. The police report further indicated that ES was not injured in the accident. In keeping with the fact that ES was not seriously injured in the accident, ES did not visit any hospital emergency room following the accident. To the extent that ES experienced any health problems at all as a result of the accident, they were of low severity. On September 28, 2017, Fatato purported to conduct an initial examination of ES at CEDA Hialeah. To the extent that Fatato performed the examination in the first instance, Fatato did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fatato did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fatato provided ES with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither ES's presenting problems, nor the treatment plan provided to ES by Fatato,

Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, ES did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Fatato, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to ES. Even so, Fatato, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fatato engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)     On December 15, 2017, an Insured named NM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in NM's vehicle did not deploy, and that NM's vehicle was drivable following the accident. The police report further indicated that NM was not injured in the accident. In keeping with the fact that NM was not seriously injured in the accident, NM did not visit any hospital emergency room following the accident. To the extent that NM experienced any health problems at all as a result of the accident, they were of low severity. On January 22, 2018, Ross purported to conduct an initial examination of NM at CEDA Hialeah. To the extent that Ross performed the examination in the first instance, Ross did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ross did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ross provided NM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NM's presenting problems, nor the treatment plan provided to NM by Ross, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, NM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ross, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to NM. Even so, Ross, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ross engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)      On December 15, 2017, an Insured named XM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in XM's vehicle did not deploy, and that XM's vehicle was drivable following the accident. The police report further indicated that XM was not injured in the accident. In keeping with the fact that XM was not seriously injured in the accident, XM did not visit any hospital emergency room following the accident. To the extent that XM experienced any health problems at all as a result of the accident, they were of low severity. On January 22, 2018, Ross purported to conduct an initial examination of XM at CEDA Hialeah. To the extent that Ross performed the examination in the first instance, Ross did not retrieve,

review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ross did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ross provided XM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither XM's presenting problems, nor the treatment plan provided to XM by Ross, Cereceda, and CEDA Hialeah, presented any risk of significant complications, morbidity, or mortality. To the contrary, XM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ross, Cereceda, and CEDA Hialeah consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to XM. Even so, Ross, Cereceda, and CEDA Hialeah billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ross engaged in some legitimate, low complexity medical decision-making during the purported examination.

806.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

807.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

808.     As set forth above, in the claims identified in Exhibit "3", virtually all of the Insureds whom the CEDA Hialeah Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

809.     It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "3" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

810.     It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by CEDA Hialeah, Cereceda,

233

Crespo-Smith, Fenelus, Habayeb, and Ross with substantially identical injuries <u>on or about the exact</u> <u>same dates</u> after their accidents.

811. Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

812. Similarly, CEDA Hialeah, Cereceda, and Crespo-Smith frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident.

813. For example:

(i) On March 1, 2014, two Insureds – AF and JL – were involved in the same automobile accident. Thereafter, AF and JL presented – incredibly – <u>on the exact same date</u>, March 21, 2014, at CEDA Hialeah for initial examinations by Crespo-Smith. AF and JL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AF and JL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Crespo-Smith provided AF and JL with substantially identical, phony "diagnoses".

(ii) On May 5, 2014, two Insureds – IN and JN – were involved in the same automobile accident. Thereafter, IN and JN presented – incredibly – <u>on the exact same date</u>, May 7, 2014, at CEDA Hialeah for initial examinations by Habayeb. IN and JN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that IN and JN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Habayeb provided IN and JN with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii) On July 13, 2014, two Insureds – HG and JH – were involved in an automobile accident. Thereafter, HG and JH presented – incredibly – <u>on the exact same date</u>, July 24, 2014, at CEDA Hialeah for initial examinations by Crespo-Smith. HG and JH

were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HG and JH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Crespo-Smith provided HG and JH with substantially identical, phony "diagnoses".

(iv)     On October 17, 2015, two Insureds – JG and MG – were involved in the same automobile accident. Thereafter, JG and MG presented – incredibly – on the exact same date, November 5, 2015, at CEDA Hialeah for initial examinations by Crespo-Smith. JG and MG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JG and MG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Crespo-Smith provided JG and MG with substantially identical, phony "diagnoses".

(v)      On May 26, 2016, two Insureds – AA and SA – were involved in the same automobile accident. Thereafter, AA and SA presented – incredibly – on the exact same date, June 30, 2016, at CEDA Hialeah for initial examinations by Crespo-Smith. AA and SA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AA and SA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Crespo-Smith provided AA and SA with substantially identical, phony "diagnoses".

(vi)     On May 27, 2016, two Insureds – JG and YG – were involved in the same automobile accident. Thereafter, JG and YG presented – incredibly – on the exact same date, June 23, 2016, at CEDA Hialeah for initial examinations by Crespo-Smith. JG and YG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JG and YG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Crespo-Smith provided JG and YG with substantially identical, phony "diagnoses".

(vii)    On November 18, 2016, two Insureds – DB and SP – were involved in the same automobile accident. Thereafter, DB and SP presented – incredibly – on the exact same date, January 12, 2017, at CEDA Hialeah for initial examinations by Crespo-Smith. DB and SP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DB and SP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Crespo-Smith provided DB and SP with substantially identical, phony "diagnoses".

(viii)   On February 7, 2017, two Insureds – TM and YM – were involved in the same automobile accident. Thereafter, TM and YM presented – incredibly – on the exact

same date, February 20, 2017, at CEDA Hialeah for initial examinations by Fenelus. TM and YM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that TM and YM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Fenelus provided TM and YM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)     On July 25, 2017, two Insureds – JA and CD – were involved in the same automobile accident. Thereafter, JA and CD presented – incredibly – on the exact same date, July 31, 2017, at CEDA Hialeah for initial examinations by Habayeb. JA and CD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JA and CD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Habayeb provided JA and CD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(x)      On August 7, 2017, two Insureds – MG and CP – were involved in the same automobile accident. Thereafter, MG and CP presented – incredibly – on the exact same date, August 8, 2017, at CEDA Hialeah for initial examinations by Habayeb. MG and CP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MG and CP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Habayeb provided MG and CP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xi)     On August 30, 2018, two Insureds – EZ and JZ – were involved in the same automobile accident. Thereafter, EZ and JZ presented – incredibly – on the exact same date, September 5, 2018, at CEDA Hialeah for initial examinations by Ross. EZ and JZ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EZ and JZ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Hialeah, Cereceda, and Ross provided EZ and JZ with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

814.     These are only representative examples. In the claims for initial examinations that are identified in Exhibit "3", CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured

involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

815.    What is more, in the claims for initial examinations that are identified in Exhibit "3", CEDA Hialeah, Cereceda, and Crespo-Smith frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated.

816.    CEDA Hialeah, Cereceda, Crespo-Smith, Fenelus, Habayeb, and Ross routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

817.    In keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross falsely purported to report results of a "Soto-Hall" test purportedly conducted on the Insureds during initial examinations in order to create the appearance of genuine, serious injuries, and to create the false impression that the initial examinations required some legitimate medical decision-making.

818.    For example, and as set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

819.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

820.    It is extremely improbable – to the point of medical impossibility – that many of the Insureds examined by CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross would present with identical "Soto-Hall" test results during initial examinations.

821.    Even so, in many of the initial examination reports in the claims identified in Exhibit "3", CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross falsely reported that the Insureds had the following underline identical "Soto-Hall" results: "Soto-Hall test was positive in the cervical spine. This test is primarily indicative of a vertebral prominens fracture at C-7 and/or T-1."

822.    These phony, identical "findings" were reported in a statistically impossible number of  initial examination reports created by CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross, including but not limited to reports for the following Insureds on the following dates:

(i)      GH, on February 18, 2013;

(ii)     CR, on February 19, 2013;

(iii)    TH, on February 20, 2013;

(iv)     RA, on February 27, 2014;

(v)      MF, on August 14, 2014;

(vi)     RF, on June 23, 2015;

(vii)    AT, on December 1, 2015;

(viii)   JE, on June 6, 2016;

(ix)     IA, on July 7, 2016;

(x)      LC, on October 10, 2016;

(xi)     TM, on February 20, 2017;

(xii)    YM, on February 20, 2017;

(xiii)   MH, on March 7, 2017;

(xiv)   TP, on March 7, 2017;

(xv)   ER, on March 27, 2017;

(xvi)   JG, on May 15, 2017;

(xvii)   MF, on July 6, 2017;

(xviii)  ZW, on November 16, 2017;

(xix)   NM, on January 22, 2018; and

(xx)   OW, on March 23, 2018.

823.   These are only representative examples. CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross routinely purported to report these same, identical "Soto-Hall" test results for the Insureds they purported to examine, to an extent that was statistically impossible.

824.   Moreover, and in keeping with the fact that CEDA Hialeah, Cereceda, Crespo-Smith, Fenelus, Habayeb, and Ross routinely inserted false "diagnoses" and/or "findings" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making for the Insureds in the claims for initial examinations that are identified in Exhibit "3", CEDA Hialeah, Cereceda, and Crespo-Smith inserted into many of the initial examination reports the following language: the Insured "presented in this office after undergoing a course of conservative treatment … [the Insured] has sought medical care due to the persistence of pain … [the Insured] suffered an emergency medical condition" as a result of the accident.

825.   What is more, CEDA Hialeah, Cereceda, and Crespo-Smith routinely appended to the initial examination reports a "**NOTICE OF EMERGENCY MEDICAL CONDITION**" which stated that "1. The below injured patient, has in the opinion of this medical provider, suffered an **Emergency Medical Condition**, as a result of the patient's injuries sustained in an

automobile accident … 2. The basis for the finding of an **Emergency Medical Condition** is that the patient has sustained acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention <u>could</u> reasonable be expected to result in any of the following: a) serious jeopardy to patient health; b) serious impairment to bodily functions; or c) serious dysfunction of a bodily organ or part."

826.    It is extremely improbable that many Insureds in the claims for initial examinations identified in Exhibit "3" would suffer from an "emergency medical condition" as a result of their relatively minor automobile accidents.

827.    For example:

(i)    On March 25, 2014, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in LM's vehicle did not deploy, and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured in the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of LM by Crespo-Smith on April 3, 2014, CEDA Hialeah, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that LM "presented in this office after undergoing a course of conservative treatment" – despite the fact that LM purportedly began chiropractic and/or physical therapy treatment at CEDA Hialeah less than two weeks earlier – that LM "has sought medical care due to the persistence of pain", and that LM "suffered an emergency medical condition" supposedly caused by LM's relatively minor automobile accident.

(ii)    On August 13, 2014, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that MF's vehicle was drivable following the accident and that MF was not injured in the accident. In keeping with the fact that MF was not seriously injured in the accident, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MF by Crespo-Smith on August 28, 2014, CEDA Hialeah, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that MF "presented in this office after undergoing a course of conservative treatment" – despite the fact that MF purportedly began chiropractic and/or physical therapy

treatment at CEDA Hialeah two weeks earlier – that MF "has sought medical care due to the persistence of pain", and that MF "suffered an emergency medical condition" supposedly caused by MF's relatively minor automobile accident.

(iii)    On June 17, 2015, an Insured  named KD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KD's vehicle did not deploy and that KD's vehicle was drivable following the accident. The police report further indicated that KD was not injured in the accident. In keeping with the fact that KD was not seriously injured in the accident, KD did not visit any hospital emergency room following the accident. To the extent that KD experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of KD by Crespo-Smith on July 9, 2015, CEDA Hialeah, Cereceda, and Crespo-Smith submitted a boilerplate examination report to GEICO which falsely contended that KD "presented in this office after undergoing a course of conservative treatment" – despite the fact that KD purportedly began chiropractic and/or physical therapy treatment at CEDA Hialeah two weeks earlier – that KD "has sought medical care due to the persistence of pain", and that KD "suffered an emergency medical condition" supposedly caused by KD's relatively minor automobile accident.

828.    These are only representative examples. In many of the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, and Crespo-Smith falsely reported that the Insureds suffered from "persistent pain" and that it was an "emergency medical condition".

829.    CEDA Hialeah, Cereceda, and Crespo-Smith routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

830.    As set forth above, to the extent that the Insureds in the claims identified in Exhibit "3" suffered any health care problems at all as the result of their relatively minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

831.    The diagnosis and treatment of these ordinary soft tissue injuries did not require any "low complexity" medical decision-making on the part of Crespo-Smith, Fatato, Fenelus,

Habayeb, Ross, or anyone else.

832.   To the contrary, and as set forth above, Crespo-Smith, Fatato, Fenelus, Habayeb, Ross, and the other physicians and chiropractors who purported to perform the initial examinations did not engage in legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "3", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the other Fraudulent Services that the Defendants purported to provide.

833.   In the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

834.   In the claims for initial examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, and Ross routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   CEDA Hialeah never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

835.    In this context, Cereceda – who at all relevant times purported to own CEDA Hialeah – did not, and could not have, legitimately supervised the business activities of CEDA Hialeah.

836.    Had Cereceda actually supervised the business activities of CEDA Hialeah, Cereceda would have noted – among other things – that the CEDA Hialeah Defendants routinely fraudulently represented in CEDA Hialeah's billing that the putative initial examinations were legitimately and lawfully performed.

(ii)    **The Fraudulent Charges for Follow-Up Examinations at CEDA Hialeah**

837.    In addition to their fraudulent initial examinations, CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross purported to subject many of the Insureds in the claims identified in Exhibit "3" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

838.    Fenelus, Habayeb, and Ross purported to personally perform the majority of the follow-up examinations in the claims identified in Exhibit "3".

839.    As set forth in Exhibit "3", CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross then billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in charges of between $180.00 and $356.00 for each follow-up examination they purported to provide; or (ii) CPT code 99214, typically resulting in charges of between $210.00 and $521.00 for each follow-up examination they purported to provide.

840.    In the claims for follow-up examinations identified in Exhibit "3", the charges for the follow-up examinations were fraudulent in that they misrepresented CEDA Hialeah's eligibility to collect PIP Benefits in the first instance.

841.     In fact, and as set forth above, CEDA Hialeah never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

842.     As set forth below, CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross's charges for the follow-up examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature and extent of the examinations.

a.     **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

843.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

844.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

845.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

846.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

847.    What is more, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

848.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

849.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)     Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)      Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)       Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)      Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)     Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

850.     Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

851.     By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "3" suffered any injuries at all in their relatively minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

852.     In keeping with the fact that the Insureds in the claims identified in Exhibit "3" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in many of the claims identified in Exhibit "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

853.     Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

854.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

855.    By the time the Insureds in the claims identified in Exhibit "3" presented at CEDA Hialeah for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

856.    Even so, in the claims for follow-up examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity.

857.    For example:

(i)    On February 15, 2013, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in CR's vehicle did not deploy, and that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured in the accident. In keeping with the fact that CR was not seriously injured in the accident, CR did not visit any hospital emergency room following the accident. To the extent that CR experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to four months of the accident. Even so, following a purported follow-up examination of CR on May 28, 2013 – more than three months after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that CR presented with problems of low to moderate severity at the follow-up examination.

(ii)   On February 16, 2013, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GH's vehicle did not deploy and that GH's vehicle was drivable following the accident. The police report further indicated that GH was not injured in the accident. In keeping with the fact that GH was not seriously injured in the accident, GH did not visit any hospital emergency room following the accident. To the extent that GH experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three months of the

accident. Even so, following a purported follow-up examination of GH on April 22, 2013 – more than two months after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that GH presented with problems of low to moderate severity. What is more, following a purported follow-up examination of GH on May 15, 2013 – three months after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that GH presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that GH had no presenting problems of moderate to high severity, CEDA Hialeah, Cereceda, and Habayeb actually stopped treating GH after May 15, 2013.

(iii)    On March 19, 2014, an Insured named VG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in VG's vehicle did not deploy and that VG's vehicle was drivable following the accident. The police report further indicated that VG was not injured in the accident. In keeping with the fact that VG was not seriously injured in the accident, VG did not visit any hospital emergency room following the accident. To the extent that VG experienced any health problems at all as a result of the accident, they were of low severity at the outset. Even so, following a purported follow-up examination of VG on April 24, 2014 – more than a month after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that VG presented with problems of low to moderate severity at the follow-up examination.

(iv)    On March 22, 2014, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JC's vehicle did not deploy and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured in the accident. In keeping with the fact that JC was not seriously injured in the accident, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of low severity at the outset. Even so, following a purported follow-up examination of JC on May 13, 2014 – more than a month and a half after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JC presented with problems of low to moderate severity at the follow-up examination. What is more, following a purported follow-up examination of JC on June 17, 2014 – more than two and a half months after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JC presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that JC had no presenting problems of moderate to high severity, CEDA Hialeah, Cereceda, and Habayeb actually stopped treating JC after June 17, 2014.

(v)    On March 25, 2014, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in LM's vehicle did not deploy, and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured in the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three and four and a half months of the accident. Even so, following a purported follow-up examination of LM on July 15, 2014 – more than three and a half months after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that LM presented with problems of low to moderate severity at the follow-up examination. What is more, following a purported follow-up examination of LM on August 1, 2014 – more than four months after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that LM presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that LM had no presenting problems of moderate to high severity, CEDA Hialeah, Cereceda, and Habayeb actually stopped treating LM after August 1, 2014.

(vi)   On April 11, 2014, an Insured named VQ was involved in an automobile accident. The contemporaneous police report indicated that the airbags to VQ's vehicle did not deploy and that VQ's vehicle was drivable following the accident. The police report further indicated that VQ was not injured in the accident. In keeping with the fact that VQ was not seriously injured in the accident, VQ did not visit any hospital emergency room following the accident. To the extent that VQ experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to four months of the accident. Even so, following a purported follow-up examination of VQ on July 21, 2014 – between three and four months after the accident – CEDA Hialeah, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that VQ presented with problems of low to moderate severity at the follow-up examination.

(vii)  On December 9, 2014, an Insured named LF was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LF's vehicle did not deploy and that LF's vehicle was drivable following the accident. The police report further indicated that LF was not injured in the accident. In keeping with the fact that LF was not seriously injured in the accident, LF did not visit any hospital emergency room following the accident. To the extent that LF experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to four months of the accident. Even so, following a purported follow-up examination of LF on April 1, 2015 – more than three and a half months after the accident – CEDA Hialeah,

249

Cereceda, and Fenelus billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that LF presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that LF had no presenting problems of moderate to high severity, CEDA Hialeah, Cereceda, and Fenelus actually stopped treating LF after April 1, 2015.

(viii)   On January 14, 2016, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AS's vehicle did not deploy, that the damage to AS's vehicle was minor, that there was minor damage to the other vehicle, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured in the accident. In keeping with the fact that AS was not seriously injured in the accident, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination of AS on March 21, 2016 – more than two months after the accident – CEDA Hialeah, Cereceda, and Fenelus billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that AS presented with problems of low to moderate severity at the follow-up examination.

(ix)   On April 27, 2017, an Insured named JJ was involved in an automobile accident. The contemporaneous police report indicated that JJ's vehicle was drivable following the accident and that the damage to JJ's vehicle was minor. The police report further indicated that JJ was not injured in the accident. In keeping with the fact that JJ was not seriously injured in the accident, JJ did not visit any hospital emergency room following the accident. To the extent that JJ experienced any health problems at all as a result of the accident, they were of low severity at the outset. Even so, following a purported follow-up examination of JJ on June 23, 2017 – more than a month and a half after the accident – CEDA Hialeah, Cereceda, and Fenelus billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JJ presented with problems of low to moderate severity at the follow-up examination.

(x)   On September 24, 2017, an Insured named ES was involved in an automobile accident. The contemporaneous police report indicated that the airbags in ES's vehicle did not deploy, that the damage to ES's vehicle was minor, that there was minor damage to the other vehicle, and that ES's vehicle was drivable following the accident. The police report further indicated that ES was not injured in the accident. In keeping with the fact that ES was not seriously injured in the accident, ES did not visit any hospital emergency room following the accident. To the extent that ES experienced any health problems at all as a result of the accident, they were of low severity at the outset. Even so, following a purported follow-up examination of ES on November 6, 2017 – more than a month after the accident – CEDA Hialeah, Cereceda, and Ross billed GEICO for the follow-up examination using

CPT code 99214, and thereby falsely represented that ES presented with problems of moderate to high severity at the follow-up examination.

858.    These are only representative examples. In many of the claims for follow-up examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

859.    In the claims for follow-up examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

860.    In the claims for follow-up examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

861.    What is more, pursuant to the CPT Assistant, when CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross billed for their putative follow-up examinations under CPT code 99214, they represented that Fenelus, Habayeb, and Ross performed at least two of the following

three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

862.    Similarly, pursuant to the CPT Assistant, when CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross billed for their putative follow-up examinations under CPT code 99213, they represented that Fenelus, Habayeb, and Ross performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

863.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "3", Fenelus, Habayeb, and Ross did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

864.    Rather, following their purported follow-up examinations, CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross – at the direction of Cereceda – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either  (ii) referred the Insureds back to CEDA Hialeah for even more medically unnecessary physical therapy services and/or chiropractic services, despite the fact that the Insureds purportedly already had received extensive physical therapy services and/or chiropractic services from CEDA Hialeah that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

865.    In the claims for follow-up examinations identified in Exhibit "3", CEDA Hialeah, Cereceda, Fenelus, Habayeb, and Ross routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

252

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   CEDA Hialeah never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

866.   In this context, Cereceda – who at all relevant times purported to own CEDA Hialeah – did not, and could not have, legitimately supervised the business activities of CEDA Hialeah.

867.   Had Cereceda actually supervised the business activities of CEDA Hialeah, Cereceda would have noted – among other things – that the CEDA Hialeah Defendants routinely fraudulently represented in CEDA Hialeah's billing that the putative follow-up examinations were legitimately and lawfully performed.

 (iii)   **The Fraudulent Charges for Physical Therapy and/or Chiropractic Treatment at CEDA Hialeah**

868.   In addition to the fraudulent initial examinations and follow-up examinations, the CEDA Hialeah Defendants routinely purported to subject each of the Insureds in the claims identified in Exhibit "3" to medically unnecessary physical therapy and/or chiropractic treatment.

869.   As set forth above, though Habayeb and Fenelus falsely purported to personally perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services in the claims identified in Exhibit "3", the physical therapy services and/or chiropractic services actually were performed without supervision by Otero, Pascucci, Rodriguez or other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah, to the extent that they were even provided at all.

870.    As set forth in Exhibit "3", the CEDA Hialeah Defendants routinely billed the purported physical therapy services and/or chiropractic services to GEICO under:

(i)      CPT code 97010 for putative hot/cold pack therapy, typically resulting in a charge of $25.00 for each round of hot/cold pack therapy they purported to provide;

(ii)     CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of either $44.00 or $45.00 for each round of mechanical traction therapy they purported to provide;

(iii)    CPT code 97014, for putative electrical stimulation, typically resulting in a charge of either $37.00 or $40.00 for each round of electrical stimulation they purported to provide;

(iv)     CPT code 97018, for putative paraffin bath therapy, typically resulting in a charge of between $30.00 and $55.00 for each round of paraffin bath therapy they purported to provide;

(v)      CPT code 97035, for putative ultrasound, typically resulting in a charge of between $35.00 and $95.00 for each round of ultrasound they purported to provide;

(vi)     CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of between $75.00 and $151.00 for each round of therapeutic exercises they purported to provide;

(vii)    CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of between $90.00 and $157.00 for each round of neuromuscular reeducation they purported to provide;

(viii)   CPT code 97124, for putative massage therapy, typically resulting in a charge of between $72.00 and $124.00 for each round of massage therapy they purported to provide;

(ix)     CPT code 97140, for putative manual therapy, typically resulting in a charge of between $55.00 and $141.00 for each round of manual therapy they purported to provide;

(x)      CPT code 97150, for putative group therapeutic procedures, typically resulting in a charge of between $55.00 and $83.00 for each round of group therapeutic procedures they purported to provide.

871.    In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

872.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and/or chiropractic treatment is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy and/or chiropractic treatment.

873.    By contrast, at CEDA Hialeah, the nature and extent of the physical therapy and/or chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.  Accordingly, the supposed treatment was medically unnecessary.

874.    In the claims for physical therapy services and/or chiropractic services identified in Exhibit "3", the charges for the physical therapy services and/or chiropractic services also were fraudulent in that they misrepresented CEDA Hialeah's eligibility to collect PIP Benefits in the first instance.

875.    In fact, and as set forth above, CEDA Hialeah never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

876.    What is more, and as set forth above, in most of the claims for physical therapy services and/or chiropractic services identified in Exhibit "3", the CEDA Hialeah Defendants falsely represented that the physical therapy services and/or chiropractic services lawfully had been performed by or directly supervised by Fenelus or Habayeb, when in fact they were

255

unlawfully performed without any supervision by Otero, Pascucci, Rodriguez or other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah, who are not and never have been licensed as physical therapists.

877.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

878.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

879.    In each of the claims for physical therapy services and/or chiropractic services identified in Exhibit "3", the CEDA Hialeah Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

880.    In fact, in most of the claims for physical therapy services and/or chiropractic services identified in Exhibit "3", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services and/or chiropractic services were performed – to the extent that they were performed at all – without supervision by Otero, Pascucci, Rodriguez or other massage therapists and/or registered chiropractic assistants associated with CEDA Hialeah, who were individuals who were not licensed to practice physical therapy and/or chiropractic; and (ii) the CEDA Hialeah Defendants deliberately misrepresented the identities of the individuals who purported to perform or directly supervise the physical therapy services and/or chiropractic services in their billing for the physical therapy services and/or chiropractic services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

**(iv)    The Fraudulent Charges for Pain Management Injections**

881.    As part and parcel of the CEDA Hialeah Defendants' fraudulent scheme, CEDA Hialeah, Cereceda, and Pabon subjected many Insureds to medically unnecessary pain management injections, including, but not limited to, facet injections.

882.    Typically, Pabon purported to perform the injections.

883.    As set forth in Exhibit "3", CEDA Hialeah, Cereceda, and Pabon then billed the injections through CEDA Hialeah to GEICO, typically under CPT codes 64490, 64491, 64493, 64494, and 64495.

884.    As set forth below, the charges for pain management injections were fraudulent because the pain management injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

885.    Furthermore, the charges for pain management injections were fraudulent in that they misrepresented CEDA Hialeah's eligibility to collect PIP Benefits in the first instance.

886.    In fact, and as set forth above, CEDA Hialeah never was eligible to collect PIP Benefits, because it was operating in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

a.    **Basic, Legitimate Use of Pain Management Injections**

887.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

888.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment,

physical therapy, and the use of pain management medication.

889.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require health care services providers to begin demonstrating at regular intervals why continued soft tissue injury treatment is necessary beyond the four-week mark.

890.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

891.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in conservative forms of treatment.

892.    In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

893.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

### b.     The Medically Unnecessary Pain Management Injections

894.    However, in the claims for pain management injections identified in Exhibit "3", CEDA Hialeah, Cereceda, and Pabon often purported to administer pain management injections to Insureds before the Insureds had tried and failed any course of legitimate, conservative treatment.

895.    For example:

(i)     On August 13, 2017, an Insured named IR was involved in an automobile accident. CEDA Hialeah, Cereceda, and Pabon purported to provide multiple facet injections to IR on November 2, 2017 – less than three months after the accident – even though IR could not have failed conservative treatment less than three months after the purported automobile accident.

(ii)    On August 14, 2017, an Insured named EM was involved in an automobile accident. CEDA Hialeah, Cereceda, and Pabon purported to provide multiple facet injections to EM on October 12, 2017 – less than two months after the accident – even though EM could not have failed conservative treatment less than two months after the purported automobile accident.

(iii)   On August 24, 2017, an Insured named HQ was involved in an automobile accident. CEDA Hialeah, Cereceda, and Pabon purported to provide multiple facet injections to HQ on November 16, 2017 – less than three months after the accident – even though HQ could not have failed conservative treatment less than three months after the purported automobile accident.

(iv)    On October 29, 2017, an Insured named GM was involved in an automobile accident. CEDA Hialeah, Cereceda, and Pabon purported to provide multiple facet injections to GM on January 25, 2018 – less than three months after the accident – even though GM could not have failed conservative treatment less than three months after the purported automobile accident.

(v)     On March 19, 2018, an Insured named ML was involved in an automobile accident. CEDA Hialeah, Cereceda, and Pabon purported to provide multiple facet injections to ML on May 10, 2018 – less than two months after the accident – even though ML could not have failed conservative treatment less than two months after the purported automobile accident.

896.    In the claims for pain management injections identified in Exhibit "3", CEDA Hialeah, Cereceda, and Pabon often purported to provide medically unnecessary pain management

injections to Insureds before the Insureds could have tried and failed any course of legitimate, conservative treatment in order to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**4.      The CEDA Miami Defendants' Fraudulent Treatment and Billing Protocol**

**(i)      The Fraudulent Charges for Initial Examinations at CEDA Miami**

897.    As an initial step in the CEDA Miami Defendants' fraudulent treatment and billing protocol, CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, and Schulman purported to provide the Insureds in the claims identified in Exhibit "4" with a putative initial examination.

898.    Crespo-Smith, Habayeb, Javech, Moya, and Schulman purported to personally perform most of the initial examinations in the claims identified in Exhibit "4".

899.    As set forth in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, and Schulman then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in charges of between $280.00 and $539.00 for each initial examination that they purported to provide.

900.    In the claims for initial examinations identified in Exhibit "4", the charges for the initial examinations were fraudulent in that they misrepresented CEDA Miami's eligibility to collect PIP Benefits in the first instance.

901.    In fact, and as set forth above, CEDA Miami never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

902.     As set forth below, the charges for the initial examinations identified in Exhibit "4" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

903.     As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

904.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

905.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

906.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

907.     For example, the CPT Assistant provides the following clinical examples of presenting problems that  might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)     Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

     (v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

908.     Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

909.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "4" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

910.     For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "4" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "4" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

911.     What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "4" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "4" the Insureds did not seek treatment at any hospital as the result of their accidents.

912.     Even so, in the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, and Schulman routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

913.    For example:

(i)     On October 28, 2013, an Insured named GD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in GD's vehicle did not deploy, and that GD's vehicle was drivable following the accident. The police report further indicated that GD was not injured in the accident. In keeping with the fact that GD was not seriously injured in the accident, GD did not visit any hospital emergency room following the accident. To the extent that GD experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of GD by Schulman on November 1, 2013, CEDA Miami, Cereceda, and Schulman billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of GD by a now deceased physician named Robert J. Lorello, M.D. ("Lorello") on November 11, 2013, CEDA Miami, Cereceda, and Lorello billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)    On November 18, 2013, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in YM's vehicle did not deploy, that the damage to YM's vehicle was minor, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured in the accident. In keeping with the fact that YM was not seriously injured in the accident, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of YM by Schulman on November 20, 2013, CEDA Miami, Cereceda, and Schulman billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)   On July 8, 2016, an Insured named TA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TA's vehicle did not deploy and that TA's vehicle was drivable following the accident. The police report further indicated that TA was not injured in the accident. In keeping with the fact that TA was not seriously injured in the accident, TA did not visit any hospital emergency room following the accident. To the extent that TA experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of TA on July 11, 2016, CEDA Miami, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems. What is more, following a purported initial examination of TA on July 19, 2016, CEDA Miami, Cereceda, and Crespo-Smith billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On September 16, 2016, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in WL's vehicle did not deploy, and that WL's vehicle was drivable following the accident. The police report further indicated that WL was not injured in the accident. In keeping with the fact that WL was not seriously injured in the accident, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of WL by Habayeb on September 21, 2016, CEDA Miami, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)     On June 5, 2017, an Insured named BM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in BM's vehicle did not deploy, and that BM's vehicle was drivable following the accident. The police report further indicated that BM was not injured in the accident. In keeping with the fact that BM was not seriously injured in the accident, BM did not visit any hospital emergency room following the accident. To the extent that BM experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of BM by Habayeb on June 12, 2017, CEDA Miami, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)    On June 5, 2017, an Insured named NM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in NM's vehicle did not deploy, and that NM's vehicle was drivable following the accident. The police report further indicated that NM was not injured in the accident. In keeping with the fact that NM was not seriously injured in the accident, NM did not visit any hospital emergency room following the accident. To the extent that NM experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of NM by Habayeb on June 12, 2017, CEDA Miami, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)   On September 22, 2017, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YS's vehicle did not deploy and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured in the accident. In keeping with the fact that YS was not seriously injured in the accident, YS did not visit any hospital emergency room following the accident. To the extent that YS

experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of YS by Habayeb on September 27, 2017, CEDA Miami, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)   On October 24, 2017, an Insured named NH was involved in an automobile accident. The contemporaneous police report indicated that NH's vehicle was drivable following the accident. The police report further indicated that NH was not injured in the accident. In keeping with the fact that NH was not seriously injured in the accident, NH did not visit any hospital emergency room following the accident. To the extent that NH experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of NH by Habayeb on November 4, 2017, CEDA Miami, Cereceda, and Habayeb billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)   On November 18, 2017, an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in DB's vehicle did not deploy, and that DB's vehicle was drivable following the accident. The police report further indicated that DB was not injured in the accident. In keeping with the fact that DB was not seriously injured in the accident, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of DB by Moya on January 24, 2018, CEDA Miami, Cereceda, and Moya billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)   On January 4, 2018, an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RS's vehicle did not deploy and that RS's vehicle was drivable following the accident. The police report further indicated that RS was not injured in the accident. In keeping with the fact that RS was not seriously injured in the accident, RS did not visit any hospital emergency room following the accident. To the extent that RS experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of RS by Javech on February 27, 2018, CEDA Miami, Cereceda, and Javech billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xi)   On January 18, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy, that the damage to MC's vehicle was minor, that there was

265

minor damage to the other vehicle, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MC by Javech on January 26, 2018, CEDA Miami, Cereceda, and Javech billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

914.    These are only representative examples. In the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, and Schulman routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

915.    In the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, and Schulman routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

916.    In the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, and Schulman also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the CEDA Miami Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy services and/or chiropractic services, and pain management injections.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

917.     What is more, in the claims identified in Exhibit "4" for initial examinations under CPT code 99203, CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman routinely misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

918.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

919.     As set forth in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman virtually always billed for the putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

920.     In fact, in most of the claims for initial examinations identified in Exhibit "4", neither Crespo-Smith, Habayeb, nor Schulman ever spent more than 15 minutes – let alone 30 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

921.     For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "4" did not entail more than 15 minutes of face-to-face time between Crespo-Smith, Habayeb, and Schulman and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman used a template in purporting to conduct the initial examinations.

922.     The template that CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

923.     The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

924.     These brief patient interviews and limited examinations did not require Cereceda, Crespo-Smith, Habayeb, and Schulman, nor any other physician or chiropractor associated with CEDA Miami, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

925.     What is more, Habayeb and Schulman could not legitimately have personally performed the initial examinations at CEDA Miami, or even directly supervised them, much less have spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

926.     For example:

(i)      On or about October 28, 2015, CEDA Miami, Cereceda, and Schulman billed GEICO under CPT code 99203 for two initial examinations that Schulman falsely purported to perform on Insureds named MC and RT. On that same day, Schulman also purported to personally provide or directly supervise at least 17 hours of physical therapy services and/or chiropractic services to at least twenty-two individual Insureds at CEDA Miami, all of which were billed to GEICO. What is more, on that same day, Schulman also purported to perform at least three 15-minute follow-up examinations which were billed to GEICO through CEDA Miami.

(ii)     On or about November 11, 2015, CEDA Miami, Cereceda, and Schulman billed GEICO under CPT code 99203 for an initial examination that Schulman falsely purported to perform on an Insured named RC. On that same day, Schulman also purported to personally provide or directly supervise at least 19.25 hours of physical therapy services and/or chiropractic services to at least twenty-three individual Insureds at CEDA Miami, all of which were billed to GEICO.

(iii)    On or about September 29, 2017, CEDA Miami, Cereceda, and Habayeb billed GEICO under CPT code 99203 for an initial examination that Habayeb falsely purported to perform on an Insured named JS. On that same day, Habayeb also purported to personally provide or directly supervise at least 16.5 hours of physical therapy services and/or chiropractic services to at least twenty-three individual Insureds at CEDA Miami, all of which were billed to GEICO. What is more, on that same day, Habayeb also purported to perform at least one 15-minute follow-up examination which was billed to GEICO through CEDA Miami.

(iv)    On or about November 20, 2017, CEDA Miami, Cereceda, and Habayeb billed GEICO under CPT code 99203 for an initial examination that Habayeb falsely purported to perform on an Insured named MP. On that same day, Habayeb also purported to personally provide or directly supervise at least 15 hours of physical therapy services and/or chiropractic services to at least twenty-three individual Insureds at CEDA Miami, all of which were billed to GEICO. What is more, on that same day, Habayeb also purported to perform at least four 15-minute follow-up examinations and at least one 5-minute follow-up examination which were billed to GEICO through CEDA Miami.

(v)    On or about December 4, 2017, CEDA Miami, Cereceda, and Habayeb billed GEICO under CPT code 99203 for an initial examination that Habayeb falsely purported to perform on an Insured named KV. On that same day, Habayeb also purported to personally provide or directly supervise at least 15.5 hours of physical therapy services and/or chiropractic services to at least twenty-one individual Insureds at CEDA Miami, all of which were billed to GEICO. What is more, on that same day, Habayeb also purported to perform at least one 25-minute follow-up examination and at least three 15-minute follow-up examinations which were billed to GEICO through CEDA Miami.

927.    These are only representative examples. In the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman routinely falsely represented that Habayeb and Schulman had spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Habayeb and Schulman also purported to personally perform or directly supervise a massive amount of physical therapy services and/or chiropractic services supposedly provided to large numbers of Insureds.

928.     What is more, and as set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

929.     It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

930.     Thus, upon information and belief, the massive, impossible number of examination and physical therapy services and/or chiropractic services that Habayeb and Schulman purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of examination and physical therapy services and/or chiropractic services that Habayeb and Schulman purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

931.     In the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman routinely falsely represented that the initial examinations involved 30 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

**c.     Misrepresentations Regarding "Detailed" Physical Examinations**

932.     Moreover, in many of the claims identified in Exhibit "4" for initial examinations under CPT code 99203, CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman routinely falsely represented the extent of the underlying physical examinations.

933.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

934.     As set forth in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations conducted detailed physical examinations of the Insureds who purportedly received the examinations.

935.     Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or chiropractor performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

936.     To the extent that the Insureds in the claims identified in Exhibit "4" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

937.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

   (i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

   (ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

   (iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

   (iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

271

(v)    brief assessment of mental status;

(vi)   examination of gait and station;

(vii)  inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii) coordination;

(ix)   examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

938.   In the claims for initial examinations identified in Exhibit "4", when CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman billed for the initial examinations under CPT code 99203, they falsely represented that the physician or chiropractor who purported to perform the examinations – namely Crespo-Smith, Habayeb, and Schulman – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

939.   In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

940.   For instance, in many of the claims under CPT code 99203 identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)   general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)    examination of sensation.

941.    For example:

(i)    On or about November 1, 2013, CEDA Miami, Cereceda, and Schulman billed GEICO under CPT code 99203 for an initial examination that Schulman purported to perform on an Insured named GD, and thereby represented that Schulman had provided a "detailed" physical examination to GD. However, Schulman did not document an extended examination of GD's musculoskeletal system, despite the fact that – to the extent GD had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)    On or about November 11, 2013, CEDA Miami, Cereceda, and a now deceased physician named Robert J. Lorello, M.D. ("Lorello") billed GEICO under CPT code 99203 for an initial examination that Lorello purported to perform on an Insured named GD, and thereby represented that Lorello had provided a "detailed" physical examination to GD. However, Lorello did not document an extended examination of GD's musculoskeletal system, despite the fact that – to the extent GD had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)    On or about July 11, 2016, CEDA Miami, Cereceda, and Habayeb billed GEICO under CPT code 99203 for an initial examination that Habayeb purported to perform on an Insured named TA, and thereby represented that Habayeb had provided a "detailed" physical examination to TA. However, Habayeb did not document an extended examination of TA's musculoskeletal system, despite the

fact that – to the extent TA had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)    On or about July 19, 2016, CEDA Miami, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named TA, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to TA. However, Crespo-Smith did not document an extended examination of TA's musculoskeletal system, despite the fact that – to the extent TA had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)    On or about August 25, 2017, CEDA Miami, Cereceda, and Crespo-Smith billed GEICO under CPT code 99203 for an initial examination that Crespo-Smith purported to perform on an Insured named MH, and thereby represented that Crespo-Smith had provided a "detailed" physical examination to MH. However, Crespo-Smith did not document an extended examination of MH's musculoskeletal system, despite the fact that – to the extent MH had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

942.    These are only representative examples. In many of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Crespo-Smith, Habayeb, and Schulman had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

943.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, and Schulman routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

944.    Furthermore, pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in medical decision making of "low complexity".

945.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

946.    As set forth above, the CPT Assistant provides various clinical examples of the kinds of presenting problems that might support the use of CPT code 99203 to bill for a patient examination, and therefore entail legitimate, low complexity medical decision-making, including:

(i)     Office visit for initial evaluation of a 48–year–old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49–year–old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13–year–old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

947.    Thus, pursuant to the CPT Assistant, the kinds of presenting problems that entail legitimate, low-complexity medical decision-making typically are either chronic and relatively

serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

948.    By contrast, when the Insureds in the claims identified in Exhibit "4" presented at CEDA Miami for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

949.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

950.    First, in the claims for initial examinations identified in Exhibit "4", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

951.    When the Insureds in the claims identified in Exhibit "4" presented to CEDA Miami for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

952.    Furthermore, prior to the initial examinations, CEDA Miami, Cereceda, Habayeb, and Schulman did not request any medical records from other providers.

953.    Second, in the claims for initial examinations identified in Exhibit "4", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

954.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by CEDA Miami, Cereceda, Habayeb, and Schulman to the extent that CEDA Miami, Cereceda, Habayeb, and

Schulman provided any such diagnostic procedures or treatment options in the first instance.

955.    In almost every instance, any "treatments" that the CEDA Miami Defendants actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

956.    Third, in the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

957.    Rather, to the extent that the initial examinations were conducted in the first instance, CEDA Miami, Cereceda, Habayeb, and Schulman provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

958.    Specifically, in most of the claims identified in Exhibit "4", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

959.    Even so, CEDA Miami, Cereceda, Habayeb, and Schulman prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

960.    Then, based upon these phony "diagnoses", CEDA Miami, Cereceda, Habayeb, and Schulman directed virtually every Insured: (i) to receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; and (ii) in the majority of cases, referred the Insureds to a medical doctor for further evaluation and treatment, regardless of the Insureds' true circumstances or presentation.

961.    For example:

(i)     On October 28, 2013, an Insured named GD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in GD's vehicle did not deploy, and that GD's vehicle was drivable following the accident. The police report further indicated that GD was not injured in the accident. In keeping with the fact that GD was not seriously injured in the accident, GD did not visit any hospital emergency room following the accident. To the extent that GD experienced any health problems at all as a result of the accident, they were of low severity. On November 1, 2013, Schulman purported to conduct an initial examination of GD at CEDA Miami. To the extent that Schulman performed the examination in the first instance, Schulman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Schulman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Schulman provided GD with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GD's presenting problems, nor the treatment plan provided to GD by Schulman, Cereceda, and CEDA Miami, presented any risk of significant complications, morbidity, or mortality. To the contrary, GD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Schulman, Cereceda, and CEDA Miami consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to GD. Even so, Schulman, Cereceda, and CEDA Miami billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Schulman engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On November 18, 2013, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in YM's vehicle did not deploy, that the damage to YM's vehicle was minor, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured in the accident. In keeping with the fact that YM was not seriously injured in the accident, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as a result of the accident, they were of low severity. On November 20, 2013, Schulman purported to conduct an initial examination of YM at CEDA Miami. To the extent that Schulman performed the examination in the first instance, Schulman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Schulman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Schulman provided YM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YM's presenting problems, nor the treatment plan provided to YM by Schulman, Cereceda, and CEDA Miami, presented any risk of significant complications, morbidity, or mortality. To the contrary, YM did not need any

significant treatment at all as a result of the accident, and the treatment plan provided by Schulman, Cereceda, and CEDA Miami consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to YM. Even so, Schulman, Cereceda, and CEDA Miami billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Schulman engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)   On July 8, 2016, an Insured named TA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TA's vehicle did not deploy and that TA's vehicle was drivable following the accident. The police report further indicated that TA was not injured in the accident. In keeping with the fact that TA was not seriously injured in the accident, TA did not visit any hospital emergency room following the accident. To the extent that TA experienced any health problems at all as a result of the accident, they were of low severity. On July 11, 2016, Habayeb purported to conduct an initial examination of TA at CEDA Miami. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided TA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TA's presenting problems, nor the treatment plan provided to TA by Habayeb, Cereceda, and CEDA Miami, presented any risk of significant complications, morbidity, or mortality. To the contrary, TA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Miami consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to TA. Even so, Habayeb, Cereceda, and CEDA Miami billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)   On September 16, 2016, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in WL's vehicle did not deploy, and that WL's vehicle was drivable following the accident. The police report further indicated that WL was not injured in the accident. In keeping with the fact that WL was not seriously injured in the accident, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as a result of the accident, they were of low severity. On September 21, 2016, Habayeb purported to conduct an initial examination of WL at CEDA Miami. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in

connection with the examination. Instead, Habayeb provided WL with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither WL's presenting problems, nor the treatment plan provided to WL by Habayeb, Cereceda, and CEDA Miami, presented any risk of significant complications, morbidity, or mortality. To the contrary, WL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Miami consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to WL. Even so, Habayeb, Cereceda, and CEDA Miami billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On June 5, 2017, an Insured named BM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in BM's vehicle did not deploy, and that BM's vehicle was drivable following the accident. The police report further indicated that BM was not injured in the accident. In keeping with the fact that BM was not seriously injured in the accident, BM did not visit any hospital emergency room following the accident. To the extent that BM experienced any health problems at all as a result of the accident, they were of low severity. On June 12, 2017, Habayeb purported to conduct an initial examination of BM at CEDA Miami. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided BM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BM's presenting problems, nor the treatment plan provided to BM by Habayeb, Cereceda, and CEDA Miami, presented any risk of significant complications, morbidity, or mortality. To the contrary, BM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Miami consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to BM. Even so, Habayeb, Cereceda, and CEDA Miami billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On June 5, 2017, an Insured named NM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in NM's vehicle did not deploy and that NM's vehicle was drivable following the accident. The police report further indicated that NM was not injured in the accident. In keeping with the fact that NM was not seriously injured in the accident, NM did not visit any hospital emergency room following the accident. To the extent that NM experienced any health problems at all as a

result of the accident, they were of low severity. On June 12, 2017, Habayeb purported to conduct an initial examination of NM at CEDA Miami. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided NM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NM's presenting problems, nor the treatment plan provided to NM by Habayeb, Cereceda, and CEDA Miami, presented any risk of significant complications, morbidity, or mortality. To the contrary, NM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Miami consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to NM. Even so, Habayeb, Cereceda, and CEDA Miami billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On September 22, 2017, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YS's vehicle did not deploy and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured in the accident. In keeping with the fact that YS was not seriously injured in the accident, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as a result of the accident, they were of low severity. On September 27, 2017, Habayeb purported to conduct an initial examination of YS at CEDA Miami. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided YS with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YS's presenting problems, nor the treatment plan provided to YS by Habayeb, Cereceda, and CEDA Miami, presented any risk of significant complications, morbidity, or mortality. To the contrary, YS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Miami consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to YS. Even so, Habayeb, Cereceda, and CEDA Miami billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On October 24, 2017, an Insured named NH was involved in an automobile accident. The contemporaneous police report indicated that NH's vehicle was drivable following the accident. The police report further indicated that NH was not injured in the accident. In keeping with the fact that NH was not seriously injured in the accident, NH did not visit any hospital emergency room following the accident. To the extent that NH experienced any health problems at all as a result of the accident, they were of low severity. On November 4, 2017, Habayeb purported to conduct an initial examination of NH at CEDA Miami. To the extent that Habayeb performed the examination in the first instance, Habayeb did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Habayeb did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Habayeb provided NH with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NH's presenting problems, nor the treatment plan provided to NH by Habayeb, Cereceda, and CEDA Miami, presented any risk of significant complications, morbidity, or mortality. To the contrary, NH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Habayeb, Cereceda, and CEDA Miami consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to NH. Even so, Habayeb, Cereceda, and CEDA Miami billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Habayeb engaged in some legitimate, low complexity medical decision-making during the purported examination.

962.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

963.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

964.   As set forth above, in the claims identified in Exhibit "4", virtually all of the Insureds whom the CEDA Miami Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

965.   It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "4" would suffer substantially

identical injuries as the result of their accidents, or require a substantially identical course of treatment.

966.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Moya, and Schulman with substantially identical injuries on or about the exact same dates after their accidents.

967.    Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Miami, Cereceda, Habayeb, and Schulman frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

968.    Similarly, CEDA Miami, Cereceda, Crespo-Smith, and Moya frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident.

969.    For example:

(i)     On July 24, 2013, two Insureds – ME and SE – were involved in the same automobile accident. Thereafter, ME and SE presented – incredibly – on the exact same date, August 5, 2013, at CEDA Miami for initial examinations by a now deceased physician named Robert J. Lorello, M.D. ("Lorello"). ME and SE were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ME and SE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Lorello provided ME and SE with substantially identical, phony "diagnoses".

(ii)    On November 20, 2013, two Insureds – JB and KB – were involved in the same automobile accident. Thereafter, JB and KB presented – incredibly – on the exact same date, December 2, 2013, at CEDA Miami for initial examinations by Lorello. JB and KB were different ages, in different physical condition, and experienced the

impact from different locations in the vehicle. To the extent that JB and KB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Lorello provided JB and KB with substantially identical, phony "diagnoses".

(iii)     On March 8, 2014, two Insureds – JA and IF – were involved in the same automobile accident. Thereafter, JA and IF presented – incredibly – on the exact same date, March 13, 2014, at CEDA Miami for initial examinations by Schulman. JA and IF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JA and IF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Schulman provided JA and IF with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)     On April 2, 2014, two Insureds – MG and MR – were involved in the same automobile accident. Thereafter, MG and MR presented – incredibly – on the exact same date, April 14, 2014, at CEDA Miami for initial examinations by Crespo-Smith. MG and MR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MG and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Crespo-Smith provided MG and MR with substantially identical, phony "diagnoses".

(v)     On August 24, 2016, two Insureds – PG and YM – were involved in the same automobile accident. Thereafter, PG and YM presented – incredibly – on the exact same date, March 20, 2017, at CEDA Miami for initial examinations by Moya. PG and YM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that PG and YM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Moya provided PG and YM with substantially identical, phony "diagnoses".

(vi)     On December 20, 2016, two Insureds – TD and MG – were involved in the same automobile accident. Thereafter, TD and MG presented – incredibly – on the exact same date, December 26, 2016, at CEDA Miami for initial examinations by Habayeb. TD and MG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that TD and MG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Habayeb provided TD and MG with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vii)     On June 24, 2017, two Insureds – DG and GG – were involved in the same automobile accident. Thereafter, DG and GG presented – incredibly – on the exact same date, June 26, 2017, at CEDA Miami for initial examinations by Habayeb. DG

284

and GG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DG and GG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Habayeb provided DG and GG with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)   On September 22, 2017, two Insureds – JA and YS – were involved in the same automobile accident. Thereafter, JA and YS presented – incredibly – <u>on the exact same date</u>, September 27, 2017, at CEDA Miami for initial examinations by Habayeb. JA and YS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JA and YS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Habayeb provided JA and YS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)   On December 7, 2017, two Insureds – AE and AM – were involved in the same automobile accident. Thereafter, AE and AM presented – incredibly – <u>on the exact same date</u>, December 12, 2017, at CEDA Miami for initial examinations by Habayeb. AE and AM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AE and AM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Miami, Cereceda, and Habayeb provided AE and AM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

970.   These are only representative examples. In the claims for initial examinations that are identified in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

971.   What is more, in the claims for initial examinations that are identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, and Moya frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated.

972.    CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Moya, and Schulman routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

973.    In keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Miami, Cereceda, and Habayeb falsely purported to report results of a "Soto-Hall" test purportedly conducted on the Insureds during initial examinations in order to create the appearance of genuine, serious injuries, and to create the false impression that the initial examinations required some legitimate medical decision-making.

974.    For example, and as set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

975.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

976.    It is extremely improbable – to the point of medical impossibility – that many of the Insureds examined by CEDA Miami, Cereceda, and Habayeb would present with identical "Soto-Hall" test results during initial examinations.

977.    Even so, in many of the initial examination reports in the claims identified in Exhibit "4", CEDA Miami, Cereceda, and Habayeb falsely reported that the Insureds had the following identical "Soto-Hall" results: "Soto-Hall test was positive in the cervical spine. This test is primarily indicative of a vertebral prominens fracture at C-7 and/or T-1."

286

978.    These phony, identical "findings" were reported in a statistically impossible number

of  initial examination reports created by CEDA Miami, Cereceda, and Habayeb, including but not

limited to reports for the following Insureds on the following dates:

(i)      TA, on July 11, 2016;

(ii)     BM, on June 12, 2017;

(iii)    NM, on June 12, 2017;

(iv)     YS, on August 22, 2017;

(v)      MP, on August 30, 2017;

(vi)     GR, on September 19, 2017;

(vii)    JA, on September 27, 2017;

(viii)   YS, on September 27, 2017;

(ix)     JC, on February 22, 2018;

(x)      VA, on February 23, 2018;

(xi)     IA, on February 23, 2018;

(xii)    LN, on March 27, 2018;

(xiii)   JR, on May 9, 2018;

(xiv)    RD, on May 9, 2018; and

(xv)     GA, on May 22, 2018.

979.    These are only representative examples. CEDA Miami, Cereceda, and Habayeb

routinely purported to report these same, identical "Soto-Hall" test results for the Insureds they

purported to examine, to an extent that was statistically impossible.

980.    As set forth above, to the extent that the Insureds in the claims identified in Exhibit

"4" suffered any health care problems at all as the result of their relatively minor automobile

accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

981.     The diagnosis and treatment of these ordinary soft tissue injuries did not require any "low complexity" medical decision-making on the part of Crespo-Smith, Habayeb, Moya, Schulman, and Yoham or anyone else.

982.     To the contrary, and as set forth above, Crespo-Smith, Habayeb, Moya, Schulman, and Yoham, and the other physicians and chiropractors who purported to perform the initial examinations did not engage in legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "4", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the other Fraudulent Services that the Defendants purported to provide.

983.     In the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Moya, Schulman, and Yoham routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

984.     In the claims for initial examinations identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Habayeb, Moya, Schulman, and Yoham routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    CEDA Miami never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

985.    In this context, Cereceda – who at all relevant times purported to own CEDA Miami – did not, and could not have, legitimately supervised the business activities of CEDA Miami.

986.    Had Cereceda actually supervised the business activities of CEDA Miami, Cereceda would have noted – among other things – that the CEDA Miami Defendants routinely fraudulently represented in CEDA Miami's billing that the putative initial examinations were legitimately and lawfully performed.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at CEDA Miami**

987.    In addition to their fraudulent initial examinations, CEDA Miami, Cereceda, Habayeb, and Schulman purported to subject many of the Insureds in the claims identified in Exhibit "4" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

988.    Habayeb and Schulman purported to personally perform most of the follow-up examinations in the claims identified in Exhibit "4".

989.    As set forth in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman then billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in charges of between $206.00 and $356.00 for each follow-up examination they purported to provide; or (ii) CPT code 99214, typically resulting in charges of between $301.00 and $521.00 for each follow-up examination they purported to provide.

990.    In the claims for follow-up examinations identified in Exhibit "4", the charges for the follow-up examinations were fraudulent in that they misrepresented CEDA Miami's eligibility to collect PIP Benefits in the first instance.

991.    In fact, and as set forth above, CEDA Miami never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

992.    As set forth below, CEDA Miami, Cereceda, Habayeb, and Schulman's charges for the follow-up examinations identified in Exhibit "4" also were fraudulent in that they misrepresented the nature and extent of the examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

993.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

994.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

995.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)    Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)  Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)  Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)  Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)  Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

996.  Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

997.  What is more, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

998.  The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

999.  For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)  Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

1000.  Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

1001.  By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "4" suffered any injuries at all in their relatively minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

1002.  In keeping with the fact that the Insureds in the claims identified in Exhibit "4" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in many of the claims identified in Exhibit "4" the Insureds did not seek treatment at any hospital as the result of their accidents.

1003.  Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were

drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

1004.   Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

1005.   By the time the Insureds in the claims identified in Exhibit "4" presented at CEDA Miami for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

1006.   Even so, in the claims for follow-up examinations identified in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity.

1007.   For example:

(i)   On November 18, 2013, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in YM's vehicle did not deploy, that the damage to YM's vehicle was minor, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured in the accident. In keeping with the fact that YM was not seriously injured in the accident, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination of YM on February 8, 2014 – more than two months after the accident – CEDA Miami, Cereceda, and Schulman billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that YM presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that YM had no presenting problems of moderate to high severity, CEDA Miami, Cereceda, and Schulman actually stopped treating YM after February 8, 2014.

(ii)     On July 8, 2016, an Insured named TA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TA's vehicle did not deploy and that TA's vehicle was drivable following the accident. The police report further indicated that TA was not injured in the accident. In keeping with the fact that TA was not seriously injured in the accident, TA did not visit any hospital emergency room following the accident. To the extent that TA experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination of TA on September 20, 2016 – more than two months after the accident – CEDA Miami, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that TA presented with problems of moderate to high severity at the follow-up examination.

(iii)    On June 5, 2017, an Insured named NM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in NM's vehicle did not deploy, and that NM's vehicle was drivable following the accident. The police report further indicated that NM was not injured in the accident. In keeping with the fact that NM was not seriously injured in the accident, NM did not visit any hospital emergency room following the accident. To the extent that NM experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination of NM on August 25, 2017 – more than two months after the accident – CEDA Miami, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that NM presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that NM had no presenting problems of moderate to high severity, CEDA Miami, Cereceda, and Habayeb actually stopped treating NM after August 25, 2017.

(iv)     On October 24, 2017, an Insured named NH was involved in an automobile accident. The contemporaneous police report indicated that NH's vehicle was drivable following the accident. The police report further indicated that NH was not injured in the accident. In keeping with the fact that NH was not seriously injured in the accident, NH did not visit any hospital emergency room following the accident. To the extent that NH experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within eight to eleven months of the accident. Even so, following a purported follow-up examination of NH on July 9, 2018 – more than eight months after the accident – CEDA Miami, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that NH presented with problems of low to moderate severity at the follow-up examination. What is more, following a purported follow-up examination of NH on August 28, 2018 – more than ten months after the accident – CEDA Miami, Cereceda, and Habayeb billed GEICO for the follow-up examination using CPT code 99214, and

thereby falsely represented that NH presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that NH had no presenting problems of moderate to high severity, CEDA Miami, Cereceda, and Habayeb actually stopped treating NH after August 28, 2018.

1008.   These are only representative examples. In many of the claims for follow-up examinations identified in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

1009.   In the claims for follow-up examinations identified in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

1010.   In the claims for follow-up examinations identified in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

1011.   What is more, pursuant to the CPT Assistant, when CEDA Miami, Cereceda, Habayeb, and Schulman billed for their putative follow-up examinations under CPT code 99214, they represented that Habayeb and Schulman performed at least two of the following three

components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

1012.   Similarly, pursuant to the CPT Assistant, when CEDA Miami, Cereceda, Habayeb, and Schulman billed for their putative follow-up examinations under CPT code 99213, they represented that Habayeb and Schulman performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

1013.   In actuality, however, in the claims for follow-up examinations identified in Exhibit "4", Habayeb and Schulman did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

1014.   Rather, following their purported follow-up examinations, CEDA Miami, Habayeb, and Schulman – at the direction of Cereceda – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either  (ii) referred the Insureds back to CEDA Miami for even more medically unnecessary physical therapy services and/or chiropractic services, despite the fact that the Insureds purportedly already had received extensive physical therapy services and/or chiropractic services from CEDA Miami that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

1015.   In the claims for follow-up examinations identified in Exhibit "4", CEDA Miami, Cereceda, Habayeb, and Schulman routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    CEDA Miami never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

1016.   In this context, Cereceda – who at all relevant times purported to own CEDA Miami – did not, and could not have, legitimately supervised the business activities of CEDA Miami.

1017.   Had Cereceda actually supervised the business activities of CEDA Miami, Cereceda would have noted – among other things – that the CEDA Miami Defendants routinely fraudulently represented in CEDA Miami's billing that the putative follow-up examinations were legitimately and lawfully performed.

### (iii)   The Fraudulent Charges for Physical Therapy and/or Chiropractic Treatment at CEDA Miami

1018.   In addition to the fraudulent initial examinations and follow-up examinations, the CEDA Miami Defendants routinely purported to subject each of the Insureds in the claims identified in Exhibit "4" to medically unnecessary physical therapy and/or chiropractic treatment.

1019.   As set forth above, though Habayeb and Schulman falsely purported to personally perform or directly supervise the vast majority of the physical therapy services and/or chiropractic services in the claims identified in Exhibit "4", the physical therapy services and/or chiropractic services actually were performed without supervision by Nunez, Otero, Paredes, Pascucci, Sanchez or other massage therapists and/or registered chiropractic assistants associated with CEDA Miami, to the extent that they were even provided at all.

1020.   As set forth in Exhibit "4", the CEDA Miami Defendants routinely billed the

purported physical therapy services and/or chiropractic services to GEICO under:

     (i)     CPT code 97010 for putative hot/cold pack therapy, typically resulting in a charge of $25.00 for each round of hot/cold pack therapy they purported to provide;

     (ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of between $44.00 and $76.00 for each round of mechanical traction therapy they purported to provide;

     (iii)   CPT code 97014, for putative electrical stimulation, typically resulting in a charge of either $37.00 or $40.00 for each round of electrical stimulation they purported to provide;

     (iv)   CPT code 97018, for putative paraffin bath therapy, typically resulting in a charge of between $32.00 and $55.00 for each round of paraffin bath therapy they purported to provide;

     (v)    CPT code 97035, for putative ultrasound, typically resulting in a charge of either $35.00 or $61.00 for each round of ultrasound they purported to provide;

     (vi)   CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of between $80.00 and $151.00 for each round of therapeutic exercises they purported to provide;

     (vii)   CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of between $90.00 and $157.00 for each round of neuromuscular reeducation they purported to provide;

     (viii)  CPT code 97124, for putative massage therapy, typically resulting in a charge of between $72.00 and $124.00 for each round of massage therapy they purported to provide;

     (ix)   CPT code 97140, for putative manual therapy, typically resulting in a charge of between $82.00 and $141.00 for each round of manual therapy they purported to provide;

     (x)    CPT code 97150, for putative group therapeutic procedures, typically resulting in a charge of between $55.00 and $83.00 for each round of group therapeutic procedures they purported to provide.

1021.  In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

1022.   In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and/or chiropractic treatment is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy and/or chiropractic treatment.

1023.   By contrast, at CEDA Miami, the nature and extent of the for physical therapy and/or chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol. Accordingly, the supposed treatment was medically unnecessary.

1024.   In the claims for physical therapy services and/or chiropractic services identified in Exhibit "4", the charges for the physical therapy services and/or chiropractic services also were fraudulent in that they misrepresented CEDA Miami's eligibility to collect PIP Benefits in the first instance.

1025.   In fact, and as set forth above, CEDA Miami never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

1026.   What is more, and as set forth above, in most of the claims for physical therapy services and/or chiropractic services identified in Exhibit "4", the CEDA Miami Defendants falsely represented that the physical therapy services and/or chiropractic services lawfully had been performed by or directly supervised by Habayeb or Schulman, when in fact they were unlawfully performed without any supervision by Nunez, Otero, Paredes, Pascucci, Sanchez or other massage therapists and/ or registered chiropractic assistants associated with CEDA Miami, who are not and never have been licensed as physical therapists.

1027.   As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

1028.   Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

1029.   In each of the claims for physical therapy services and/or chiropractic services identified in Exhibit "4", the CEDA Miami Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

1030.   In fact, in most of the claims for physical therapy services and/or chiropractic services identified in Exhibit "4", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services and/or chiropractic services were performed – to the extent that they were performed at all – without supervision by Nunez, Otero, Paredes, Pascucci, Sanchez, and other massage therapists and/or registered chiropractic assistants associated with CEDA Miami, who were individuals who were not licensed to practice physical therapy and/or chiropractic; and (ii) the CEDA Miami Defendants deliberately misrepresented the identities of the individuals who purported to perform or directly supervise the physical therapy services and/or chiropractic services in their billing for the physical therapy services and/or chiropractic services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

**(iv)     The Fraudulent Charges for Pain Management Injections**

1031.   As part and parcel of the CEDA Miami Defendants' fraudulent scheme, CEDA Miami, Cereceda, Crespo-Smith, Javech, and Moya subjected many Insureds to medically unnecessary pain management injections, including, but not limited to, tendon injections, trigger

point injections, arthrocentesis injections, epidural injections, and facet injections, which often purportedly were performed with fluoroscopic guidance.

1032.   Typically, Crespo-Smith, Javech or Moya purported to perform the injections.

1033.   As set forth in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Javech, and Moya then billed the injections through CEDA Miami to GEICO, typically under CPT codes 20550, 20552, 20605, 20610, 62311, 64490, 64491, 64492, 64493, 64494, and 64495.

1034.   As set forth below, the charges for pain management injections were fraudulent because the pain management injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

1035.   Furthermore, the charges for pain management injections were fraudulent in that they misrepresented CEDA Miami's eligibility to collect PIP Benefits in the first instance.

1036.   In fact, and as set forth above, CEDA Miami never was eligible to collect PIP Benefits, because it was operating in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

a.      **Basic, Legitimate Use of Pain Management Injections**

1037.   Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

1038.   If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

1039.   The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require health care services providers to begin demonstrating at regular intervals why continued soft tissue injury treatment is necessary beyond the four-week mark.

1040.   In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

1041.   This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in conservative forms of treatment.

1042.   In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

1043.   This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

b.      **The Medically Unnecessary Pain Management Injections**

1044.   However, in the claims for pain management injections identified in Exhibit "4",

CEDA Miami, Cereceda, Crespo-Smith, Javech, and Moya often purported to administer pain

management injections to Insureds before the Insureds had tried and failed any course of

legitimate, conservative treatment.

1045.   For example:

(i)     On July 19, 2014, an Insured named CS was involved in an automobile accident.
        CEDA Miami, Cereceda, and Crespo-Smith purported to provide an arthrocentesis
        injection to CS on July 21, 2014 – less than a week after the accident – even though
        CS could not have failed conservative treatment less than a week after the purported
        automobile accident.

(ii)    On November 10, 2014, an Insured named RC was involved in an automobile
        accident. CEDA Miami, Cereceda, and Moya purported to provide an
        arthrocentesis injection to RC on January 22, 2015 – less than three months after
        the accident – even though RC could not have failed conservative treatment less
        than three months after the purported automobile accident. Less than a week after
        that, on January 27, 2015, CEDA Miami, Cereceda, and Moya purported to provide
        multiple facet injections to RC.

(iii)   On November 10, 2014, an Insured named LP was involved in an automobile
        accident. CEDA Miami, Cereceda, and Moya purported to provide an
        arthrocentesis injection to LP on January 22, 2015 – less than three months after
        the accident – even though LP could not have failed conservative treatment less
        than three months after the purported automobile accident.

(iv)    On January 13, 2015, an Insured named OO was involved in an automobile
        accident. CEDA Miami, Cereceda, and Crespo-Smith purported to provide a trigger
        point injection to OO on March 2, 2015 – less two months after the accident – even
        though OO could not have failed conservative treatment less two months after the
        purported automobile accident.

(v)     On February 6, 2015, an Insured named AM was involved in an automobile
        accident. CEDA Miami, Cereceda, and Moya purported to provide an
        arthrocentesis injection to AM on March 17, 2015 – less than two months after the
        accident – even though AM could not have failed conservative treatment less than
        two months after the purported automobile accident.

(vi)    On March 18, 2015, an Insured named IV was involved in an automobile accident.
        CEDA Miami, Cereceda, and Moya purported to provide an arthrocentesis injection

to IV on May 13, 2015 – less than two months after the accident – even though IV could not have failed conservative treatment less than two months after the purported automobile accident.

(vii)     On March 25, 2015, an Insured named PL was involved in an automobile accident. CEDA Miami, Cereceda, and Moya purported to provide an arthrocentesis injection to PL on May 26, 2015 – less than three months after the accident – even though PL could not have failed conservative treatment less than three months after the purported automobile accident.

(viii)    On April 7, 2015, an Insured named EM was involved in an automobile accident. CEDA Miami, Cereceda, and Moya purported to provide an arthrocentesis injection to EM on May 27, 2015 – less than two months after the accident – even though EM could not have failed conservative treatment less than two months after the purported automobile accident.

(ix)      On April 14, 2015, an Insured named MH was involved in an automobile accident. CEDA Miami, Cereceda, and Moya purported to provide multiple facet injections to MH on June 11, 2015 – less than two months after the accident – even though MH could not have failed conservative treatment less than two months after the purported automobile accident.

(x)       On April 7, 2015, an Insured named YH was involved in an automobile accident. CEDA Miami, Cereceda, and Moya purported to provide an arthrocentesis injection to YH on June 25, 2015 – less than three months after the accident – even though YH could not have failed conservative treatment less than three months after the purported automobile accident.

(xi)      On October 31, 2016, an Insured named NA was involved in an automobile accident. CEDA Miami, Cereceda, and Moya purported to provide an epidural injection to NA on January 23, 2017 – less than three months after the accident – even though NA could not have failed conservative treatment less than three months after the purported automobile accident.

(xii)     On October 12, 2017, an Insured named AP was involved in an automobile accident. CEDA Miami, Cereceda, and Javech purported to provide an arthrocentesis injection to AP on December 12, 2017 – less than three months after the accident – even though AP could not have failed conservative treatment less than three months after the purported automobile accident.

(xiii)    On October 12, 2017, an Insured named TM was involved in an automobile accident. CEDA Miami, Cereceda, and Javech purported to provide an arthrocentesis injection to TM on December 7, 2017 – less than two months after the accident – even though TM could not have failed conservative treatment less than two months after the purported automobile accident.

(xiv)   On August 14, 2017, an Insured named EM was involved in an automobile accident. CEDA Miami, Cereceda, and Javech purported to provide an arthrocentesis injection to EM on September 28, 2017 – less than two months after the accident – even though EM could not have failed conservative treatment less than two months after the purported automobile accident.

(xv)   On August 22, 2017, an Insured named MS was involved in an automobile accident. CEDA Miami, Cereceda, and Crespo-Smith purported to provide an arthrocentesis injection to MS on September 29, 2017 – less than two months after the accident – even though MS could not have failed conservative treatment less than two months after the purported automobile accident.

1046.   These are only representative examples. In the claims for pain management injections identified in Exhibit "4", CEDA Miami, Cereceda, Crespo-Smith, Javech, and Moya often purported to provide medically unnecessary pain management injections to Insureds before the Insureds could have tried and failed any course of legitimate, conservative treatment in order to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

c.   **The Fraudulent Charges for Fluoroscopic Guidance**

1047.   Not only did CEDA Miami, Cereceda, Crespo-Smith, Javech, and Moya routinely bill GEICO for medically unnecessary pain management injections, but CEDA Miami, Cereceda, and Moya also often and fraudulently unbundled separate charges for fluoroscopic guidance from the underlying injection charges, in a calculated effort to increase their billing for the injections.

1048.   For example, and as set forth in Exhibit "4", CEDA Miami, Cereceda, and Moya routinely unbundled separate charges of $272.00 for fluoroscopic guidance under CPT code 77003 from their underlying charges under CPT codes 64490, 64491, 64493, and 64494.

1049.   Pursuant to the CPT Assistant, fluoroscopic guidance is deemed to be a component part of, and included in, charges for pain management injections under CPT codes 64490, 64491, 64493, and 64494.

1050.   As a result, health care services providers are not entitled to be reimbursed separately for fluoroscopic guidance under CTP code 77003 when billing for pain management injections under CPT codes 64490, 64491, 64493, and 64494.

1051.   Nevertheless, CEDA Miami, Cereceda, and Moya often unbundled billing for fluoroscopic guidance from the underlying injection charges so as to maximize the amount of fraudulent billing they could submit to GEICO.

1052.   For example:

(i)     CEDA Miami, Cereceda, and Moya unbundled a separate charge of $272.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64493 and 64494 for facet injections that they purported to provide to an Insured named AR on October 20, 2015.

(ii)    CEDA Miami, Cereceda, and Moya unbundled a separate charge of $272.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64493 and 64494 for facet injections that they purported to provide to an Insured named JS on January 27, 2016.

(iii)   CEDA Miami, Cereceda, and Moya unbundled a separate charge of $272.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64493 and 64494 for facet injections that they purported to provide to an Insured named LR on March 30, 2016.

(iv)    CEDA Miami, Cereceda, and Moya unbundled a separate charge of $272.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT code 64490 for a facet injection that they purported to provide to an Insured named MR on May 5, 2016.

(v)     CEDA Miami, Cereceda, and Moya unbundled a separate charge of $272.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64493 and 64494 for facet injections that they purported to provide to an Insured named CC on May 10, 2016.

1053.   Each of the unbundled charges for fluoroscopic guidance constituted a misrepresentation that CEDA Miami was entitled to be reimbursed for the charge, when in fact it was not.

**5.      The CEDA Cutler Bay Defendants' Fraudulent Treatment and Billing Protocol**

**(i)**      **The Fraudulent Charges for Initial Examinations at CEDA Cutler Bay**

1054.   As an initial step in CEDA Cutler Bay, Cereceda, Haban, and Reese's (collectively, the "CEDA Cutler Bay Defendants") fraudulent treatment and billing protocol, the CEDA Cutler Bay Defendants purported to provide the Insureds in the claims identified in Exhibit "5" with a putative initial examination.

1055.   Haban and Reese purported to personally perform the vast majority of the initial examinations in the claims identified in Exhibit "5".

1056.   As set forth in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in charges of $359.00 for each initial examination that they purported to provide.

1057.   In the claims for initial examinations identified in Exhibit "5", the charges for the initial examinations were fraudulent in that they misrepresented CEDA Cutler Bay's eligibility to collect PIP Benefits in the first instance.

1058.   In fact, and as set forth above, CEDA Cutler Bay never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

1059.   As set forth below, the charges for the initial examinations identified in Exhibit "5" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.**      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

1060.   As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

1061.   The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

1062.   Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

1063.   The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

1064.   For example, the CPT Assistant provides the following clinical examples of presenting problems that  might support the use of CPT code 99203 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)      Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

1065.  Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

1066.  By contrast, to the extent that the Insureds in the claims identified in Exhibit "5" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

1067.  For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "5" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "5" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

1068.  What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "5" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "5" the Insureds did not seek treatment at any hospital as the result of their accidents.

1069.  Even so, in the claims for initial examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban often billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

1070.  For example:

(i)      On January 18, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's

vehicle did not deploy, that the damage to MC's vehicle was minor, that there was minor damage to the other vehicle, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MC by Haban on January 30, 2018, CEDA Cutler Bay, Cereceda, and Haban billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)     On June 14, 2018, an Insured named FB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in FB's vehicle did not deploy, and that FB's vehicle was drivable following the accident. The police report further indicated that FB was not injured in the accident. In keeping with the fact that FB was not seriously injured in the accident, FB did not visit any hospital emergency room following the accident. To the extent that FB experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of FB by Haban on June 21, 2018, CEDA Cutler Bay, Cereceda, and Haban billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)    On June 18, 2018, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in MA's vehicle did not deploy, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured in the accident. In keeping with the fact that MA was not seriously injured in the accident, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MA by Haban on June 19, 2018, CEDA Cutler Bay, Cereceda, and Haban billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

1071.   These are only representative examples. In the vast majority of claims for initial examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, and Haban falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

310

1072.   In the vast majority of the claims for initial examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, and Haban falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

1073.   In the claims for initial examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, and Haban also represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the CEDA Cutler Bay Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

1074.   What is more, in the claims identified in Exhibit "5" for initial examinations under CPT code 99203, CEDA Cutler Bay, Cereceda, Haban, and Reese routinely misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

1075.   Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

1076.   As set forth in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese virtually always billed for the putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

311

1077. In fact, in most of the claims for initial examinations identified in Exhibit "5", neither Haban nor Reese ever spent more than 15 minutes – let alone 30 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

1078. For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "5" did not entail more than 15 minutes of face-to-face time between Haban, Reese and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, CEDA Cutler Bay, Cereceda, Haban, and Reese used a template in purporting to conduct the initial examinations.

1079. The template that CEDA Cutler Bay, Cereceda, Haban, and Reese used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

1080. The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

1081. These brief patient interviews and limited examinations did not require Haban, Reese, nor any other physician or chiropractor associated with CEDA Cutler Bay, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

1082. In the claims for initial examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely falsely represented that the initial examinations involved 30 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

c.    **Misrepresentations Regarding "Detailed" Physical Examinations**

1083. Moreover, in every claim identified in Exhibit "5" for initial examinations under

312

CPT code 99203, CEDA Cutler Bay, Cereceda, Haban, and Reese routinely falsely represented the extent of the underlying physical examinations.

1084.   Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

1085.   As set forth in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations conducted detailed physical examinations of the Insureds who purportedly received the examinations.

1086.   Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or chiropractor performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

1087.   To the extent that the Insureds in the claims identified in Exhibit "5" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

1088.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

    (iii)     examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

    (iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

    (v)     brief assessment of mental status;

    (vi)     examination of gait and station;

    (vii)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

    (viii)     coordination;

    (ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

    (x)     examination of sensation.

1089.   In the claims for initial examinations identified in Exhibit "5", when CEDA Cutler Bay, Cereceda, Haban, and Reese billed for the initial examinations under CPT code 99203, they falsely represented that the physician or chiropractor who purported to perform the examinations – namely – Haban and Reese – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

1090.   In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

1091.   For instance, in many of the claims under CPT code 99203 identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i) measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii) general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii) examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin and/or other location;

(v) brief assessment of mental status;

(vi) examination of gait and station;

(vii) inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii) coordination;

(ix) examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x) examination of sensation.

1092. For example:

(i) On or about January 30, 2018, CEDA Cutler Bay, Cereceda, and Haban billed GEICO under CPT code 99203 for an initial examination that Haban purported to perform on an Insured named MC, and thereby represented that Haban had provided a "detailed" physical examination to MC. However, Haban did not document an extended examination of MC's musculoskeletal system, despite the fact that – to the extent MC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii) On or about June 19, 2018, CEDA Cutler Bay, Cereceda, and Haban billed GEICO under CPT code 99203 for an initial examination that Haban purported to perform on an Insured named MA, and thereby represented that Haban had provided a "detailed" physical examination to MA. However, Haban did not document an extended examination of MA's musculoskeletal system, despite the fact that – to the extent MA had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)     On or about June 21, 2018, CEDA Cutler Bay, Cereceda, and Haban billed GEICO under CPT code 99203 for an initial examination that Haban purported to perform on an Insured named FB, and thereby represented that Haban had provided a "detailed" physical examination to FB. However, Haban did not document an extended examination of FB's musculoskeletal system, despite the fact that – to the extent FB had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)     On or about January 7, 2019, CEDA Cutler Bay, Cereceda, and Reese billed GEICO under CPT code 99203 for an initial examination that Reese purported to perform on an Insured named CD, and thereby represented that Reese had provided a "detailed" physical examination to CD. However, Reese did not document an extended examination of CD's musculoskeletal system, despite the fact that – to the extent CD had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On or about January 11, 2019, CEDA Cutler Bay, Cereceda, and Reese billed GEICO under CPT code 99203 for an initial examination that Reese purported to perform on an Insured named IV, and thereby represented that Reese had provided a "detailed" physical examination to IV. However, Reese did not document an extended examination of IV's musculoskeletal system, despite the fact that – to the extent IV had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)     On or about January 25, 2019, CEDA Cutler Bay, Cereceda, and Reese billed GEICO under CPT code 99203 for an initial examination that Reese purported to perform on an Insured named AV, and thereby represented that Reese had provided a "detailed" physical examination to AV. However, Reese did not document an extended examination of AV's musculoskeletal system, despite the fact that – to the extent AV had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

1093.     These are only representative examples. In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Haban and Reese had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

1094.   In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.      Misrepresentations Regarding the Extent of Medical Decision-Making**

1095.   Furthermore, pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in medical decision making of "low complexity".

1096.   In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

1097.   As set forth above, the CPT Assistant provides various clinical examples of the kinds of presenting problems that might support the use of CPT code 99203 to bill for a patient examination, and therefore entail legitimate, low complexity medical decision-making, including:

(i)      Office visit for initial evaluation of a 48–year–old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49–year–old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

      (iii)     Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

      (iv)     Initial office visit for evaluation of 13–year–old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

      (v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

1098.   Thus, pursuant to the CPT Assistant, the kinds of presenting problems that entail legitimate, low-complexity medical decision-making typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

1099.   By contrast, when the Insureds in the claims identified in Exhibit "5" presented at CEDA Cutler Bay for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

1100.   The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

1101.   First, in the claims for initial examinations identified in Exhibit "5", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

1102.   When the Insureds in the claims identified in Exhibit "5" presented to CEDA Cutler Bay for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

1103.   Furthermore, prior to the initial examinations, CEDA Cutler Bay, Cereceda, and Haban did not request any medical records from other providers.

318

1104.   Second, in the claims for initial examinations identified in Exhibit "5", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

1105.   Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by CEDA Cutler Bay, Cereceda, and Haban, to the extent that CEDA Cutler Bay, Cereceda, and Haban provided any such diagnostic procedures or treatment options in the first instance.

1106.   In almost every instance, any "treatments" that the CEDA Cutler Bay Defendants actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

1107.   Third, in the claims for initial examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, and Haban did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

1108.   Rather, to the extent that the initial examinations were conducted in the first instance, CEDA Cutler Bay, Cereceda, and Haban provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

1109.   Specifically, in most of the claims identified in Exhibit "5", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

1110.   Even so, CEDA Cutler Bay, Cereceda, and Haban prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every

Insured.

1111. Then, based upon these phony "diagnoses", CEDA Cutler Bay, Cereceda, and Haban directed virtually every Insured: (i) to receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; and (ii) in the majority of cases, referred the Insureds to a medical doctor for further evaluation and treatment, regardless of the Insureds' true circumstances or presentation.

1112. For example:

(i)     On January 18, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy, that the damage to MC's vehicle was minor, that there was minor damage to the other vehicle, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low severity. On January 30, 2018, Haban purported to conduct an initial examination of MC at CEDA Cutler Bay. To the extent that Haban performed the examination in the first instance, Haban did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Haban did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Haban provided MC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MC's presenting problems, nor the treatment plan provided to MC by Haban, Cereceda, and CEDA Cutler Bay, presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Haban, Cereceda, and CEDA Cutler Bay consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MC. Even so, Haban, Cereceda, and CEDA Cutler Bay billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Haban engaged in some legitimate, low complexity medical decision-making during the purported examination

(ii)    On June 14, 2018, an Insured named FB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in FB's vehicle did not deploy, and that FB's vehicle was drivable following the accident. The police report further indicated that FB was not injured in the accident. In keeping with the fact that FB was not seriously injured

in the accident, FB did not visit any hospital emergency room following the accident. To the extent that FB experienced any health problems at all as a result of the accident, they were of low severity. On June 21, 2018, Haban purported to conduct an initial examination of FB at CEDA Cutler Bay. To the extent that Haban performed the examination in the first instance, Haban did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Haban did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Haban provided FB with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither FB's presenting problems, nor the treatment plan provided to FB by Haban, Cereceda, and CEDA Cutler Bay, presented any risk of significant complications, morbidity, or mortality. To the contrary, FB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Haban, Cereceda, and CEDA Cutler Bay consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to FB. Even so, Haban, Cereceda, and CEDA Cutler Bay billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Haban engaged in some legitimate, low complexity medical decision-making during the purported examination

(iii)   On June 18, 2018, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in MA's vehicle did not deploy, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured in the accident. In keeping with the fact that MA was not seriously injured in the accident, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as a result of the accident, they were of low severity. On June 19, 2018, Haban purported to conduct an initial examination of MA at CEDA Cutler Bay. To the extent that Haban performed the examination in the first instance, Haban did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Haban did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Haban provided MA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by Haban, Cereceda, and CEDA Cutler Bay, presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Haban, Cereceda, and CEDA Cutler Bay consisted of medically unnecessary chiropractic services and physical therapy services, which did not pose the least bit of risk to MA. Even so, Haban, Cereceda, and CEDA Cutler Bay billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Haban engaged in some legitimate, low complexity medical decision-making during the purported examination

1113.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

1114.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

1115.   As set forth above, in the claims identified in Exhibit "5", virtually all of the Insureds whom the CEDA Cutler Bay Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

1116.   It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "5" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

1117.   It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations from CEDA Cutler Bay, Cereceda, and Haban with substantially identical injuries on or about the exact same dates after their accidents.

1118.   Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Cutler Bay, Cereceda, and Haban frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

1119.   For example:

(i)     On January 15, 2018, three Insureds – JM, MM, and JW – were involved in the same automobile accident. Thereafter, JM, MM, and JW presented – incredibly – on the exact same date, January 26, 2018, at CEDA Cutler Bay for initial examinations by Haban. JM, MM, and JW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JM, MM, and JW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Cutler Bay, Cereceda, and Haban provided JM, MM, and JW with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(ii)    On March 11, 2018, two Insureds – AD and AX – were involved in the same automobile accident. Thereafter, AD and AX presented – incredibly – on the exact same date, March 12, 2018, at CEDA Cutler Bay for initial examinations by Haban. AD and AX were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AD and AX suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Cutler Bay, Cereceda, and Haban provided AD and AX with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)   On April 20, 2018, two Insureds – MH and LY – were involved in the same automobile accident. Thereafter, MH and LY presented – incredibly – on the exact same date, April 23, 2018, at CEDA Cutler Bay for initial examinations by Haban. MH and LY were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MH and LY suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Cutler Bay, Cereceda, and Haban provided MH and LY with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)    On April 28, 2018, two Insureds – RD and UD – were involved in the same automobile accident. Thereafter, RD and UD presented – incredibly – on the exact same date, May 7, 2018, at CEDA Cutler Bay for initial examinations by Haban. RD and UD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RD and UD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Cutler Bay, Cereceda, and Haban provided RD and UD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)     On June 16, 2018, two Insureds – FR and MV – were involved in the same automobile accident. Thereafter, FR and MV presented – incredibly – on the exact same date, June 19, 2018, at CEDA Cutler Bay for initial examinations by Haban. FR and MV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that FR and MV suffered

any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, CEDA Cutler Bay, Cereceda, and Haban provided FR and MV with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

1120.   These are only representative examples. In the claims for initial examinations that are identified in Exhibit "5", CEDA Cutler Bay, Cereceda, and Haban frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

1121.   CEDA Cutler Bay, Cereceda, and Haban frequently inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

1122.   In keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CEDA Cutler Bay, Cereceda, Haban, and Reese falsely purported to report results of a "Soto-Hall" test purportedly conducted on the Insureds during initial examinations in order to create the appearance of genuine, serious injuries, and to create the false impression that the initial examinations required some legitimate medical decision-making.

1123.   For example, and as set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

1124.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

324

1125.   It is extremely improbable – to the point of medical impossibility – that many of the Insureds examined by CEDA Cutler Bay, Cereceda, Haban, and Reese would present with identical "Soto-Hall" test results during initial examinations.

1126.   Even so, in many of the initial examination reports in the claims identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese falsely reported that the Insureds had the following <u>identical</u> "Soto-Hall" results: "Soto-Hall test was positive in the cervical spine. This test is primarily indicative of a vertebral prominens fracture at C-7 and/or T-1."

1127.   These phony, identical "findings" were reported in a statistically impossible number of  initial examination reports created by CEDA Cutler Bay, Cereceda, Haban, and Reese, including but not limited to reports for the following Insureds on the following dates:

(i)      RG, on January 29, 2018;

(ii)     YT, on February 23, 2018;

(iii)    SD, on March 5, 2018,

(iv)    JA, on March 15, 2018;

(v)     EU, on April 12, 2018;

(vi)    MY, on April 23, 2018;

(vii)   LV, on April 23, 2018;

(viii)  LJ, on May 3, 2018;

(ix)    LT, on May 8, 2018;

(x)     LR, on May 19, 2018;

(xi)    TC, on June 1, 2018

(xii)   CM, on June 5, 2018;

(xiii)  MA, on June 19, 2018;

(xiv)    MV, on June 19, 2018;

(xv)     FV, on June 19, 2018;

(xvi)    FB, on June 21, 2018;

(xvii)   CD, on January 7, 2019; and

(xviii)  IV, on January 11, 2019.

1128.   These are only representative examples. CEDA Cutler Bay, Cereceda, Haban, and Reese routinely purported to report these same, identical "Soto-Hall" test results for the Insureds they purported to examine, to an extent that was statistically impossible.

1129.   As set forth above, to the extent that the Insureds in the claims identified in Exhibit "5" suffered any health care problems at all as the result of their relatively minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

1130.   The diagnosis and treatment of these ordinary soft tissue injuries did not require any "low complexity" medical decision-making on the part of Haban, Reese, or anyone else.

1131.   To the contrary, and as set forth above, Haban, Reese, and the other physicians and chiropractors who purported to perform the initial examinations did not engage in legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "5", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the other Fraudulent Services that the Defendants purported to provide.

1132.   In the claims for initial examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial

examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

1133.   In the claims for initial examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)   the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)  CEDA Cutler Bay never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at CEDA Cutler Bay**

1134.   In addition to their fraudulent initial examinations, CEDA Cutler Bay, Cereceda, Haban, and Reese purported to subject many of the Insureds in the claims identified in Exhibit "5" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

1135.   Haban and Reese purported to personally perform the majority of the follow-up examinations in the claims identified in Exhibit "5".

1136.   As set forth in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese then billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in charges of $237.00 for each follow-up examination they purported to provide; or (ii) CPT code 99214, typically resulting in charges of $348.00 for each follow-up examination they purported to provide.

1137.   In the claims for follow-up examinations identified in Exhibit "5", the charges for the follow-up examinations were fraudulent in that they misrepresented CEDA Cutler Bay's eligibility to collect PIP Benefits in the first instance.

1138.   In fact, and as set forth above, CEDA Cutler Bay never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of  the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

1139.   As set forth below, CEDA Cutler Bay, Cereceda, Haban, and Reese's charges for the follow-up examinations identified in Exhibit "5" also were fraudulent in that they misrepresented the nature and extent of the examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

1140.   Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

1141.   The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

1142.   For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

    (iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

    (v)    Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

    (vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

    (vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

    (viii)    Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

1143.   Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

1144.   What is more, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

1145.   The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

1146.   For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

    (i)    Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

1147.  Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

1148.  By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "5" suffered any injuries at all in their relatively minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

1149.  In keeping with the fact that the Insureds in the claims identified in Exhibit "5" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in many of the claims identified in Exhibit "5" the Insureds did not seek treatment at any hospital as the result of their accidents.

1150.  Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were

drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

1151.   Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

1152.   By the time the Insureds in the claims identified in Exhibit "5" presented at CEDA Cutler Bay for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

1153.   Even so, in the claims for follow-up examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity.

1154.   For example:

(i)     On January 31, 2018, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CC's vehicle did not deploy and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured in the accident. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to nine months of the accident. Even so, following purported follow-up examinations of CC on April 3, 2018, and May 29, 2018 – between two and four months after the accident – CEDA Cutler Bay, Cereceda, and Haban billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that CC presented with problems of low to moderate severity at the follow-up examinations. What is more, following a purported follow-up examination of CC on October 16, 2018 – more than eight months after the accident – CEDA Cutler Bay, Cereceda, and Reese billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CC presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that CC had no presenting problems of moderate to high severity, CEDA Cutler Bay, Cereceda, and Reese actually stopped treating CC after October 16, 2018.

(ii)     On March 3, 2018, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JG's vehicle did not deploy and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured in the accident. In keeping with the fact that JG was not seriously injured in the accident, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to four months of the accident. Even so, following a purported follow-up examination of JG on June 30, 2018 – between three and four months after the accident – CEDA Cutler Bay, Cereceda, and Haban billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JG presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that JG had no presenting problems of moderate to high severity, CEDA Cutler Bay, Cereceda, and Haban actually stopped treating JG after June 30, 2018.

(iii)    On January 4, 2018, an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RS's vehicle did not deploy and that RS's vehicle was drivable following the accident. The police report further indicated that RS was not injured in the accident. In keeping with the fact that RS was not seriously injured in the accident, RS did not visit any hospital emergency room following the accident. To the extent that RS experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within four to eleven months of the accident. Even so, following a purported follow-up examination of RS on May 9, 2018 – between four and five months after the accident – CEDA Cutler Bay, Cereceda, and Haban billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that RS presented with problems of low to moderate severity at the follow-up examination. What is more, following a purported follow-up examination of RS on November 16, 2018 – between ten and eleven months after the accident – CEDA Cutler Bay, Cereceda, and Reese billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that RS presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that RS had no presenting problems of moderate to high severity, CEDA Cutler Bay, Cereceda, and Reese actually stopped treating RS after November 16, 2018.

1155.   These are only representative examples. In the claims for follow-up examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting

problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

1156.   In the claims for follow-up examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

1157.   In the claims for follow-up examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese also falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

1158.   What is more, pursuant to the CPT Assistant, when CEDA Cutler Bay, Cereceda, Haban, and Reese billed for their putative follow-up examinations under CPT code 99214, they represented that Haban and Reese performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

1159.   Similarly, pursuant to the CPT Assistant, when CEDA Cutler Bay, Cereceda, Haban, and Reese billed for their putative follow-up examinations under CPT code 99213, they represented that Haban and Reese performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

333

1160.   In actuality, however, in the claims for follow-up examinations identified in Exhibit "5", Haban and Reese did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

1161.   Rather, following their purported follow-up examinations, CEDA Cutler Bay, Haban, and Reese – at the direction of Cereceda – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either  (ii) referred the Insureds back to CEDA Cutler Bay for even more medically unnecessary physical therapy services and/or chiropractic services, despite the fact that the Insureds purportedly already had received extensive physical therapy services and/or chiropractic services from CEDA Cutler Bay that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

1162.   In the claims for follow-up examinations identified in Exhibit "5", CEDA Cutler Bay, Cereceda, Haban, and Reese routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   CEDA Cutler Bay never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws.

**6.      The Fraudulent Charges for Services That Never Were Provided in the First Instance**

1163.   Not only did CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Cereceda falsely represent that CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay were eligible to collect PIP Benefits, when in fact they never were eligible to collect PIP Benefits because they were operated in violation of the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and not only did they misrepresent the nature, extent, and reimbursability of the Fraudulent Services, but they also routinely billed GEICO for services that they never provided in the first instance.

1164.   Numerous Insureds have provided sworn testimony to the effect that they never received the services that were billed to GEICO through CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay.

1165.   For example:

(i)     On July 19, 2018, an Insured named AM gave a sworn statement  indicating that he never received massage therapy treatment or manual therapy treatment at CEDA Miami. Even so, CEDA Miami, Cereceda, and Habayeb billed GEICO $2,656.00 for 32 massage treatments they falsely purported to provide to AM between March 26, 2018 and May 30, 2018, as well as an additional $94.00 for a manual therapy treatment they falsely purported to provide to AM on March 22, 2018.

(ii)    On August 24, 2018, an Insured named MV gave a sworn statement indicating that he never received any hot/cold pack treatments at CEDA Hialeah between July 24, 2018 and August 10, 2018. Even so, CEDA Hialeah, Cereceda, Habayeb, and Ross billed GEICO $125.00 for five hot/cold pack treatments they falsely purported to provide to MV between July 26, 2018 and August 10, 2018.

(iii)   On August 24, 2018, an Insured named JH gave a sworn statement indicating that he never received any ultrasound treatment or massage therapy treatment at CEDA Downtown. Even so, CEDA Downtown, Cereceda, and Canizares billed GEICO $200.00 for five ultrasound treatments they falsely purported to provide to JH between October 25, 2017 and December 18, 2017, as well as an additional $332.00 for four massage treatments they falsely purported to provide JH between October 30, 2017 and December 18, 2017.

(iv)    On August 31, 2018, an Insured named EC gave a sworn statement indicating that he never received any ultrasound treatment or group therapeutic procedures at CEDA Hialeah between October 11, 2017 and March 8, 2018. Even so, CEDA

Hialeah, Cereceda, Fatato, Habayeb, and Ross billed GEICO $1,120.00 for 28 ultrasound treatments they falsely purported to provide to EC between October 12, 2017 and March 6, 2018. What is more, CEDA Hialeah, Cereceda, and Ross billed GEICO an additional $330.00 for six group therapeutic procedure treatments they falsely purported to provide to EC between October 30, 2017 and January 30, 2018.

(v)     On September 20, 2018, an Insured named VH gave a sworn statement indicating that he never received any ultrasound treatment or chiropractic manipulation treatment at CEDA Kendall between July 13, 2018 and July 24, 2018. Even so, CEDA Kendall, Cereceda, and Yoham billed GEICO $200.00 for five ultrasound treatments they falsely purported to provide to VH between July 13, 2018 and July 24, 2018, as well as an additional $460.00 for four chiropractic manipulation treatments they falsely purported to provide to VH between July 17, 2018 and July 24, 2018.

(vi)    On September 20, 2018, an  Insured named MS gave a sworn statement indicating that she never received any group therapeutic procedures or chiropractic manipulation treatment at CEDA Cutler Bay between July 17, 2018 and August 10, 2018. Even so, CEDA Cutler Bay, Cereceda, Haban, and Reese billed GEICO $440.00 for eight group therapeutic procedure treatments they falsely purported to provide to MS between July 18, 2018 and August 2, 2018, as well as an additional $640.00 for eight chiropractic manipulation treatments they falsely purported to provide to MS between July 18, 2018 and August 2, 2018.

(vii)   During an examination under oath on September 25, 2018, an Insured named JM gave testimony indicating that she never received any ultrasound treatment at CEDA Hialeah between July 12, 2018 and September 6, 2018. Even so, CEDA Hialeah, Cereceda, Ross, and a chiropractor named Barry Gillman, D.C., billed GEICO $440.00 for 11 ultrasound treatments they falsely purported to provide to JM between July 16, 2018 and September 5, 2018.

(viii)  During an examination under oath on September 25, 2018, an Insured named MP gave testimony indicating that she never received any ultrasound treatment at CEDA Hialeah between July 27, 2018 and September 7, 2018. Even so, CEDA Hialeah, Cereceda, Ross, and a chiropractor named Barry Gillman, D.C., billed GEICO $680.00 for 17 ultrasound treatments they falsely purported to provide to MP between July 27, 2018 and September 7, 2018.

(ix)    During an examination under oath on November 27, 2018, an Insured named BF gave testimony indicating that he never received any chiropractic manipulation treatments at CEDA Kendall between June 25, 2018 and August 31, 2018. Even so, CEDA Kendall, Cereceda, and Yoham billed GEICO $1,360.00 for 17 chiropractic manipulation treatments they falsely purported to provide to BF between June 27, 2018 and August 27, 2018.

(x)     During an examination under oath on March 4, 2019, an Insured named MP gave testimony indicating that he never received any ultrasound treatment or therapeutic massage treatment at CEDA Downtown between August 23, 2018 and December 5, 2018. Even so, CEDA Downtown, Cereceda, and Canizares billed GEICO $480.00 for 12 ultrasound treatments they falsely purported to provide to MP between August 24, 2018 and November 10, 2018, as well as an additional $996.00 for 12 massage treatments they falsely purported to provide to MP between August 29, 2018 and November 10, 2018.

1166.   These are only representative examples. In the claims identified in Exhibits "1" – "5", numerous Insureds provided sworn statements to insurance investigators to the effect that CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay were billing for services they had not rendered.

III.   **The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

1167.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

1168.   The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay were in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and therefore, were eligible to collect PIP Benefits in the first instance. In fact, CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay never were in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and never were eligible to collect PIP Benefits, because of the fraudulent scheme described above.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Springs Crossing was

337

in compliance with the Clinic Act and the Self-Referral Act, and therefore, was eligible to collect PIP Benefits in the first instance. In fact, Springs Crossing never was in compliance with the Clinic Act and the Self-Referral Act, and never was eligible to collect PIP Benefits, because of the fraudulent scheme described above.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services and/or chiropractic services, because they were provided by unsupervised massage therapists and/or registered chiropractic assistants in contravention of Florida law.

(iv)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(v)   The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

1169.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

1170.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

1171.   For instance, the Defendants knowingly misrepresented and concealed facts concerning their unlawful self-referral arrangements in order to conceal them from GEICO and other insurers.

1172.   What is more, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided – to the extent that they were provided at all – by unsupervised massage therapists and registered chiropractic assistants in contravention of Florida law.

1173.   Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

1174.   Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

1175.   In addition, the Defendants conducted their fraudulent scheme through multiple entities in order to conceal the volume of fraudulent billing submitted through any one entity, and thereby perpetuate their scheme.

1176.   The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

1177.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $20,000,000.00.

1178.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against CEDA Downtown, CEDA Kendall, CEDA Hialeah,
CEDA Miami, CEDA Cutler Bay, and Springs Crossing
(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

1179.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-1178  above.

1180.   There is an actual case in controversy between GEICO and CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

1181.   CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of the Clinic Act, Self-Referral Act, and Chiropractic Advertising Laws.

1182.   CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided.

1183.   CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

1184.   Springs Crossing has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were provided – to the extent that they were provided at all – pursuant to an illegal referral scheme.

1185.   CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

1186.   CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, and CEDA Cutler Bay have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1187.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing have no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Cereceda**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

1188.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-145, 193-218, 275-311, 420-584, and 1162-1178, above.

1189.   CEDA Downtown is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

1190.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Downtown's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that CEDA Downtown was not eligible to receive under the No-Fault Law because: (i) CEDA Downtown unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Downtown Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1191.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

1192.   CEDA Downtown's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cereceda operated CEDA Downtown, inasmuch as CEDA

Downtown was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for CEDA Downtown to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the CEDA Downtown Defendants continue to attempt collection on the fraudulent billing submitted through CEDA Downtown to the present day.

1193.   CEDA Downtown is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CEDA Downtown in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1194.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,200,000.00 pursuant to the fraudulent bills submitted through CEDA Downtown.

1195.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Cereceda, Canizares, Crespo-Smith, Facuseh,**
**Pabon, Hidalgo, Pena, Soto, and Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1196.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-145, 193-218, 275-311, 420-584, and 1162-1178, above.

1197.   CEDA Downtown is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1198.   Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata are employed by or associated with the CEDA Downtown enterprise.

1199.   Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CEDA Downtown's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that CEDA Downtown was not eligible to receive under the No-Fault Law because: (i) CEDA Downtown unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Downtown Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1200.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

1201.   Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1202.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,200,000.00 pursuant to the fraudulent bills submitted through the CEDA Downtown enterprise.

1203.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against the CEDA Downtown Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

1204.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-145, 193-218, 275-311, 420-584, and 1162-1178, above.

1205.   The CEDA Downtown Defendants are actively engaged in trade and commerce in the State of Florida.

1206.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1207.   The CEDA Downtown Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1208.   The bills and supporting documents submitted by the CEDA Downtown Defendants to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CEDA Downtown's eligibility to collect PIP Benefits in the first instance; (ii)

345

that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1209.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the CEDA Downtown Defendants has been materially injurious to GEICO and its Insureds.

1210.   The conduct of the CEDA Downtown Defendants was the actual and proximate cause of the damages sustained by GEICO.

1211.   The CEDA Downtown Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $4,200,000.00.

1212.   By reason of the CEDA Downtown Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FIFTH CAUSE OF ACTION
### Against Cereceda
### (Under Fla. Stat. 772.103(3))

1213.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-145, 193-218, 275-311, 420-584, and 1162-1178, above.

1214.   CEDA Downtown is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1215.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Downtown's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and

346

misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Downtown unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Downtown Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1216.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1217.   CEDA Downtown is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CEDA Downtown in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1218.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,200,000.00 pursuant to the fraudulent bills submitted through the CEDA Downtown enterprise.

1219.   By reason of Cereceda's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## SIXTH CAUSE OF ACTION
### Against Cereceda, Canizares, Crespo-Smith, Facuseh,
### Pabon, Hidalgo, Pena, Soto, and Zapata
### (Under Fla. Stat. 772.103(4))

1220.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-145, 193-218, 275-311, 420-584, and 1162-1178, above.

1221.   CEDA Downtown is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1222.   Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata are employed by or associated with the CEDA Downtown enterprise.

1223.   In furtherance of the fraudulent scheme, Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata submitted or caused to be submitted thousands of fraudulent bills through CEDA Downtown to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1224.   When the billing was submitted, Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Downtown unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Downtown Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that

348

purportedly were provided in order to inflate the charges submitted to GEICO.

1225.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1226.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,200,000.00 pursuant to the fraudulent bills submitted through the CEDA Downtown enterprise.

1227.   By reason of Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**SEVENTH CAUSE OF ACTION**
**Against the CEDA Downtown Defendants**
**(Common Law Fraud)**

1228.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-145, 193-218, 275-311, 420-584, and 1162-1178, above.

1229.   The CEDA Downtown Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through CEDA Downtown for the Fraudulent Services.

341.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that CEDA Downtown was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact CEDA Downtown never was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent

Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1230.   The CEDA Downtown Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CEDA Downtown that were not reimbursable.

1231.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,200,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the CEDA Downtown Defendants through CEDA Downtown.

1232.   The CEDA Downtown Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1233.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
**Against the CEDA Downtown Defendants**
**(Unjust Enrichment)**

1234.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-145, 193-218, 275-311, 420-584, and 1162-1178, above.

1235.   As set forth above, the CEDA Downtown Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1236.   When GEICO paid the bills and charges submitted or caused to be submitted by the CEDA Downtown Defendants through CEDA Downtown, it reasonably believed that it was legally obligated to make such payments based on the CEDA Downtown Defendants' improper, unlawful, and/or unjust acts.

1237.   The CEDA Downtown Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the CEDA Downtown Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1238.   The CEDA Downtown Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1239.   By reason of the above, the CEDA Downtown Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $4,200,000.00.

### NINTH CAUSE OF ACTION
**Against Cereceda**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

1240.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 146-158, 193-204, 219-232, 275, 312-347, 420-428, 585-740, and 1163-1178, above.

1241.   CEDA Kendall is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1242.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Kendall's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous

basis for over three years seeking payments that CEDA Kendall was not eligible to receive under the No-Fault Law because: (i) CEDA Kendall unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Kendall Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1243.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

1244.   CEDA Kendall's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cereceda operated CEDA Kendall, inasmuch as CEDA Kendall was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for CEDA Kendall to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the CEDA Kendall Defendants continue to attempt collection on the fraudulent billing submitted through CEDA Kendall to the present day.

1245.   CEDA Kendall is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These

inherently unlawful acts are taken by CEDA Kendall in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1246.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,400,000.00 pursuant to the fraudulent bills submitted through CEDA Kendall.

1247.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against Cereceda, Crespo-Smith, Moya, Yoham, Aguayo,
Baires, Ceballos, Hernandez, and Sanchez
(Violation of RICO, 18 U.S.C. § 1962(d))**

1248.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 146-158, 193-204, 219-232, 275, 312-347, 420-428, 585-740, and 1163-1178, above.

1249.   CEDA Kendall is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1250.   Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez are employed by or associated with the CEDA Kendall enterprise.

1251.   Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CEDA Kendall's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that CEDA Kendall was not

eligible to receive under the No-Fault Law because: (i) CEDA Kendall unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Kendall Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1252.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

1253.  Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1254.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,400,000.00 pursuant to the fraudulent bills submitted through the CEDA Kendall enterprise.

1255.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against the CEDA Kendall Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

1256.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 146-158, 193-204, 219-232, 275, 312-347, 420-428, 585-740, and 1163-1178, above.

1257.   The CEDA Kendall Defendants are actively engaged in trade and commerce in the State of Florida.

1258.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1259.   The CEDA Kendall Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1260.   The bills and supporting documents submitted by the CEDA Kendall Defendants to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CEDA Kendall's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1261.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the CEDA Kendall Defendants has been materially injurious to GEICO and its Insureds.

1262.   The conduct of the CEDA Kendall Defendants was the actual and proximate cause of the damages sustained by GEICO.

1263.   The CEDA Kendall Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $5,400,000.00.

1264.   By reason of the CEDA Kendall Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TWELFTH CAUSE OF ACTION
### Against Cereceda
### (Under Fla. Stat. 772.103(3))

1265.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 146-158, 193-204, 219-232, 275, 312-347, 420-428, 585-740, and 1163-1178, above.

1266.   CEDA Kendall is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1267.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Kendall's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Kendall unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent

protocol designed solely to financially enrich the CEDA Kendall Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1268.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1269.   CEDA Kendall is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CEDA Kendall in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1270.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,400,000.00 pursuant to the fraudulent bills submitted through the CEDA Kendall enterprise.

1271.   By reason of Cereceda's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### THIRTEENTH CAUSE OF ACTION
**Against Cereceda, Crespo-Smith, Moya, Yoham,
Aguayo, Baires, Ceballos, Hernandez, and Sanchez
(Under Fla. Stat. 772.103(4))**

1272.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 146-158, 193-204, 219-232, 275, 312-347, 420-428, 585-740, and 1163-1178, above.

1273.   CEDA Kendall is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1274.   Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez are employed by or associated with the CEDA Kendall enterprise.

1275.   In furtherance of the fraudulent scheme, Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez submitted or caused to be submitted thousands of fraudulent bills through CEDA Kendall to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1276.   When the billing was submitted, Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Kendall unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Kendall Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1277.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1278.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,400,000.00 pursuant to the fraudulent bills submitted through the CEDA Kendall enterprise.

1279.   By reason of Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FOURTEENTH CAUSE OF ACTION**
**Against the CEDA Kendall Defendants**
**(Common Law Fraud)**

1280.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 146-158, 193-204, 219-232, 275, 312-347, 420-428, 585-740, and 1163-1178, above.

1281.   The CEDA Kendall Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through CEDA Kendall for the Fraudulent Services.

341.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that CEDA Kendall was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact CEDA Kendall never was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every

359

claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1282.   The CEDA Kendall Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CEDA Kendall that were not reimbursable.

1283.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,400,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the CEDA Kendall Defendants through CEDA Kendall.

1284.   The CEDA Kendall Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1285.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against the CEDA Kendall Defendants
### (Unjust Enrichment)

1286.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 146-158, 193-204, 219-232, 275, 312-347, 420-428, 585-740, and 1163-1178, above.

1287.   As set forth above, the CEDA Kendall Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1288.   When GEICO paid the bills and charges submitted or caused to be submitted by the CEDA Kendall Defendants through CEDA Kendall, it reasonably believed that it was legally obligated to make such payments based on the CEDA Kendall Defendants' improper, unlawful, and/or unjust acts.

1289.   The CEDA Kendall Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the CEDA Kendall Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1290.   The CEDA Kendall Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1291.   By reason of the above, the CEDA Kendall Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $5,400,000.00.

### SIXTEENTH CAUSE OF ACTION
#### Against Cereceda
#### (Violation of RICO, 18 U.S.C. § 1962(c))

1292.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 159-171, 193-204, 233-246, 275, 348-383, 420-428, 741-896, and 1163-1178, above.

1293.   CEDA Hialeah is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1294.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Hialeah's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that CEDA Hialeah was not eligible to receive under the No-Fault Law because: (i) CEDA Hialeah unlawfully was operated in violation of the Clinic

Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Hialeah Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1295.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

1296.  CEDA Hialeah's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cereceda operated CEDA Hialeah, inasmuch as CEDA Hialeah was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for CEDA Hialeah to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the CEDA Hialeah Defendants continue to attempt collection on the fraudulent billing submitted through CEDA Hialeah to the present day.

1297.  CEDA Hialeah is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CEDA Hialeah in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1298.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,800,000.00 pursuant to the fraudulent bills submitted through CEDA Hialeah.

1299.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**Against Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb,**
**Pabon, Ross, Otero, Pascucci, and Rodriguez**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1300.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 159-171, 193-204, 233-246, 275, 348-383, 420-428, 741-896, and 1163-1178, above.

1301.   CEDA Hialeah is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1302.   Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez are employed by or associated with the CEDA Hialeah enterprise.

1303.   Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CEDA Hialeah's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that CEDA Hialeah was not eligible to receive under the No-Fault Law because: (i) CEDA Hialeah unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying

Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Hialeah Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1304.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

1305.   Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1306.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,800,000.00 pursuant to the fraudulent bills submitted through the CEDA Hialeah enterprise.

1307.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**Against the CEDA Hialeah Defendants**

**(Under Fla. Stat. 501.201 et. seq.)**

1308.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 159-171, 193-204, 233-246, 275, 348-383, 420-428, 741-896, and 1163-1178, above.

1309.   The CEDA Hialeah Defendants are actively engaged in trade and commerce in the State of Florida.

1310.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1311.   The CEDA Hialeah Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1312.   The bills and supporting documents submitted by the CEDA Hialeah Defendants to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CEDA Hialeah's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1313.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the CEDA Hialeah Defendants has been materially injurious to GEICO and its Insureds.

1314.   The conduct of the CEDA Hialeah Defendants was the actual and proximate cause of the damages sustained by GEICO.

1315.   The CEDA Hialeah Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $3,800,000.00.

1316.  By reason of the CEDA Hialeah Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## NINETEENTH CAUSE OF ACTION
### Against Cereceda
### (Under Fla. Stat. 772.103(3))

1317.  GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 159-171, 193-204, 233-246, 275, 348-383, 420-428, 741-896, and 1163-1178, above.

1318.  CEDA Hialeah is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1319.  Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Hialeah's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Hialeah unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Hialeah Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for

the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1320.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1321.   CEDA Hialeah is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CEDA Hialeah in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1322.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,800,000.00 pursuant to the fraudulent bills submitted through the CEDA Hialeah enterprise.

1323.   By reason of Cereceda's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## TWENTIETH CAUSE OF ACTION
### Against Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez
### (Under Fla. Stat. 772.103(4))

1324.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 159-171, 193-204, 233-246, 275, 348-383, 420-428, 741-896, and 1163-1178, above.

1325.   CEDA Hialeah is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1326.   Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez are employed by or associated with the CEDA Hialeah enterprise.

1327.  In furtherance of the fraudulent scheme, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez submitted or caused to be submitted thousands of fraudulent bills through CEDA Hialeah to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1328.  When the billing was submitted, Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Hialeah unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Hialeah Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1329.  These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1330.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,800,000.00 pursuant to the fraudulent bills submitted through the CEDA Hialeah enterprise.

1331.   By reason Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWENTY-FIRST CAUSE OF ACTION**
**Against the CEDA Hialeah Defendants**
**(Common Law Fraud)**

1332.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 159-171, 193-204, 233-246, 275, 348-383, 420-428, 741-896, and 1163-1178, above.

1333.   The CEDA Hialeah Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through CEDA Hialeah for the Fraudulent Services.

341.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that CEDA Hialeah was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact CEDA Hialeah never was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1334.   The CEDA Hialeah Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CEDA Hialeah that were not reimbursable.

1335.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,800,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the CEDA Hialeah Defendants through CEDA Hialeah.

1336.   The CEDA Hialeah Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1337.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
### Against the CEDA Hialeah Defendants
### (Unjust Enrichment)

1338.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 159-171, 193-204, 233-246, 275, 348-383, 420-428, 741-896, and 1163-1178, above.

1339.   As set forth above, the CEDA Hialeah Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1340.   When GEICO paid the bills and charges submitted or caused to be submitted by the CEDA Hialeah Defendants through CEDA Hialeah, it reasonably believed that it was legally

obligated to make such payments based on the CEDA Hialeah Defendants' improper, unlawful, and/or unjust acts.

1341.   The CEDA Hialeah Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the CEDA Hialeah Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1342.   The CEDA Hialeah Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1343.   By reason of the above, the CEDA Hialeah Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,800,000.00.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Cereceda**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

1344.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 172-184, 193-204, 247-260, 275, 384-428, 897-1053, and 1163-1178, above.

1345.   CEDA Miami is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1346.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Miami's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that CEDA Miami was not eligible to receive under the No-Fault Law because: (i) CEDA Miami unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined

fraudulent protocol designed solely to financially enrich the CEDA Miami Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1347.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

1348.   CEDA Miami's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cereceda operated CEDA Miami, inasmuch as CEDA Miami was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for CEDA Miami to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the CEDA Miami Defendants continue to attempt collection on the fraudulent billing submitted through CEDA Miami to the present day.

1349.   CEDA Miami is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CEDA Miami in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1350.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted through CEDA Miami.

1351.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTY-FOURTH CAUSE OF ACTION
**Against Cereceda, Crespo-Smith, Habayeb, Javech, Moya,
Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez
(Violation of RICO, 18 U.S.C. § 1962(d))**

1352.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 172-184, 193-204, 247-260, 275, 384-428, 897-1053, and 1163-1178, above.

1353.   CEDA Miami is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1354.   Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez are employed by or associated with the CEDA Miami enterprise.

1355.   Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CEDA Miami's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that CEDA Miami was not eligible to receive under the No-Fault Law because: (i) CEDA Miami unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Miami Defendants, rather than to treat or otherwise benefit the Insureds who purportedly

were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1356.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

1357.   Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1358.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted through the CEDA Miami enterprise.

1359.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
**Against the CEDA Miami Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

1360.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 172-184, 193-204, 247-260, 275, 384-428, 897-1053, and 1163-1178, above.

1361.   The CEDA Miami Defendants are actively engaged in trade and commerce in the State of Florida.

1362.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1363.   The CEDA Miami Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1364.   The bills and supporting documents submitted by the CEDA Miami Defendants to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CEDA Miami's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1365.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the CEDA Miami Defendants has been materially injurious to GEICO and its Insureds.

1366.   The conduct of the CEDA Miami Defendants was the actual and proximate cause of the damages sustained by GEICO.

1367.   The CEDA Miami Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $3,600,000.00.

1368.   By reason of the CEDA Miami Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

<u>TWENTY-SIXTH CAUSE OF ACTION</u>
**Against Cereceda**
**(Under Fla. Stat. 772.103(3))**

375

1369.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 172-184, 193-204, 247-260, 275, 384-428, 897-1053, and 1163-1178, above.

1370.   CEDA Miami is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1371.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Miami's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting submit or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Miami unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Miami Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1372.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1373.   CEDA Miami is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These

inherently unlawful acts are taken by CEDA Miami in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1374.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted through the CEDA Miami enterprise.

1375.  By reason of Cereceda's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.


## TWENTY-SEVENTH CAUSE OF ACTION
### Against Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez (Under Fla. Stat. 772.103(4))

1376.  GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 172-184, 193-204, 247-260, 275, 384-428, 897-1053, and 1163-1178, above.

1377.  CEDA Miami is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1378.  Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez are employed by or associated with the CEDA Miami enterprise.

1379.  In furtherance of the fraudulent scheme, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez submitted or caused to be submitted thousands of fraudulent bills through CEDA Miami to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1380.  When the billing was submitted, Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez knew that the billing contained false and

misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Miami unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Miami Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1381.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1382.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted through the CEDA Miami enterprise.

1383.   By reason of Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Against the CEDA Miami Defendants**
**(Common Law Fraud)**

1384.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 172-184, 193-204, 247-260, 275, 384-428, 897-1053, and 1163-1178, above.

378

1385.   The CEDA Miami Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through CEDA Miami for the Fraudulent Services.

341.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that CEDA Miami was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact CEDA Miami never was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1386.   The CEDA Miami Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CEDA Miami that were not reimbursable.

1387.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the CEDA Miami Defendants through CEDA Miami.

1388.   The CEDA Miami Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1389.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against the CEDA Miami Defendants
### (Unjust Enrichment)

1390.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 172-184, 193-204, 247-260, 275, 384-428, 897-1053, and 1163-1178, above.

1391.   As set forth above, the CEDA Miami Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1392.   When GEICO paid the bills and charges submitted or caused to be submitted by the CEDA Miami Defendants through CEDA Miami, it reasonably believed that it was legally obligated to make such payments based on the CEDA Miami Defendants' improper, unlawful, and/or unjust acts.

1393.   The CEDA Miami Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the CEDA Miami Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1394.   The CEDA Miami Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1395.   By reason of the above, the CEDA Miami Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,600,000.00.

## THIRTIETH CAUSE OF ACTION
### Against Cereceda
### (Violation of RICO, 18 U.S.C. § 1962(c))

1396.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 188-204, 261-274, 420-428, and 1054-1178, above.

1397.   CEDA Cutler Bay is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1398.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Cutler Bay's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that CEDA Cutler Bay was not eligible to receive under the No-Fault Law because: (i) CEDA Cutler Bay unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Cutler Bay Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1399.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

1400.   CEDA Cutler Bay's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cereceda operated CEDA Cutler Bay, inasmuch as CEDA Cutler Bay was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for CEDA Cutler Bay to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the CEDA Cutler Bay Defendants continue to attempt collection on the fraudulent billing submitted through CEDA Cutler Bay to the present day.

1401.   CEDA Cutler Bay is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CEDA Cutler Bay in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1402.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through CEDA Cutler Bay.

1403.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRTY-FIRST CAUSE OF ACTION**
**Against Cereceda, Haban, and Reese**

(**Violation of RICO, 18 U.S.C. § 1962(d)**)

1404.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 188-204, 261-274, 420-428, and 1054-1178, above.

1405.   CEDA Cutler Bay is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1406.   Cereceda, Haban, and Reese are employed by or associated with the CEDA Cutler Bay enterprise.

1407.   Cereceda, Haban, and Reese knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CEDA Cutler Bay's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over a year seeking payments that CEDA Cutler Bay was not eligible to receive under the No-Fault Law because: (i) CEDA Cutler Bay unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Cutler Bay Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1408.   A representative sample of the fraudulent bills and corresponding mailings

submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

1409.   Cereceda, Haban, and Reese knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1410.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through the CEDA Cutler Bay enterprise.

1411.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY-SECOND CAUSE OF ACTION**
**Against the CEDA Cutler Bay Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

1412.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 188-204, 261-274, 420-428, and 1054-1178, above.

1413.   The CEDA Cutler Bay Defendants are actively engaged in trade and commerce in the State of Florida.

1414.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1415.   The CEDA Cutler Bay Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

384

1416.   The bills and supporting documents submitted by the CEDA Cutler Bay Defendants to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CEDA Cutler Bay's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1417.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the CEDA Cutler Bay Defendants has been materially injurious to GEICO and its Insureds.

1418.   The conduct of the CEDA Cutler Bay Defendants was the actual and proximate cause of the damages sustained by GEICO.

1419.   The CEDA Cutler Bay Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $400,000.00.

1420.   By reason of the CEDA Cutler Bay Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## THIRTY-THIRD CAUSE OF ACTION
### Against Cereceda
### (Under Fla. Stat. 772.103(3))

1421.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 188-204, 261-274, 420-428, and 1054-1178, above.

1422.   CEDA Cutler Bay is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1423.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of CEDA Cutler Bay's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), submit or cause to be

submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Cutler Bay unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Cutler Bay Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1424. These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1425. CEDA Cutler Bay is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CEDA Cutler Bay in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1426. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through the CEDA Cutler Bay enterprise.

1427.   By reason of Cereceda's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### THIRTY-FOURTH CAUSE OF ACTION
**Against Cereceda, Haban, and Reese**
**(Under Fla. Stat. 772.103(4))**

1428.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 188-204, 261-274, 420-428, and 1054-1178, above.

1429.   CEDA Cutler Bay is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1430.   Cereceda, Haban, and Reese are employed by or associated with the CEDA Cutler Bay enterprise.

1431.   In furtherance of the fraudulent scheme, Cereceda, Haban, and Reese submitted or caused to be submitted thousands of fraudulent bills through CEDA Cutler Bay to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1432.   When the billing was submitted, Cereceda, Haban, and Reese knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CEDA Cutler Bay unlawfully was operated in violation of the Clinic Act, Self-Referral Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the CEDA Cutler Bay Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and

(v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1433.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1434.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through the CEDA Cutler Bay enterprise.

1435.   By reason of Cereceda, Haban, and Reese's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

<u>THIRTY-FIFTH CAUSE OF ACTION</u>
**Against the CEDA Cutler Bay Defendants**
**(Common Law Fraud)**

1436.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 188-204, 261-274, 420-428, and 1054-1178, above.

1437.   The CEDA Cutler Bay Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through CEDA Cutler Bay for the Fraudulent Services.

341.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that CEDA Cutler Bay was in compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact CEDA Cutler Bay never was in

compliance with the Clinic Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1438.   The CEDA Cutler Bay Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CEDA Cutler Bay that were not reimbursable.

1439.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the CEDA Cutler Bay Defendants through CEDA Cutler Bay.

1440.   The CEDA Cutler Bay Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1441.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-SIXTH CAUSE OF ACTION**
**Against the CEDA Cutler Bay Defendants**
**(Unjust Enrichment)**

1442. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 188-204, 261-274, 420-428, and 1054-1178, above.

1443. As set forth above, the CEDA Cutler Bay Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1444. When GEICO paid the bills and charges submitted or caused to be submitted by the CEDA Cutler Bay Defendants through CEDA Cutler Bay, it reasonably believed that it was legally obligated to make such payments based on the CEDA Cutler Bay Defendants' improper, unlawful, and/or unjust acts.

1445. The CEDA Cutler Bay Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the CEDA Cutler Bay Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1446. The CEDA Cutler Bay Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1447. By reason of the above, the CEDA Cutler Bay Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $400,000.00.

**THIRTY-SEVENTH CAUSE OF ACTION**
**Against Cereceda**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

1448. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 185-187, 205-274, and 1167-1178, above.

1449. Springs Crossing is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1450. Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of Springs Crossing's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the

United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Springs Crossing was not eligible to receive under the No-Fault Law because: (i) Springs Crossing unlawfully was operated in violation of the Clinic Act and Self-Referral Act; (ii) the underlying Fraudulent Services were not lawfully provided; and (iii) the underlying Fraudulent Services were provided – to the extent that they were provided at all – pursuant to an illegal referral scheme.

1451. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

1452. Springs Crossing's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cereceda operated Springs Crossing, inasmuch as Springs Crossing was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Springs Crossing to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Springs Crossing Defendants continue to attempt collection on the fraudulent billing submitted through Springs Crossing to the present day.

1453. Springs Crossing is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Springs Crossing in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1454.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,800,000.00 pursuant to the fraudulent bills submitted through Springs Crossing.

1455.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRTY-EIGHTH CAUSE OF ACTION
**Against Cereceda and Alonso**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1456.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 185-187, 205-274, and 1167-1178, above.

1457.   Springs Crossing is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1458.   Cereceda and Alonso are employed by or associated with the Springs Crossing enterprise.

1459.   Cereceda and Alonso knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Springs Crossing's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Springs Crossing was not eligible to receive under the No-Fault Law because: (i) Springs Crossing unlawfully was operated in violation of the Clinic Act and Self-Referral Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were provided – to the extent that they were provided at all – pursuant to an illegal referral scheme.

1460.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

1461.   Cereceda and Alonso knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1462.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,800,000.00 pursuant to the fraudulent bills submitted through the Springs Crossing enterprise.

1463.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY-NINTH CAUSE OF ACTION**
**Against the Springs Crossing Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

1464.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 185-187, 205-274, and 1167-1178, above.

1465.   The Springs Crossing Defendants are actively engaged in trade and commerce in the State of Florida.

1466.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1467.   The Springs Crossing Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1468.   The bills and supporting documents submitted by the Springs Crossing Defendants to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Springs Crossing's eligibility to collect PIP Benefits in the first instance; and (ii) that the Fraudulent Services were lawfully provided.

1469.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the Springs Crossing Defendants has been materially injurious to GEICO and its Insureds.

1470.   The conduct of the Springs Crossing Defendants was the actual and proximate cause of the damages sustained by GEICO.

1471.   The Springs Crossing Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $2,800,000.00.

1472.   By reason of the Springs Crossing Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FORTIETH CAUSE OF ACTION**
**Against Cereceda**
**(Under Fla. Stat. 772.103(3))**

1473.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 185-187, 205-274, and 1167-1178, above.

1474.   Springs Crossing is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1475.   Cereceda knowingly has conducted and/or participated, directly or indirectly, in the conduct of Springs Crossing's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile

insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Springs Crossing unlawfully was operated in violation of the Clinic Act and Self-Referral Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were provided – to the extent that they were provided at all – pursuant to an illegal referral scheme.

1476.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1477.   Springs Crossing is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Springs Crossing in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1478.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,800,000.00 pursuant to the fraudulent bills submitted through the Springs Crossing enterprise.

1479.   By reason of Cereceda's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### FORTY-FIRST CAUSE OF ACTION
**Against Cereceda and Alonso**
**(Under Fla. Stat. 772.103(4))**

1480.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 185-187, 205-274, and 1167-1178, above.

1481.   Springs Crossing is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1482.   Cereceda and Alonso are employed by or associated with the Springs Crossing enterprise.

1483.   In furtherance of the fraudulent scheme, Cereceda and Alonso submitted or caused to be submitted thousands of fraudulent bills through Springs Crossing to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1484.   When the billing was submitted, Cereceda and Alonso knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Springs Crossing unlawfully was operated in violation of the Clinic Act and Self-Referral Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were provided – to the extent that they were provided at all – pursuant to an illegal referral scheme.

1485.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1486.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,800,000.00 pursuant to the fraudulent bills submitted through the Springs Crossing enterprise.

1487.   By reason of Cereceda and Alonso's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FORTY-SECOND CAUSE OF ACTION**
**Against the Springs Crossing Defendants**
**(Common Law Fraud)**

1488.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-131, 185-187, 205-274, and 1167-1178, above.

1489.   The Springs Crossing Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Springs Crossing for the Fraudulent Services.

341.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Springs Crossing was in compliance with the Clinic Act and the Self-Referral Act, and eligible to collect PIP Benefits in the first instance, when in fact Springs Crossing never was in compliance with the Clinic Act and the Self-Referral Act, and never was eligible to collect PIP Benefits; and (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

1490.   The Springs Crossing Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Springs Crossing that were not reimbursable.

1491.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,800,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Springs Crossing Defendants through Springs Crossing.

1492.   The Springs Crossing Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1493.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FORTY-THIRD CAUSE OF ACTION
**Against the Springs Crossing Defendants**
**(Unjust Enrichment)**

1494.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-131, 185-187, 205-274, and 1167-1178, above.

1495.   As set forth above, the Springs Crossing Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1496.   When GEICO paid the bills and charges submitted or caused to be submitted by the Springs Crossing Defendants through Springs Crossing, it reasonably believed that it was legally obligated to make such payments based on the Springs Crossing Defendants' improper, unlawful, and/or unjust acts.

1497.   The Springs Crossing Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Springs Crossing Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1498.   The Springs Crossing Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1499.   By reason of the above, the Springs Crossing Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,800,000.00.

## JURY DEMAND

1500.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that CEDA Downtown, CEDA Kendall, CEDA Hialeah, CEDA Miami, CEDA Cutler Bay, and Springs Crossing have no right to receive payment for any pending bills submitted to GEICO;

B.   On the Second Cause of Action against Cereceda, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $4,200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.   On the Third Cause of Action against Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $4,200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.   On the Fourth Cause of Action against the CEDA Downtown Defendants, compensatory damages in an amount to be determined at trial but in excess of $4,200,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.   On the Fifth Cause of Action against Cereceda, compensatory damages in an amount to be determined at trial but in excess of $4,200,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.      On the Sixth Cause of Action against Cereceda, Canizares, Crespo-Smith, Facuseh, Pabon, Hidalgo, Pena, Soto, and Zapata, compensatory damages in an amount to be determined at trial but in excess of $4,200,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

G.      On the Seventh Cause of Action against the CEDA Downtown Defendants, compensatory damages in an amount to be determined at trial but in excess of $4,200,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against the CEDA Downtown Defendants, more than $4,200,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

I.      On the Ninth Cause of Action against Cereceda, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $5,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $5,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against the CEDA Kendall Defendants, compensatory damages in an amount to be determined at trial but in excess of $5,400,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

L.      On the Twelfth Cause of Action against Cereceda, compensatory damages in an amount to be determined at trial but in excess of $5,400,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

M.      On the Thirteenth Cause of Action against Cereceda, Crespo-Smith, Moya, Yoham, Aguayo, Baires, Ceballos, Hernandez, and Sanchez, compensatory damages in an amount to be determined at trial but in excess of $5,400,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

N.      On the Fourteenth Cause of Action against the CEDA Kendall Defendants, compensatory damages in an amount to be determined at trial but in excess of $5,400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against the CEDA Kendall Defendants, more than $5,400,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

P.      On the Sixteenth Cause of Action against Cereceda, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.      On the Seventeenth Cause of Action against Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against the CEDA Hialeah Defendants, compensatory damages in an amount to be determined at trial but in excess of $3,800,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

S.      On the Nineteenth Cause of Action against Cereceda, compensatory damages in an amount to be determined at trial but in excess of $3,800,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

T.      On the Twentieth Cause of Action against Cereceda, Crespo-Smith, Fatato, Fenelus, Habayeb, Pabon, Ross, Otero, Pascucci, and Rodriguez, compensatory damages in an amount to be determined at trial but in excess of $3,800,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

U.      On the Twenty-First Cause of Action against the CEDA Hialeah Defendants, compensatory damages in an amount to be determined at trial but in excess of $3,800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

V.      On the Twenty-Second Cause of Action against the CEDA Hialeah Defendants, more than $3,800,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

W.      On the Twenty-Third Cause of Action against Cereceda, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez, compensatory damages

402

in favor of GEICO in an amount to be determined at trial but in excess of $3,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y.      On the Twenty-Fifth Cause of Action against the CEDA Miami Defendants, compensatory damages in an amount to be determined at trial but in excess of $3,600,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Z.      On the Twenty-Sixth Cause of Action against Cereceda, compensatory damages in an amount to be determined at trial but in excess of $3,600,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

AA.      On the Twenty-Seventh Cause of Action against Cereceda, Crespo-Smith, Habayeb, Javech, Moya, Schulman, Nunez, Otero, Paredes, Pascucci, and Sanchez, compensatory damages in an amount to be determined at trial but in excess of $3,600,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

BB.      On the Twenty-Eighth Cause of Action against the CEDA Miami Defendants, compensatory damages in an amount to be determined at trial but in excess of $3,600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC.      On the Twenty-Ninth Cause of Action against the CEDA Miami Defendants, more than $3,600,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

DD.      On the Thirtieth Cause of Action against Cereceda, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

EE.      On the Thirty-First Cause of Action against Cereceda, Haban, and Reese, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

FF.      On the Thirty-Second Cause of Action against the Cutler Bay Defendants, compensatory damages in an amount to be determined at trial but in excess of $400,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

GG.      On the Thirty-Third Cause of Action against Cereceda, compensatory damages in an amount to be determined at trial but in excess of $400,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

HH.      On the Thirty-Fourth Cause of Action against Cereceda, Haban, and Reese, compensatory damages in an amount to be determined at trial but in excess of $400,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

II.      On the Thirty-Fifth Cause of Action against the CEDA Cutler Bay Defendants, compensatory damages in an amount to be determined at trial but in excess of $400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

JJ.      On the Thirty-Sixth Cause of Action against the CEDA Cutler Bay Defendants, more than $400,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

KK.      On the Thirty-Seventh Cause of Action against Cereceda, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,800,000.00, together

with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

LL.    On the Thirty-Eighth Cause of Action against Cereceda and Alonso, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

MM.    On the Thirty-Ninth Cause of Action against the Springs Crossing Defendants, compensatory damages in an amount to be determined at trial but in excess of $2,800,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

NN.    On the Fortieth Cause of Action against Cereceda, compensatory damages in an amount to be determined at trial but in excess of $2,800,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

OO.    On the Forty-First Cause of Action against Cereceda and Alonso, compensatory damages in an amount to be determined at trial but in excess of $2,800,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

PP.    On the Forty-Second Cause of Action against the Springs Crossing Defendants, compensatory damages in an amount to be determined at trial but in excess of $2,800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

QQ.    On the Forty-Third Cause of Action against the Springs Crossing Defendants, more than $2,800,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:        May 30, 2019

/s/ *John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

Christina Bezas (pro hac vice pending)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
christina.bezas@rivkin.com

*Attorneys for Plaintiffs*