**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 19-22206-CIV-ALTONAGA/GOODMAN**

GOVERNMENT EMPLOYEES
INSURANCE CO., et al.,

      Plaintiffs,

v.

MARK A. CERECEDA, et al.,

      Defendants.
_____/

**ORDER ON PERMISSIBLE SCOPE OF DISCOVERY**

*"You've made your bed, now you have to lie in it."*

- Well-known idiom, traced back to approximately 1590[1]

The Plaintiffs in this lawsuit are related insurance carriers which filed a 406-page Complaint asserting 43 counts and attaching more than 8,500 pages of spreadsheets as exhibits. Specifically, Government Employees Insurance Co. ("Geico") and related Geico entities ("Geico," collectively) filed a lawsuit against a chiropractor (Mark A. Cereceda), other healthcare providers, and myriad LLCs which purportedly provided fraudulent healthcare services. Geico alleges that Cereceda is the managing member and owner of

---

[1]   *Idioms Online*, https://www.idioms.online/you-have-made-your-bed-and-must-lie-in-it (last visited January 14, 2021).

the LLCs.

Geico alleges that Defendants billed it for fraudulent healthcare services as the assignees of the Geico insureds' no-fault (personal injury protection, or "PIP") insurance benefits. Geico's lawsuit is based on 456,612 invoices, reflecting purported healthcare services provided to approximately 8,000 patients.

During discovery, Defendants propounded interrogatories designed to obtain the specifics of Geico's allegations. The interrogatories (Nos. 1, 7, 10, 13, 16, and 19) asked Geico to pinpoint which of the healthcare services were fraudulent, which charges submitted to Geico were for medically unnecessary services, which charges submitted to Geico were for services provided by an unsupervised massage therapist, which charges submitted to Geico used a billing code which misrepresented and/or exaggerated the level of service provided, which charges submitted to Geico were provided by individuals who lacked the requisite licenses, and which charges submitted to Geico were for services never provided.

Geico filed supplemental answers to those interrogatories, and by way of summary, Geico's response was that *everything* was improper. Specifically, Geico (which is seeking to recover $20 million) provided supplemental interrogatory answers declaring that: all charges were fraudulent; all the medical services were medically unnecessary; all the charges for massage therapists were for services performed by unsupervised massage therapists; all charges for initial examinations and for follow-up examinations were billed

2

using billing codes that misrepresented and/or exaggerated the level of service provided; all charges performed by the named individuals were for services performed by persons who lacked the requisite licenses to perform services without supervision; and that all charges for initial examinations using code 99203 and follow-up examinations using codes 99213 and 99214 were for services not actually provided.

Geico contends that it need not provide any further detail because courts have permitted insurance carriers to bring these types of lawsuits by alleging an overall scheme to use pre-determined protocols for patients, without regard for the individual circumstances of each patient. Geico argues that it need not in discovery provide information on a patient-by-patient, file-by-file, or medical service-by-service basis in light of its "contention that all of the Defendants' purported healthcare services were medically unnecessary." [ECF No. 112, p. 2].

Geico submitted case law authority upholding a carrier's ability to withstand a motion to dismiss a complaint which lacks the specificity requested in the interrogatories here and upholding a verdict for a carrier using the overall treatment protocol theory. But it did not submit any on-point authority deciding whether a defendant in this type of fraud lawsuit is entitled to *discovery* of more-specific or more-individualized illustrations of the fraud.

On the other hand, Defendants, who are confronting allegations under the Racketeer Influenced and Corrupt Organization Act ("RICO"), contend that Geico's

interrogatory answers are incomplete and lack the specificity needed to allow them to adequately defend against the claims. They ask for an order compelling complete answers or, in the alternative, an order prohibiting Plaintiffs from "presenting, in support of their claims, any evidence pertaining to why they believe any individual medical services are fraudulent." [ECF No. 113, p. 2].

Similar to Geico's memorandum of law, though, Defendants' memorandum does not cite any on-point cases about the *discoverability* of file-specific information in a RICO/fraud case brought by an insurer (against a healthcare services provider) who alleges an overarching fraud scheme involving predetermined medical protocols.

## I.     Factual and Procedural Background

Defendants filed a motion to dismiss the lawsuit arguing that the Court "should be skeptical that Geico's shotgun approach of listing every invoice for every patient without delineating which services it is **not** contesting as legitimately medically rendered can pass muster under Federal Rule 11." [ECF No. 57, p. 2 (emphasis in original)]. United States District Judge Cecilia M. Altonaga denied the dismissal motion. [ECF No. 72]. At the hearing on Defendants' motion to dismiss, Judge Altonaga ruled that the complaint "more than satisfies Rule 12(b)(6) and the pleading standards for the fraud-based claims that are alleged in it." [ECF No. 83, p. 66].

In an initial Trial Scheduling Order, Judge Altonaga referred all discovery matters to the Undersigned. [ECF No. 52].

I held an initial discovery hearing on October 30, 2020. [ECF No. 101]. In a Post-Discovery Hearing Administrative Order, I ordered Geico to answer the interrogatories at issue, noting that Defendants are entitled to this factual information because they are "entitled to know which of the medical services are being challenged, and why." [ECF No. 102, p. 2].

After that Order was entered, Geico provided the supplemental interrogatory answers outlined above (i.e., that *all* services were fraudulent because they were all medically unnecessary).

Plaintiffs further amended some of their responses on January 7, 2021. [ECF No. 113-4]. In an amended answer to Interrogatory No. 19, Plaintiffs now identify, on a patient-by-patient basis, 10 specific examples of services that they allege were never provided. These 10 illustrations involve 32 massage treatments, a manual therapy treatment, five hot/cold treatments, five ultrasound treatments, four additional massage treatments, 28 ultrasound treatments, six group therapeutic procedure treatments, five additional ultrasound treatments, four chiropractic manipulation treatments, eight group therapeutic procedure treatments, eight additional chiropractic manipulation treatments, 11 more ultrasound treatments, 17 more ultrasound treatments, 17 more chiropractic manipulation treatments, 12 additional ultrasound treatments, and 12 additional massage treatments.

According to Defendants, these are the same examples which Geico included in its

Complaint "in support of their sweeping conclusion that all of the services were fraudulent." [ECF No. 113, p. 2, n. 2].

This amended interrogatory answer encompasses 174 services (out of more than 450,000 at issue), 10 patients (out of more than 8,000), and $10,553 (out of more than $20 million claimed by GEICO in this lawsuit).

I held a follow-up discovery hearing on December 30, 2020. [ECF No. 108]. During that hearing, Geico's counsel explained, in response to a question, that its expert report did not discuss specific patient files or give conclusions on a patient-by-patient basis -- but that the expert *might*, at trial, discuss *certain specific patient* files in order to explain his conclusions and provide concrete, in-context illustrations of his views.

Following the hearing, I issued a Post-Hearing Administrative Order requiring the parties to file their experts' reports and to submit memoranda on the following issue: "the discoverability of information on a patient-by-patient basis, file-by-file basis, or medical service-by-medical service basis in light of Plaintiff's contention that **all** medical services provided were medically necessary." [ECF No. 109, pp. 1-2 (emphasis in original)]. The Order also provided that "[i]f possible, the parties should include cases on *discovery* issues, as opposed to dispositive motions or an appeal on substantive issues, but the cases discussed do not need to be officially published." *Id.* at p. 2.

The Order also provided further clarification: "The memoranda should also discuss, among other points, the possibility that Plaintiffs' expert might at trial be asked

6

to testify about specific patient file examples to support Plaintiffs' position that all services to all patients were medically unnecessary. And it should discuss the possibility that some of the standard protocol medical services might have been appropriate for a specific patient (e.g., an MRI of the back of a patient who has spasms and sciatica pain after being involved in a car collision) even if technically deemed medically unnecessary under the applicable state statutory definition." *Id.*

The parties submitted the memoranda [ECF Nos. 112; 113] but apparently did not find any on-point authority concerning discovery (as the briefs did not discuss that type of authority). The parties also submitted the expert reports. Geico filed one expert report from Dr. James N. Dillard. [ECF No. 110]. Defendants filed three expert reports [ECF No. 111], but only two of these (i.e., Jean Acevedo and Daniel Bowerman) involve issues relevant here.

Geico's expert, Dr. James Dillard, is a licensed physician, chiropractor, and acupuncturist. His report represents that he reviewed "the" treatment and billing records submitted to Geico. [ECF No. 110-1, p. 1]. He did not say he reviewed a sample, a representative selection, a random grouping, or any other type of less-than-complete compilation. His report also says he reviewed other materials within the patient's claim files, such as police reports, accident reports, treatment records, and reports of other healthcare providers who treated patients.

Therefore, taken at face value, his report represents that he reviewed more than

450,000 invoices concerning approximately 8,000 patients. But none of his opinions or conclusions mention any specific patient, file, or service.

Dr. Dillard's report says, in its conclusions, that Defendants' practices used pre-determined treatment protocols for "the **substantial majority**" of their patients, which "**primarily**" consisted of medically unnecessary purported services without regard for the individual circumstances of the patients subject to these services. *Id*. at p. 2 (emphasis added). He also concluded that in a "**significant**" number of cases the purported therapy services "evidently" were performed by unsupervised individuals who lacked credentials to perform the services without direct supervision. *Id.* (emphasis added).

Similarly, his report states that in a "**significant**" number of cases, the billing submitted misrepresented and exaggerated the nature and extent of the services. *Id*. The report likewise says that "in many cases" there were routine medical services provided in a manner that deviated from the relevant standards of care. *Id*.

There are many other similar conclusions and observations in the report (e.g., myriad problematic events happened in a "**large**" number of cases, certain scenarios "**frequently**" conflicted with other file information, some developments happened in a "**significant**" number of cases, a "**substantial majority**" of patients were involved in a circumstance but only a "**very small percentage** of patients" were involved in another circumstance, etc.). *Id.* at pp. 2-3 (emphasis added).

Jean Acevedo, one of Defendants' experts, is certified in healthcare compliance and

8

coding. Her resume does not list her educational experience of academic credentials. In any event, she reviewed treatment billing records for 51 individual claims referenced by the patients' initials in Geico's Complaint. She also reviewed reports she prepared in connection with periodic reviews which Dr. Cereceda (the lead Defendant) hired her to perform over the past six years.

According to Ms. Acevedo's report, there is no evidence to suggest any pattern of fraudulent claims being submitted for non-reimbursable expenses, nor provided under inappropriate levels of supervision, nor not properly represented by clinical documentation or with billing codes which misrepresented or exaggerated the level of service. Her conclusion is that no predetermined treatment protocol was used.

The report also noted that Geico is extrapolating its allegations to all claims submitted, without using a proscribed statistical sampling approach.

Not only did Ms. Acevedo not find evidence of fraudulent claims submission in the 51 files she reviewed, but she noticed that some services were *under* coded, resulting in a *lower* payment than the documentation supports.

Defendants' other medical expert is Daniel Bowerman, a licensed chiropractor and certified professional coder. According to his resume, he served as a litigation consultant for the FBI Health Care Fraud unit and served as a litigation consultant and expert for the Department of Justice and the Pennsylvania and Ohio Attorney Generals' Office. He reviewed files from a representative sampling of 51 patients. Neither the report nor

9

Defendants' memorandum explain whether these are the same 51 files which Ms. Acevedo reviewed.

Dr. Bowerman's report explained that his review of the sample files does not show identical treatment for all patients. Likewise, his report concludes that there is no basis in the medical records for Geico to conclude that the treatment plans were predetermined or fraudulently prescribed.

Dr. Bowerman's report also opines that Geico's statement that all of the services billed to it were "medically unnecessary" is belied by common sense and the medical records he reviewed. [ECF No. 111-2, p. 28].

   a. The Parties' Contentions

According to Geico, federal courts presiding over no-fault insurance (PIP) fraud cases like this one have held that a plaintiff insurer can establish the absence of medical necessity by demonstrating that a defendant healthcare provider used "a pre-determined treatment protocol that resulted in a large cohort of patients receiving substantially similar treatment regardless of their individualized circumstances." [ECF No. 112, p. 2]. Moreover, it similarly notes that "these courts have rejected the argument that a determination of liability requires a plaintiff-insurer to produce some additional, individualized proof to demonstrate that each of the healthcare services at issue was medically unnecessary." *Id.*

As argued by Geico, it need not provide claim-by-claim proof to demonstrate that

each service was medically necessary -- because it is the mere existence of the pre-determined protocol that renders the services unnecessary.

During the second discovery hearing, the Undersigned pointed out that a jury might conclude that Geico failed to meet its burden to prove the underlying fraud because it viewed the protocol theory as inadequate or unfair, and that a plaintiff needs to demonstrate the lack of medical necessity on a patient-by-patient basis. Geico's counsel said he understood the risk and is prepared to deal with the reality that a strategy of using an overarching pre-determined protocol approach might cause a jury to reach a defense verdict because of a failure of proof.

Defendants, however, emphasize that Plaintiffs "made a calculated decision to file a 43-count complaint" which include some allegations (such as the allegation that certain services were not medically necessary) which they say "can only be proven on an individualized claim-by-claim basis." [ECF No. 113, pp. 4-5].

Noting that Plaintiffs' expert's opinions do not rely on a review of specific patient files or individual medical services, Defendants say that Geico is using "hide-the-ball discovery tactics." *Id.* at p. 5. They argue that "it strains credulity" to accept the theory that every exam and every medical treatment provided to accident victims by licensed medical professionals "for the better part of a decade" was medically unnecessary. *Id.* at pp. 5-6. And they contend that it seems impossible for Plaintiffs to prove that all medical services were medically unnecessary without examining each claim individually.

## II. Applicable Legal Standards and Analysis

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and specifies that discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Rule 33 allows a party to serve written interrogatories, which "must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). Finally, Rule 37(a) allows a party to request the entry of an order compelling discovery from another party. In particular, Rule 37(a)(3)(b)(iii)-(iv) allows a party to request an order compelling better answers where a party "fails to answer an interrogatory." An "evasive or incomplete" answer is considered as a complete failure to answer. Fed. R. Civ. P. 37(a)(4).

It is well established that "district courts are entitled to **broad discretion** in managing pretrial discovery matters." *Perez v. Miami-Dade Cty.*, 297 F.3d 1255, 1263 (11th Cir. 2002) (emphasis added); *see also Holladay v. Royal Caribbean Cruises, Ltd.*, 334 F.R.D. 628, 630 (S.D. Fla. 2020). Similarly, there is no doubt that magistrate judges are afforded broad discretion in resolving non-dispositive discovery disputes. *See Tracy P. v. Sarasota*

*Cty.*, No. 8:05CV927T27EAJ, 2007 WL 1364381, at *2 (M.D. Fla. May 9, 2007); *Johnston v. Aetna Life Ins. Co.*, 282 F. Supp. 3d 1303, 1312 (S.D. Fla. 2017).

A district judge may modify or set aside a magistrate judge's discovery rulings which are clearly erroneous or contrary to law, a standard which is "extremely deferential." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co., Inc.*, No. 12-CV-81397, 2015 WL 11921411, at *1 (S.D. Fla. July 6, 2015) (internal quotation omitted).

"A finding is clearly erroneous only if 'the reviewing court, after assessing the evidence in its entirety, is left with a definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997)). Or, as the Seventh Circuit has put it: "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).

"The mere fact that a reviewing court might have decided the issue differently is not sufficient to overturn a decision when there are two permissible views of the issue." *Pendlebury v. Starbucks Coffee Co.*, No. 04-80521, 2007 WL 4592267, at *2-3 (S.D. Fla. Dec. 28, 2007) (internal citation omitted). As a result of this bedrock principle, "the 'clear error' exception must be rarely invoked." *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015).

Framed by these basic rules, the mere fact that a reviewing court may decide the

issue "differently is not sufficient to overturn a decision when there are two permissible views of the issue." *Sun Capital Partners*, 2015 WL 11921411, at *1 (denying objections to magistrate judge's discovery order) (internal quotation omitted). *See generally Am. Family Mut. Ins. Co. v. Roth*, No. 05C3839, 2010 WL 3397362, at *2 (N.D. Ill. Aug. 25, 2010) (internal citations omitted) ("Indeed, on virtually identical facts, two decision makers can arrive at opposite conclusions, both of which constitute appropriate exercises of discretion.").

This case is not the first time that an insurance carrier has leveled fraud and/or RICO allegations against health care providers concerning PIP-related bills. In fact, there have been several of these cases filed over the past ten years, and they all seem to have some basic traits in common. One such characteristic is the strategic choice to proceed on the pre-determined protocol theory, rather than using a claim-by-claim approach.

Based on the treatment courts have given these types of lawsuits, the Undersigned is comfortable with the notion that a carrier may, if it wishes, draft a complaint using the protocol theory and then use that approach again at trial. *See State Farm Mut. Auto Ins. Co. v. Physicians Injury Care Ctr., Inc.*, No. 6:06-cv-1757, 2010 WL 11475709 (M.D. Fla. May 24, 2010) (rejecting argument that insurer failed to provide individualized proof to demonstrate that each healthcare service at issue was medically unnecessary because experts testified that the overall treatment protocol was invalid and that the examinations and diagnoses were not legitimate); *State Farm Mut. Auto. Ins. Co. v. Health & Wellness*

14

Case 1:19-cv-22206-CMA Document 114 Entered on FLSD Docket 01/15/2021 Page 15 of 19

*Servs.*, 389 F. Supp. 3d 1137, 1146 (S.D. Fla. 2019) (denying motion to dismiss similar PIP fraud complaint where plaintiff-insurer had alleged that the defendants "implemented a predetermined treatment plan" that "resulted in hundreds of patients receiving nearly identical, non-individualized, medically unnecessary treatment"); *Travelees Indem. Co. v. Valley Psychological, P.C.*, No. 11-cv-2834, 2012 WL 3614431, at *3 (E.D.N.Y. Aug. 21, 2012) (emphasis added) (explaining that insurer had not alleged 987 mini-frauds; it instead alleged "a single, ongoing conspiracy to defraud" based on the use of "medical processing and treatment **protocols** designed solely to defraud" the carrier and other no-fault insurers and noting that "at issue is **not one particular insurance claim** or another, but rather the whole of the Moving Defendants' **business model**").

Moreover, although he was acting as a district judge sitting by designation, United States Circuit Court Judge Adalberto Jordan recently denied a similar motion to dismiss in *State Farm Mutual Auto. Ins. Co. v. Advanced Chiropractic and Medical Center Corp.*, No. 18-21127, 2019 WL 2534908 (S.D. Fla. March 15, 2019) (rejecting argument that plaintiff had not provided claim-specific examples of treatment fraud and noting that the insurer's claims were that every treatment and therapy was potentially medically unnecessary).

Similarly, in *State Farm Mut. Automobile Ins. Co. v. Parisien*, the court granted the plaintiff-insurer's motion to enjoin the defendant healthcare providers' PIP collections proceedings, noting that:

> The gravamen of State Farm's allegations is that Defendants have systematically and concertedly administered treatments in a rote fashion,

> **independent of the clinical needs of the patient**, in such a combination as to maximize reimbursements while minimizing the possibility of detection through the use of various controlled entities. Yet these alleged violations may not be apparent if the claims and their supporting documentation are examined in isolation on a case-by-case basis. Facially legitimate treatments may be provided with little variance across multiple patients, but it is only by analyzing the claims **as a whole** that the irresistible inference arises that the treatments are not being provided on the basis of medical necessity.

352 F. Supp. 3d 215, 229 (E.D.N.Y. 2018) (emphasis added).

Geico has already survived a motion to dismiss and it will presumably be able to get to trial on the same theory of a broad-based fraud based on pre-determined medical protocols.

But that does not necessarily mean that Geico can automatically escape discovery which targets the specific claims and precise services. Geico and its experts have not analyzed the case on a patient-by-patient, claim-by-claim, service-by-service basis. It would require a massive effort for Geico to do that now. Moreover, because Geico may be able to prevail at trial on this theory, it has no need of its own to generate a comprehensive claim-by-claim analysis.

If Geico were to proceed at trial with only evidence of Defendants' overall business model, then the failure to provide specific discovery responses would be understandable. But Geico advised me at the hearing that its expert "might" try to bolster his opinion testimony with specific illustrations. In other words, Geico would be seeking to introduce some of the very evidence it refuses to provide in discovery.

If that were to occur, then the result would be inequitable and unduly prejudicial

to Defendants.

But this Court has the power to prevent this result by giving Geico a choice on how to proceed and by limiting trial evidence if necessary, depending on which alternative Geico selects.

A court may limit the scope of evidence or theories of liability a party may offer in support of its case based on its discovery responses or expert reports. *See Cretney-Tsosie v. Creekside Hospice II, LLC*, 2:13-CV-00167, 2016 WL 1257867, at *6 (D. Nev. Mar. 30, 2016). In that case, the United States was unable to identify all false claims or all false certifications and was relying on extrapolations made by its experts. The Court, noting that the United States had "elected to prove its claims by this method," ruled that the United States would be precluded from altering its liability or damages theory and method of proof at trial. *Id.*

Adopting that common sense approach here, the Court's solution is to give Geico a choice: if it sticks with its chosen strategy of using a non-specific protocol approach, then its experts will not be able to testify about any specific patient, claim or service -- even if it is for "illustration" purposes. On the other hand, if Geico wants to preserve its ability to have an expert give trial testimony which mentions in any way any specific claim, patient, or service, then it will need to fully and specifically answer the interrogatories at issue.

Of course, as Geico's counsel recognized at the hearing, proceeding on an overall

protocol approach involving a theory that all services were medically unnecessary while omitting any specifics is risky and may generate difficulty in establishing fraud to the jury's satisfaction. That litigation hazard may be more real than imagined, given Dr. Dillard's conclusions that are phrased with terminology which seem to reflect a less-than-all assessment of claims as being fraudulent (i.e., "substantial majority," "primarily," "significant number," "large number," "and "very small percentage").

On the other hand, if Geico does not change its approach but Defendants question Geico's experts about specific patients, files, and services at either a deposition or at trial, then Defendants will have "opened the door" and given Geico the opportunity to have its experts discuss specifics, whether for illustrative purposes or otherwise.[2] But asking a *general* question about what the expert did or did not do will not cause the door to be opened. For example, asking Geico's experts the following questions will <u>not</u> create a door-opening scenario: (1) your opinion is not based on a claim-by-claim conclusion, is it? (2) your report does not specify whether any patients needed a follow-up examination, does it? (3) some patients may well have been in need of an MRI, wouldn't you agree?

But asking the following types of questions *would* open the door: (1) patient John

---

[2]  As explained in *Bearint ex re. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1349 (11th Cir. 2004), our Circuit "recognizes the concept of 'curative admissibility' – which is also called 'opening the door' or 'fighting fire with fire.'" Under the doctrine, when a party offers inadmissible evidence before a jury, the court may in its discretion allow the opposing party to offer otherwise inadmissible evidence on the same matter to rebut any unfair prejudice created. *Id.*

Smith received a massage from therapist Mary Jones and likely benefitted from it because he had a spasm, right? (2) You have no specific proof that Patient Mary Smith never had the massage which you say Geico was fraudulently billed for, correct? (3) Our experts reviewed 51 patient files and you would have to agree that John Jones was one of the 51 and that all of the healthcare services he received were provided by licensed providers who appropriately filled out records, right?

Geico will need to provide defense counsel with its choice within five (5) days of entry of this Order. If Geico decides to preserve its ability to introduce specific evidence about particular claims or patients or services, then it must provide the comprehensive interrogatory answers within 30 days of giving notice of its strategic solution.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on January 15, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Cecilia M. Altonaga
All counsel of record